## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AWI Delaware, Inc.,[1] | ) | Case No. 14-12092 (___) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Associated Wholesalers, Inc., | ) | Case No. 14-12093 (___) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Nell's Inc., | ) | Case No. 14-12094 (___) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Co-Op Agency Inc., | ) | Case No. 14-12095 (___) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Associated Logistics, Inc., | ) | Case No. 14-12096 (___) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| White Rose Inc., | ) | Case No. 14-12097 (___) |
| | ) | |
| Debtor. | ) | |
| | ) | |

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: AWI Delaware, Inc. (3683); Associated Wholesalers, Inc. (7857); Nell's, Inc. (1195); Co-Op Agency Inc. (4081); Associated Logistics, Inc. (1506); White Rose Inc. (1833); Rose Trucking Corp. (2630); WR Service Corp. (5698); WR Service II Corp. (9444); WR Service V Corp. (4224); and White Rose Puerto Rico, LLC (4914). The Debtors' address is Associated Wholesalers, Inc. c/o Douglas A. Booth, Route 422, P.O. Box 67, Robesonia, PA 19551.

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Rose Trucking Corp., | ) | Case No. 14-12098 (___) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| WR Service Corp., | ) | Case No. 14-12099 (___) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| WR Service II Corp., | ) | Case No. 14-12100 (___) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| WR Service V Corp., | ) | Case No. 14-12101 (___) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| White Rose Puerto Rico, LLC, | ) | Case No. 14-12102 (___) |
| | ) | |
| Debtor. | ) | Joint Administration Requested |

## DECLARATION OF DOUGLAS A. BOOTH
## IN SUPPORT OF FIRST DAY MOTIONS FOR RELIEF

I, Douglas A. Booth, hereby state that the following is true to the best of my knowledge, information and belief.

1.    I am the Chief Restructuring Officer of Associated Wholesalers, Inc., AWI Delaware, Inc., Nell's, Inc., Co-Op Agency, Inc., Associated Logistics, Inc., White Rose, Inc., Rose Trucking Corp., WR Service Corp., WR Service II Corp., WR Service V Corp. and  White

2

Rose Puerto Rico LLC (collectively, the "Debtors").  I am also a partner at Carl Marks Advisory Group LLC ("Carl Marks").

2.      I am generally familiar with the Debtors' day-to-day operations, business affairs and books and records.  Except as otherwise indicated, all facts set forth in this Declaration are offered to the best of my knowledge, information and belief, and are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtors' management or professionals working with me or under my supervision, or my informed opinion based upon my experience and knowledge of the Debtors' industry, operations and financial condition.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.  I am authorized to submit this Declaration on behalf of the Debtors.

3.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief with the Court under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (the "Bankruptcy Code").  To enable the Debtors to operate effectively and preserve the value of estate assets, the Debtors have requested various types of relief in "first-day" applications and motions contemporaneously filed with this Court (the "First Day Pleadings").

4.      I submit this Declaration in support of the First Day Pleadings.  Any capitalized term not defined herein shall have the meaning ascribed to such term in the relevant First Day Pleading.  The First Day Pleadings seek, among other things, to: (a) ensure the continuation of the Debtors' cash management systems and other business operations without interruption; (b) restore customer and vendor confidence and sustain important customer programs; (c) maintain employee morale and confidence; and (d) establish certain other administrative procedures to promote a smooth transition into chapter 11.  Gaining and maintaining the support

of the Debtors' employees, customers, vendors and other key constituencies, as well as maintaining the day-to-day operations of the Debtors' businesses with minimal disruption, will be critical to the success of these chapter 11 cases.

5.      Part I of this Declaration describes the Debtors' businesses and the circumstances surrounding the filing of the chapter 11 petitions.  Part II sets forth the relevant facts in support of the First Day Pleadings.  Part III concludes that the relief requested in the First Day Pleadings is in the best interests of the Debtors, their creditors and estates and therefore should be granted.

**PART I:  BACKGROUND**

I.      **Associated Wholesalers, Inc.**

     A.      **General Background**

6.      Associated Wholesalers, Inc. ("AWI"), a Pennsylvania corporation, together with Nell's Inc., Co-op Agency, Inc., Associated Logistics, Inc. and AWI Delaware, Inc. (collectively with AWI, the "AWI Debtors"), is a leading cooperative food distributor that provides distribution and retail services to member retailers.  Founded in 1962 and headquartered in Robesonia, Pennsylvania, AWI currently services 800 supermarkets, specialty stores, convenience stores and superettes with grocery, meat, produce, dairy, frozen foods and general merchandise/health and beauty care ("GM/HBC") products.  AWI also provides a wide array of retail services to its customers.  AWI primarily serves the mid-Atlantic United States, with customers in Pennsylvania, New Jersey, Delaware, Maryland, Virginia, West Virginia and Ohio.  It owns two distribution facilities: one in Robesonia, Pennsylvania and one in York, Pennsylvania.

7.      AWI is owned by its 500 retail members, who in turn operate supermarkets, including major supermarket chains.  AWI further has five affiliated entities, all of which are debtors in these proceedings:

- **Nell's, Inc.** ("Nell's").  Nell's, a Pennsylvania corporation, was incorporated in 1983 and is a wholly owned subsidiary of AWI.  Nell's was formed for the purpose of owning and operating retail establishments.  It currently has 352 employees and owns four retail stores.

- **Co-op Agency, Inc.** ("Co-Op").  Co-Op, a Pennsylvania corporation, was incorporated in 1973 as a wholly owned subsidiary of AWI for the purpose of providing insurance coverage to member retailers.  As a full-service independent insurance agency, Co-Op has a commercial division that specializes in insurance for supermarket and convenience stores, a personal division that provides individual consumers with automobile, home, flood, boat and renter's insurance, and a life and health division that offers corporate and individual products such as life, health, disability, dental, estate planning, 401(k) plans and pension plans for corporations.

- **Associated Logistics, Inc.** ("ALI").  Logistics is a Pennsylvania corporation that was incorporated in 1999.  Logistics, which is a wholly owned subsidiary of AWI, is a freight, shipping and trucking company that provides services to AWI and certain outside customers.

- **AWI Delaware, Inc.** ("AWI Delaware").  AWI Delaware, a Delaware corporation, was incorporated in 2001 as a wholly owned subsidiary of AWI that sublicenses certain intellectual property from Western Family Foods, Inc. ("Western Family").  AWI Delaware in turn licenses such intellectual property to AWI, with the permission of Western Family.

- **White Rose, Inc.** ("White Rose").  White Rose is a Delaware corporation that was incorporated in 2006, although its origins trace back to 1886.  Further details concerning White Rose are set forth below.

## B.    Facilities and Products

8.    AWI has historically operated on a cooperative basis, providing services to its shareholders and members.  AWI's shareholders in turn benefit from the "economies of scale" achieved by purchasing products and services through AWI, and through patronage distributions.[2]  AWI provides its customers with a full assortment of more than 19,000 food and non-food products, including grocery, frozen, dairy, produce, meat, cigarettes and GM/HBC

---

[2]    Patronage distributions are annual distributions to shareholders based on each shareholder's volume of purchases.

products. In addition, as indicated above, AWI offers a broad spectrum of retail services to its customers, including advertising, convenience store, insurance, marketing, merchandising and store development services.

9. AWI's operations are carried out through its distribution warehouses in Robesonia and York, Pennsylvania. The facility in Robesonia, Pennsylvania (the "Robesonia Facility") is an 800,000 square foot facility that serves as the company's headquarters, as well as a distribution center for grocery, frozen, meat, produce and dairy products. The facility in York, Pennsylvania (the "York Facility") is a 200,000 square foot facility that is used for the distribution of GM/HBC products and cigarettes. AWI's products are distributed to customers from these facilities via an owned and leased transportation fleet of 99 tractors and 246 trailers.

10. The AWI Debtors have approximately 1,459 employees,[3] of which 529 are union employees.

11. AWI is further a party to three collective bargaining agreements with the Teamsters Local Union No. 429 ("Local 429") and the Teamsters Local Union No. 776 ("Local 776"): (a) an agreement with Local 429, covering 423 warehouse employees and drivers at the Robesonia Facility, which expires in January 2017; (b) an agreement with Local 429, covering 39 maintenance and sanitary employees at the Robesonia Facility, which expires in January 2015; and (c) an agreement with Local 776, covering 67 warehouse employees at the York Facility, which expires in May 2015.

12. AWI participates in one multi-employer pension plan (the "Pension Plan") and made $2.7 million in contributions to this plan in 2013.

---

[3] This figure does not include the employees of White Rose, which are described in greater detail below.

### C. Recent Operating Results and Events

13. As described below, since 2006, AWI has faced significant economic challenges. While annual revenue for the AWI Debtors, on a consolidated basis, was approximately $1.1 billion in each of the fiscal years ending on August 31, 2011, August 31, 2012 and August 31, 2013, respectively, net income for the last three fiscal years was as follows:[4]

| | |
|---|---|
| 2011: | $22.5 million |
| 2012: | $22.9 million |
| 2013: | $19.0 million |

## II. White Rose

### A. General Background

14. White Rose, a Delaware corporation, together with Rose Trucking Corp., WR Service Corp., WR Service II Corp., WR Service V Corp. and White Rose Puerto Rico, LLC (collectively with White Rose, the "White Rose Debtors"), is a leading independent food wholesaler and distributor serving the greater New York metropolitan area. The company traces its origins to 1886, when brothers Joseph and Sigel Seeman founded Seeman Brothers & Doremus ("Seeman Brothers") to provide grocery deliveries throughout New York City. With the introduction of commercially canned foods and the growth of the "brand name" movement, Seeman Brothers gave the "White Rose" name to their entire product line. Seeman Brothers converted from a partnership to a corporation in 1920 and became a public corporation in 1926. In 1965, Di Giorgio Corporation purchased Seeman Brothers' wholesale business, including the White Rose label, as well as another wholesale food distribution business. This combined wholesale operation, which was the largest wholesale grocery operation in the New York

---

[4] These figures reflect net income before patronage and income taxes.

1643903.6 09/09/2014

metropolitan area, became White Rose Food Corp. in 1974. In June 2006, AWI acquired Di Giorgio Corporation and changed its name to White Rose, Inc.

15.     The White Rose Debtors distribute a wide assortment of food and non-food items, as well as a highly-regarded private label offering, to their approximately 495 customers through three main channels: (i) independent grocery stores and members of cooperatives; (ii) regional and national supermarket chain stores; and (iii) diverters, including downstream distributors. The company also maintains a trade name "banner" program under which it offers banner members certain additional services, including weekly advertising circulars, shelf labels and other merchandising support materials.

16.     White Rose is a wholly owned subsidiary of AWI and has 11 affiliated entities, 5 of which are debtors in these proceedings:

- *Rose Trucking Corp.* ("Rose Trucking"). Rose Trucking, a New Jersey corporation, was incorporated in 1993 and is a wholly owned subsidiary of White Rose. Rose Trucking provides freight, shipping and trucking services to White Rose and certain other outside customers.

- *WR Service Corp.* ("WR Service"). WR Service is a New York corporation that was incorporated in 1985 for the purpose of holding an interest in an assignment of a customer lease.

- *WR Service II Corp.* ("WR Service II"). WR Service II is a New York corporation that was incorporated in 1992 for the purpose of holding an interest in an assignment of a customer lease.

- *WR Service V Corp.* ("WR Service V"). WR Service V is a New York corporation that was incorporated for the purpose of holding a license for certain trademarks.

- *White Rose Puerto Rico, LLC*. ("WR Puerto Rico"). WR Puerto Rico is a Delaware corporation that was incorporated in 2003 for the purpose of facilitating the shipment of products to White Rose customers in Puerto Rico.

**B.     Facilities and Products**

17.     White Rose provides its customers with a full assortment of more than 19,000 food and non-food items comprised of both brand name and private label products. These products can be broken into three categories: grocery, frozen and dairy products. The products are purchased from more than 850 manufacturers and distributors and White Rose sources its private label products from producers, manufacturers and packers that are licensed by White Rose.

18.     White Rose carries out its operations through three leased warehouse and distribution centers, two of which are located in Carteret, New Jersey. The first facility in Carteret, New Jersey is an 810,000 square foot facility that serves as the company's headquarters, as well as a distribution facility for groceries and non-perishable items. The second facility in Carteret, New Jersey is a 279,000 square foot facility that serves as a distribution facility for frozen products. White Rose's facility in Woodbridge, New Jersey is a 200,000 square foot facility that is used for the distribution of refrigerated products. Products are distributed to customers from these facilities using an owned and leased transportation fleet consisting of 111 tractors and 353 trailers.

19.     The White Rose Debtors have approximately 777 employees, of which 586 are union employees.

**C.     Recent Operating Results and Events**

20.     As described below, following AWI's acquisition of White Rose in 2006, White Rose experienced significant challenges. While annual revenue for the White Rose Debtors, on a consolidated basis, was approximately $1.1 billion in each of the fiscal years ending on August

31, 2011, August 31, 2012 and August 31, 2013, respectively, net income for the White Rose Debtors for the last three fiscal years was as follows:[5]

| | |
|---|---|
| 2011: | $1.8 million |
| 2012: | $2.4 million |
| 2013: | ($2.6 million) |

## III.    Credit Facility and Debt Structure

21.    Debtors AWI, Nell's, ALI and White Rose (the "Borrowers") are parties to a Second Amended and Restated Credit Agreement dated as of June 30, 2010 (as amended, the "Credit Facility") with a group of lenders that are, or may become, parties to the Credit Facility (collectively, the "Lenders"), Bank of America, N.A., as successor by merger to LaSalle Bank, N.A. ("BofA"), Banc of American Securities LLC as sole lead arranger and joint book runner, Wells Fargo Capital Finance, LLC as joint book runner and syndication agent, and RBS Business Capital, as documentation agent (collectively with the Lenders and BofA, the "Bank Group").  In addition to being a member of the Bank Group, BofA also serves as lender, issuer and agent for the Bank Group with respect to the Credit Facility.

22.    Debtors AWI Delaware, Co-Op and Rose Trucking (together, the "Guarantors") are guarantors under the Credit Facility.

23.    The Credit Facility consists of (a) a revolving credit facility of up to $225 million; and (b) term loans from each lender equaling a percentage of $15 million.  The Credit Facility also provides for the issuance of letters of credit on behalf of the Borrowers, not to exceed $25 million at any one time.

---

[5]    These figures reflect net income before patronage and income taxes.

24.     On June 30, 2010, AWI, Nell's, Logistics, White Rose, AWI Delaware, Co-Op and Rose Trucking Corp. (collectively, the "Credit Parties") entered into a Second Amended and Restated License and Security Agreement (the "Security Agreement") with BofA, as successor by merger to LaSalle Business Credit LLC, as agent.  Pursuant to the Security Agreement, the obligations owed to the Bank Group under the Credit Facility are secured by liens on substantially all of the Debtors' assets (the "Pre-Petition Collateral").

25.     On February 28, 2014, the Borrowers, the Guarantors, the Lenders and BofA entered into a Waiver and Fourth Amendment to the Credit Facility, which, among other things, waived certain existing defaults under the Credit Facility and provided for the sale of certain real estate.

26.     Since entering into the Waiver and Fourth Amendment, AWI has received a series of notices of default from BofA – on May 1, 2014, June 5, 2014 and June 18, 2014 – which defaults arose primarily due to the Debtors' failure to comply with certain financial covenants set forth in the Credit Facility.

27.     As of the Petition Date, the Debtors owe the Bank Group an aggregate principal amount of not less than $131,857.966 (inclusive of outstanding letters of credit), plus accrued interest.

28.     The Debtors estimate that they also have approximately $72 million of trade debt as of the Petition Date.

## IV.     Events Leading to Filing

29.     Following AWI's acquisition of the Di Giorgio Corporation (later renamed White Rose, Inc.) in June 2006, AWI and its affiliates, including White Rose, faced significant economic challenges.  Indeed, at the time that it acquired White Rose, AWI believed that the

companies could be integrated to take advantage of certain synergies that would enhance both businesses. Unfortunately, AWI was never able to capitalize on the perceived benefits of the combining the businesses. In addition, at the same time, White Rose's customer base continued to erode as a result of a number of factors, including compressed margins and fierce competition. AWI itself was not immune from these industry conditions, and saw a decline in business beginning in 2013.

30.     In December 2013, AWI retained Carl Marks Advisory Group LLC ("Carl Marks") to conduct a third-party business review of the company and to facilitate the development of strategic options for White Rose. Although this process led to the identification of several initiatives that could improve profitability and stability in the businesses, the Borrowers ultimately experienced additional defaults under the Credit Facility.

## V.     Sale and Restructuring Efforts

31.     On May 13, 2014, the Debtors hired Lazard Middle Market, LLC ("LMM") as their exclusive investment banker. Upon its retention, LMM prepared marketing materials and an extensive electronic data room. On June 6, 2014, LMM began actively marketing the White Rose Debtors, sending teasers and non-disclosure agreements to 18 strategic buyers and 37 financial buyers.

32.     As LMM proceeded to market the White Rose Debtors for sale, it found, based on discussions and feedback from potential buyers, that many potential strategic buyers were only interested in the purchase of the AWI Debtors' assets, or that such buyers would only consider a purchase of the White Rose Debtors' assets as part of a purchase of all of the Debtors' assets. At the same time, the AWI Debtors' businesses continued to decline and it became clear that AWI would not be able to absorb the debts likely to remain after the sale of the White Rose Debtors'

assets. Based upon these events, the Debtors ultimately concluded that the best way to maximize value for all of their constituents was to market all of their businesses and assets for sale.

33. Since expanding the scope of the sale process to incorporate all of AWI's assets, LMM has sent teasers to 40 strategic buyers and 42 financial buyers. Moreover, since initiating the marketing process, substantial interest has been expressed by strategic and financial buyers in acquiring the assets. Thirty-six parties have executed non-disclosure agreements to conduct due diligence in connection with a possible acquisition. LMM has also distributed a Confidential Information Memorandum to these parties and provided access to an extensive electronic data room. The data room contains significant information about all aspects of the business, and the Debtors and LMM have been responding to requests for additional information from interested parties. In addition, LMM and the Debtors' management conducted in-person meetings with potential bidders to show them the facilities and further explore their interest in purchasing all or a portion of the assets. The Debtors also formed a special committee of the Board of Directors to assist LMM and spearhead the Debtors' efforts in facilitating and accelerating the sale process.

34. Following this wholesome marketing process, the Debtors received letters of intent from three potential strategic buyers. Thereafter, following negotiations, the Debtors entered into an Asset Purchase Agreement with C&S Wholesale Grocers, Inc. ("C&S") on September 9, 2014 (the "Asset Purchase Agreement"), which, subject to Court approval, will serve as the stalking horse bidder in a competitive bidding process before this Court.

35. The Asset Purchase Agreement contemplates a competitive bidding process and thus provides an adequate floor for an auction of the Debtors' assets. LMM continues to work with various potential purchasers, a number of whom are still actively involved in the Sale process, in an effort to solicit competing bids for the Assets at auction.

13

## PART II: FIRST DAY PLEADINGS

36.     Essential to the success of these chapter 11 cases (the "Chapter 11 Cases") will be the entry of orders granting the relief requested in each of the First Day Pleadings. I believe that the approval of the Debtors' First Day Pleadings is critical and necessary to the success of the Chapter 11 Cases. The factual background and support for each of the Debtors' First Day Pleadings is provided below.[6]

**Motion of the Debtors for Entry of an Order Directing Joint Administration of Their Related Chapter 11 Cases Pursuant to Federal Rule of Bankruptcy Procedure 1015(b) and Local Rule 1015-1 (the "Joint Administration Motion")**

37.     In the Joint Administration Motion, the Debtors seek the joint administration of their Chapter 11 Cases for procedural purposes only. The Debtors are "affiliates," as defined in section 101(2) of the Bankruptcy Code. In addition, the Debtors' operations are closely integrated and there will be numerous motions, applications and other pleadings filed in the Chapter 11 Cases that will affect all of the Debtors. Accordingly, joint administration in the present case will allow for the efficient administration of the Debtors' Chapter 11 Cases.

38.     Joint administration of the Chapter 11 Cases will permit the Clerk of the Court to use a single general docket for each of the Debtors' cases and for the proposed claims agent to combine notices to creditors and other parties in interest of the Debtors' respective estates. Moreover, allowing joint administration will significantly reduce the volume of pleadings that otherwise would be filed with the Clerk of this Court, render the completion of various administrative tasks less costly and minimize the number of unnecessary delays. The relief

---

[6]     Capitalized terms not defined in this section shall have the same meaning ascribed in the respective First Day Pleading.

requested by the Joint Administration Motion will also simplify supervision of the administrative aspects of these cases by the Office of the United States Trustee.

39.     The proposed joint administration order also will save time and money and avoid duplicative and potentially confusing filings by permitting counsel for all parties in interest to: (a) use a single caption on the numerous documents that will be served and filed herein; and (b) file the papers in one case rather than in multiple cases.  Finally, joint administration will protect parties in interest by ensuring that parties in each of the Debtors' respective chapter 11 cases will be apprised of the various matters before the Court in these cases.

40.     I have read the Joint Administration Motion and believe that the relief requested in the Motion is in the best interests of the Debtors and the Debtors' estates.

**Motion of the Debtors for Entry of an Order Extending the Time within which the Debtors Must File Their (I) Schedules of Assets and Liabilities; (II) Schedules of Executory Contracts and Unexpired Leases; and (III) Statements of Financial Affairs (the "Schedule Extension Motion")**

41.     In the Schedule Extension Motion, the Debtors seek a fifteen (15)-day extension of the deadline by which they must file their schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules and Statements").  Pursuant to the Bankruptcy Code, the Debtors' deadline to file the Schedules and Statements is fifteen (15) days from the Petition Date.  In addition, Local Rule 1007(1)(b) provides that the deadline for filing Schedules and Statements is automatically extended for an additional 15 days if the debtor has more than 200 creditors and if the petition is accompanied by a creditor list.  Here, the Debtors filed a list of creditors on the Petition Date and have more than 200 creditors.  Accordingly, in the absence of an extension, Bankruptcy Rule 1007(c) and Local Rule 1007-1(b) require the Debtors to file their Schedules and Statements within thirty (30) days of the Petition Date.

42. Given the size and complexity of the Debtors' businesses, a significant amount of information must be accumulated, reviewed and analyzed in order to properly prepare the Schedules and Statements. In addition, there will be a number of critical issues facing the Debtors in the thirty days following the Petition Date. These issues and others will require substantive attention by the Debtors' personnel and their professionals. Thus, while the Debtors have initiated the major task of assembling the data necessary for the Schedules and Statements, they will not be able to complete this undertaking within thirty days from the Petition Date.

43. In light of the circumstances outlined above, the Court should extend by an additional fifteen (15) days, for a total of forty-five (45) days, until October ___, 2014, the date by which the Debtors must file their Schedules and Statements.

**Motion of the Debtors for an Order Authorizing the Debtors to (I) File a Consolidated List of Creditors, (II) File a Consolidated List of Debtors' Thirty Creditors Holding Largest Unsecured Claims; and (III) Mail Initial Notices (the "Creditor List Motion")**

44. In the Creditor List Motion, the Debtors seek permission to file consolidated lists of creditors and the Debtors' thirty (30) largest creditors. The Debtors also seek permission to complete all mailings of notices, including notices of the commencement of these cases and the meeting of creditors.

45. The Debtors have identified over 14,000 entities to which notice of certain proceedings in the Chapter 11 Cases must be provided. The Debtors presently maintain various computerized lists of the names and addresses of their respective creditors that are entitled to receive notices and other documents in these cases. The information, as maintained in the Debtors' computer files (or those of the Debtors' agents), may be consolidated and utilized in an efficient manner to provide notices and other pleadings to parties in interest as required by Local

Rule 1007-2. As such, the Debtors request authorization of the Court to file the lists in a consolidated form, identifying their creditors and equity security holders in substantially the same formats that are currently maintained by the Debtors in the ordinary course of business.

46.    Pursuant to Bankruptcy Rule 1007(d), a debtor in a voluntary chapter 11 case must file with the petition "a list containing the name, address and claim of the creditors that hold the 20 largest unsecured claims, excluding insiders, as prescribed by the Official Form." Fed. R. Bankr. P. 1007(d). The Debtors submit that a single consolidated list of their combined thirty (30) largest unsecured creditors in these cases would be more reflective of the body of unsecured creditors that have the greatest stake in these cases than separate lists for each of the Debtors. Accordingly, the Debtors respectfully request authorization to file a single consolidated list of their thirty (30) largest unsecured creditors in these cases (the "Consolidated Top 30 List").

47.    The Debtors also respectfully request that the Court authorize the Debtors or their proposed claims agent, Epiq Bankruptcy Solutions, LLC, to complete all mailings to creditors and equity holders in the Debtors' Chapter 11 Cases in lieu of effecting service through the Office of the Clerk of the United States Bankruptcy Court for the District of Delaware (the "Clerk's Office").

48.    For the foregoing reasons, the relief requested in the Creditor List Motion should be granted.

**Motion of the Debtors for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Official Committee Members (the "Interim Compensation Motion")**

49.    The Debtors will file an application to retain Saul Ewing LLP as their bankruptcy counsel. The Debtors anticipate that they may retain other professionals in these Chapter 11 Cases as the need arises. In addition, if an official committee is appointed in these Chapter 11

17

Cases, such committee may also seek to retain various professionals. The Debtors' professionals will carry out unique functions and will coordinate with one another to avoid unnecessary duplication of services while obtaining maximum advantage from each firm's expertise and knowledge of the Debtors.

50. Briefly stated, the requested procedures would require the presentation to the Debtors, and certain parties in interest, of a detailed statement of services rendered and expenses incurred by each professional for the prior month. If there is no timely objection, the professional would be permitted to be paid 80% of the amount of fees incurred for the month, with a 20% hold-back, and 100% of expenses for the month. These payments would be subject to the Court's subsequent approval as part of the normal interim fee application process. I believe that these procedures will enable all parties to monitor closely the costs of administration of these Chapter 11 Cases and not unduly burden the Debtors.

51. Accordingly, I believe that the relief requested in the Interim Compensation Motion is in the best interests of the Debtors' estates, their creditors and other parties in interest.

**Application of the Debtors for Entry of an Order Authorizing and Approving the Employment and Retention of Epiq Bankruptcy Solutions, LLC as Notice, Claims and Balloting Agent to the Debtors (the "Claims Agent Application")**

52. The sheer size of the Debtors' creditor body may make it impracticable for the Clerk's Office to (a) serve notice on the large number of creditors and interested parties and (b) administer claims during these Chapter 11 Cases.

53. I respectfully submit that the most effective and efficient manner of noticing these creditors and interested parties of the filing of these Chapter 11 Cases, and to transmit, receive, docket, maintain, photocopy and scan claims, is for the Debtors to engage an independent third party to act as the Debtors' notice and claims agent. The Debtors may also require the services of an agent to administer votes pursuant to a plan of liquidation. Accordingly, the Debtors

propose to employ Epiq Bankruptcy Solutions, LLC ("Epiq") as claims, noticing and balloting agent, to assist the Debtors in distributing notices, as necessary, and to process other administrative information in these Chapter 11 Cases.

54.     Epiq is a firm that specializes in noticing, claims processing, balloting and other administrative tasks in chapter 11 cases.  The Debtors chose Epiq based on both its experience and the competitiveness of its fees.  The Debtors wish to engage Epiq to send out certain designated notices and to collect and monitor claims and perform certain ballot-related functions with respect to these Chapter 11 Cases.

55.     I believe that the services provided by Epiq do not and will not duplicate the services that are being provided to the Debtors in these Chapter 11 Cases by any other professional.  Epiq has further ensured the Debtors that it will coordinate with the Debtors' other professionals retained in these Chapter 11 Cases to ensure there is no duplication of services.

56.     Accordingly, I believe that Epiq is well qualified and uniquely able to provide services to the Debtors as notice, claims and balloting agent in these Chapter 11 Cases in an efficient and timely manner.

**Motion for the Debtors for Entry of an Order (A) Authorizing the Debtors to Pay Prepetition (I) Sales, Use, Fuel, Property and Other Similar Taxes and (II) Tolls, Fees, Licenses and Other Similar Charges and Assessments and (B) Authorizing Applicable Banks and Other Financial Institutions to Receive, Process, Honor and Pay Checks Presented for Payment Related Thereto (the "Tax Motion")**

57.     In the Tax Motion, the Debtors seek authority it pay, in their sole discretion, certain Taxes and Fees (as defined below) in the ordinary course of business.

58.     In connection with the normal operation of their businesses, the Debtors, as described more fully below, (a) incur sales, use, fuel, property and other taxes necessary to operate their businesses (collectively, the "Taxes"), and (b) are charged for tolls, fees, licenses and other similar charges and assessments (collectively, the "Fees") by various taxing, tolling

19

and licensing authorities (collectively, the "Taxing Authorities"). The Taxes and Fees are paid to the various Taxing Authorities on a periodic basis and, depending on the nature and incurrence of a particular Tax or Fee, are remitted monthly, quarterly or yearly. The Taxes and Fees incurred by the Debtors generally fall into one of the following categories:[7]

### Sales Taxes

59.     In the normal course of business, the Debtors are required to collect sales taxes (the "Sales Taxes") from non-exempt purchasers of certain products on a per sale basis and periodically remit such taxes to the applicable taxing authorities. Typically, Sales Taxes accrue as products are sold and are calculated based on a statutory percentage of the sale price.

60.     The process by which the Debtors remit the Sales Taxes varies, depending upon the Taxing Authority that is to be paid. Moreover, with respect to those jurisdictions that require the Debtors to remit estimated Sales Taxes, the applicable Taxing Authority subsequently reconciles payments on a monthly basis to determine any payment deficiency or surplus for the relevant period, after which the applicable refund or payment is made.

61.     As of the Petition Date, the Debtors estimate that approximately $76,000 in Sales Taxes relating to the prepetition period will be due and owing to the Taxing Authorities in the ordinary course of business.

---

[7]     In connection with certain Taxes and Fees, the Debtors are required to issue surety bonds for the benefit of the relevant Taxing Authorities in order to secure the Debtors' obligations to pay such Taxes or Fees (collectively, the "Bond Obligations"). Specifically, Nell's Inc. as principal, and Western Surety as surety, have issued a surety bond in favor of a federal Medicare program in connection with Nell's Inc.'s sale of certain medical equipment. In addition, Rose Trucking, as principal, and Travelers Indemnity Company, as surety, have issued surety bonds for the benefit of (i) the Federal Motor Carrier Safety Administration, which bond is required in order for Rose Trucking to conduct business as a freight broker, (ii) the New Jersey Division of Taxation, for motor fuel taxes, (iii) the New Jersey Turnpike Authority, for toll obligations and (iv) the Pennsylvania Turnpike Authority, for toll obligations. Lastly, various states require the Debtors to issue surety bonds to secure the payment of taxes relating to the sale of cigarettes and other tobacco products in the states.

**Use Taxes**

62.     In addition to the Sales Taxes, the Debtors are sometimes required to pay use taxes (collectively, the "Use Taxes") in certain limited circumstances. For example, the Debtors may be required to pay Use Taxes when a vendor does not collect and remit sales tax on account of an item that is otherwise taxable. The Debtors typically pay approximately $34,000 per year in Use Taxes. The Debtors estimate that approximately $3,000 in Use Taxes relating to the prepetition period will be due and owing to the Taxing Authorities as of the Petition Date and seek authority to pay any prepetition Use Taxes in the ordinary course of business.[8]

**Real and Personal Property Taxes**

63.     The Debtors' personal property and real property in Pennsylvania is subject to state and local property taxes (the "Personal Property Taxes" and the "Real Property Taxes" respectively, and collectively, the "Property Taxes"). The Real Property Taxes - which are approximately $50,000 per month - are generally paid on a monthly basis. The Debtors estimate that as of the Petition Date, approximately $150,000 in Real Property Taxes has accrued but has not been paid. If unpaid, the Real Property Taxes could result in a lien on the Real Property.

64.     The Debtors' Personal Property Taxes are approximately $300 per year, which the Debtors similarly pay on a monthly basis. The Debtors estimate that, as of the Petition Date, approximately $130 in Personal Property Taxes has accrued but has not been paid. Similar to Real Property Taxes, certain jurisdictions place a lien for unpaid Personal Property Taxes on the property so taxed.

---

[8]     The Use Taxes may constitute "trust fund" taxes. In other words, the Debtors are holding these funds in trust for the benefit of the Taxing Authorities, in which instance such funds may not constitute property of the Debtors' estates. 11 U.S.C. § 541(d). Hence, payment of the Use Taxes will not prejudice the rights of unsecured creditors since such amounts would not be available for distribution.

65. To the extent that liens are placed on properties that exceed the value of the unpaid Property Taxes, the Debtors' Property Tax obligations could be increased by the accumulation of interest and the Debtors' operations could generally be disrupted by collection efforts instituted by the applicable Taxing Authorities, including the imposition of tax liens on the Debtors' assets.

**Excise Taxes**

66. Next, the Debtors pay excise taxes ("Excise Taxes") in many of the states in which they conduct business for their sale of eggs, cigarettes and tobacco products, which taxes are paid on a monthly basis. In addition, in the City of Baltimore, Maryland, the Debtors incur monthly "beverage container" excise taxes for the supply of non-reusable containers in the city. The Debtors generally pay Excise Taxes on a monthly or quarterly basis.

67. With respect to Excise Taxes on cigarettes and other tobacco products, AWI pays such taxes by purchasing tax stamps that are affixed to each pack of cigarettes or other tobacco product prior to shipment. AWI is a duly authorized tax stamping agent and has a wholesaler license to distribute such products in each of the various taxing jurisdictions in which the Debtors conduct business. Tax stamps are sold by the roll from the various taxing authorities, and in the case of cigarette tax stamps, typically come in rolls of thirty thousand. Tax stamps are maintained in AWI's inventory in quantities commensurate with the tobacco goods that AWI ships. AWI replenishes its inventory of tax stamps on a rolling basis at the minimum level necessary for operations. In most cases, AWI receives a commission for its purchase of tax stamps, which functions as a discount on the purchase price of the stamps. In addition, AWI may return unused and/or damaged stamps to a particular state and receive a refund of the

22

relevant portion of the purchase price. Because AWI purchases its cigarette tax stamps in advance, the Debtors are generally current with respect to such obligations; however, the Debtors seek authority to continue to purchase cigarette tax stamps and honor any obligations related thereto in the ordinary course of business.

68. As of the Petition Date, the Debtors estimate that approximately $50,000 in Excise Taxes relating to the prepetition period will be due and owing to the Taxing Authorities.

**Highway Use and Fuel Taxes**

69. The Debtors' operations depend on the transport of goods and materials between their facilities and to customers. To this end, the Debtors rely on tractor-trailer units and other company vehicles (collectively, the "Rigs") to transport goods and materials on interstate highways. This transport in turn causes the Debtors to incur fuel taxes (collectively, the "Fuel Taxes"). Additionally, in certain states in which the Debtors operate the Rigs, the Debtors are responsible for the payment of highway use taxes on a monthly basis (the "Highway Use Taxes, and together with the Fuel Taxes, the "Highway Use and Fuel Taxes"). The amount of the Highway Use and Fuel Taxes that the Debtors pay to a respective state Taxing Authority varies based on the mileage and weight of the Rigs operated in the state. In the aggregate the Debtors estimate that they may owe approximately $600 in Highway Use and Fuel Taxes as of the Petition Date. Notably, because the Debtors carry an International Fuel Tax Agreement ("IFTA") license, the Debtors need not file fuel tax reports in each state in which their vehicles operate.

70. Given that (i) the Debtors will be continuing to conduct business following the Petition Date and are responsible for the Highway Use and Fuel Taxes and (ii) the amount of the Highway Use and Fuel Taxes is de-minimis, the Debtors believe that it is appropriate to pay the

1643903.6 09/09/2014

Highway Use and Fuel Taxes in the ordinary course of business. Paying these amounts is critical to the Debtors' continued operations given that the ability to operate on highways and fulfill customer requests could be curtailed if the Highway Use and Fuel Taxes are not paid.

**Tolls**

71.     In the ordinary course of business, certain of the Debtors have drivers who routinely drive Rigs (whether owned by the Debtors or third parties) on highways that require the payment of tolls (collectively, the "Tolls"). Depending upon the Rig and the delivery route, a driver may simply pay a Toll in cash and receive a reimbursement from the Debtors for the expense. In the alternative, with respect to certain routes, drivers may be able to use an approved electronic transponder (an "E-Transponder"), such as EZ Pass, whereby Tolls are assessed and recorded by the E-Transponders as the Rig passes through the toll booth. Where E-Transponders are used by drivers for Tolls, no reimbursement requests are needed since the Debtors pay the relevant Taxing Authority directly for any outstanding invoices.

72.     If the Debtors were unable to reimburse drivers, or otherwise pay, for Tolls, the Debtors would likely experience difficulties in efficiently delivering purchased materials to destinations that involve a toll road. Indeed, drivers would likely be compelled to find alternative routes, if any, through which to conduct their vehicle hauling operations, thereby increasing labor, fuel and wear and tear costs.

**Registration Fees**

73.     The Debtors are required to register and pay annual licensing and registration fees (the "Registration Fees") for their corporate vehicles, including the Rigs. The amounts paid for Registration Fees vary according to (i) the miles that a Rig travels in each state, (ii) the weight of each Rig traveling in a state and (iii) the number of Rigs traveling in each state. Moreover,

included in the Registration Fees are the Debtors' IFTA licensing fees (the "IFTA License Fees"), which are approximately $25,000 per month.

74.     The nonpayment of certain of the Registration Fees could result in a significant disruption of the Debtors' operations.  For example, the Debtors' failure to pay the Registration Fees may lead a base state to revoke the registration credentials for the Debtors' Rigs in such state *as well in all other states* in which the Debtors operate.  Since all state laws require an operator of a vehicle to properly obtain registration credentials prior to the operation of such vehicle, the lack of registration credentials would render the Debtors unable to legally operate the Rigs in effectively all states in which the Debtors operate and potentially result in a total cessation of business.  In addition, failure to pay the IFTA License Fees may result in a revocation of the license, which would in turn require the Debtor to expend company time and resources filing fuel tax reports for each state through which the Rigs transport goods.  Such a result would not only be impracticable but would also waste company resources that could be better applied elsewhere.

75.     The Debtors do not believe that they owe any prepetition amounts relating to Registration Fees.  Nevertheless, out of an abundance of caution, the Debtors seek authority to pay, in their discretion, any prepetition amounts relating to Registration Fees in the ordinary course of business to the extent that the Debtors subsequently discover any such prepetition amounts are due and owing.

### Business License Fees and Annual Reporting Fees

76.     Many municipal and state governments in which the Debtors operate their businesses require the Debtors to obtain a business license and pay corresponding business license fees (the "Business License Fees").  Likewise, to remain in good standing, many of the

1643903.6 09/09/2014

states in which the Debtors conduct business require the Debtors to file annual reports and pay corresponding annual reporting fees (the "Annual Reporting Fees"). The criteria governing the issuance of business licenses, annual reporting and the amounts of Business License and Annual Reporting Fees vary greatly according to local laws. Typically, Annual Reporting Fees are based upon a flat rate established by the relevant Taxing Authority. In contrast, Business License Fees may be flat rate fees or may fluctuate based on either the number of employees working in a jurisdiction or the type of business conducted in a state.

77.     The Debtors estimate that they pay approximately $25,000 in Business License Fees annually. The Debtors further estimate that they pay approximately $1,500 in Annual Reporting Fees annually. While the Debtors are generally current on their obligations, some Business License and Annual Reporting Fee amounts could be accrued and owing as of the Petition Date. Because the Debtors' failure to pay such fees could have adverse consequences for the Debtors' ability to conduct business in the respective state or municipality, the Debtors require authority to pay Business License Fees and Annual Reporting Fees in the ordinary course of business.

### Business Privilege Taxes, Franchise Taxes and Other Miscellaneous Taxes and Fees

78.     Lastly, the Debtors pay a variety of other business taxes and fees depending upon the relevant jurisdiction, including franchise taxes, business privilege taxes, mercantile taxes, litter control fees and heavy vehicle taxes. The Debtors estimate that as of the Petition Date, approximately $50,000 of miscellaneous taxes and fees have accrued and remain owing to various Taxing Authorities.

79.     With the exception of the outstanding accrued pre-petition amounts described above, the Debtors believe that they are substantially current with respect to the Taxes and Fees.

The Debtors therefore seek the relief requested in the Tax Motion only to the extent that (i) any Taxes and Fees accrued prepetition were not in fact paid prepetition or were paid in an amount that was less than the amount actually owed, or (ii) any payments sought to be made prepetition are lost or otherwise not received in full by any of the Taxing Authorities. Further, there may be Taxes and Fees incurred prepetition that may become due shortly after the commencement of the Chapter 11 Cases.

80.     I believe that the failure to pay the Taxes and Fees could trigger a material adverse impact on the Debtors' operations, including the potential suspension of the Debtors' ability to operate in certain jurisdictions. Moreover, if any of the Taxing Authorities attempt to exercise certain remedies against the Debtors, it would have the devastating effect of distracting the attention of the Debtors' management and professionals away from the important task of the Debtors' successful Chapter 11 Cases.

81.     Accordingly, I believe that the relief requested in the Tax Motion is in the best interests of the Debtors' estates, their creditors and other parties in interest and should be granted.

**Motion of the Debtors for Entry of an Order (A) Authorizing the Debtors to (I) Continue Using Existing Cash Management System and (II) Maintain Existing Bank Accounts and Business Forms; and (B) Granting Postpetition Intercompany Claims Administrative Expense Priority (the "Cash Management Motion")**

82.     In the Cash Management Motion, the Debtors seek authorization to continue to use their existing cash management system (the "Cash Management System"), maintain their existing bank accounts and business forms and provide administrative expense status to intercompany claims.

83.     The Debtors' Cash Management System, is described below and set forth in the schedule and charts attached to the Cash Management Motion as **Exhibits "A," "B," and "C."**

The Cash Management System enables the Debtors to centrally control and monitor corporate funds, ensure cash availability and liquidity, comply with the requirements of the Debtors' financing agreements, reduce administrative expenses by facilitating the movement of funds and enhance the development of accurate account balance and presentment information.

84.     As detailed on the flowchart attached as **Exhibit "B"** to the Cash Management Motion, prior to the Petition Date, the cash receipts and disbursements flow for Debtors AWI, ALI, Co-Op, AWI Delaware and Nell's (together, the "AWI Entities") was as follows:

    a.    ***Collection Accounts***. The AWI Entities maintain a total of nine collection accounts at Fulton Bank (the "Collection Accounts") for the purpose of collecting receivables from customers. Specifically, AWI, ALI and Co-Op each maintain one Collection Account, while Nell's maintains six Collection Accounts, one of which is a "general" Collection Account, and the balance of which are used for receivables collected from each Nell's location. In addition, Nell's maintains four separate Collection Accounts for the purpose of collecting the proceeds of lottery sales made at each of its locations. Such payments may be in the form of cash, checks, wire transfers or automatic clearing house ("ACH") receipts. Amounts in the Collection Accounts are transferred on a daily basis to a cash concentration account held by Fulton Bank. In addition, on a daily basis, funds are transferred from this cash concentration account to a depository account at BofA, where such funds are used to pay down the Debtors' obligations under the Credit Facility.

    b.    ***Funding Account***. On a daily basis, in accordance with the terms of the Credit Facility, the Debtors request an advance from BofA to fund the Debtors' operations. This advance is transferred from a BofA funding account (the "AWI Funding Account") to a concentration disbursements account at Fulton Bank (the "Concentration Disbursements Account"). This account funds four disbursement accounts at Fulton Bank (collectively, the "AWI Disbursement Accounts") to cover any payables made from those accounts. In addition, the Debtors maintain three (3) payroll accounts at Fulton Bank (the "AWI Payroll Disbursement Accounts"). The AWI Payroll Disbursement Accounts are funded directly from the AWI Funding Account. Transfers to the disbursement accounts (other than the AWI Payroll Disbursement Accounts) are typically made on a daily basis and are based on the Debtors' operating requirements. In addition, on a daily basis, the Debtors request advances from the AWI Funding Account to a "control disbursements" account at BofA. This account is used for the Debtors' "one check process," under which the

28

Debtors pay all of their vendors for merchandise in one check that is issued from the account.[9]

    c.      ***Disbursement Accounts***. As indicated above, the AWI Entities maintain seven AWI Disbursement Accounts at Fulton Bank, each of which is automatically funded by the Concentration Disbursements Account: (i) an AWI accounts payable account for general operating expenses, (ii) an AWI payroll account, (iii) an ALI account for general operating expenses; (iv) a Co-Op account for general operating expenses, (v) a Co-Op payroll account, (vi) a Nell's general operating account and (vii) a Nell's payroll account.

    d.      ***Co-Op Premium Trust Escrow Account***. Co-Op maintains an independent premium trust escrow account at Fulton Bank, which holds premiums received for various insurance policies placed by Co-Op that are required to be held separately from Co-Op's other funds.

    e.      ***AWI Delaware Account***. AWI Delaware maintains a separate operating account at Wilmington Trust that is used to pay ordinary expenses associated with the business, such as office supplies, rent and utilities.

85.      Also, as detailed on the flowchart attached as **Exhibit "C"** to the Cash Management Motion, prior to the Petition Date, the cash receipts and disbursements flow for White Rose and Rose Trucking (together, the "<u>White Rose Entities</u>") was as follows:

    a.      ***Depository Account***. The White Rose Entities maintain a depository account at BofA for the purpose of receiving payments from customers. Such payments may be in the form of cash, checks, wire transfers or ACH receipts. Amounts in the account are transferred on a daily basis to a concentration account held by BofA (the "<u>WR Concentration Account</u>"), where such funds are used to pay down the Debtors' obligations under the Credit Facility.

    b.      ***Funding Account***. On a daily basis, in accordance with the terms of the Credit Facility, the Debtors request an advance from BofA based on what is needed to fund payroll and other operating requirements of the White Rose Entities. This advance is transferred from a funding account at BofA (the "<u>WR Funding Account</u>") to one of five disbursement accounts, which are described below.

---

[9]      To "reimburse" AWI for paying its vendors up front through the "one-check process," the White Rose Entities periodically transfer to AWI the amounts paid to vendors by AWI on their behalf.

c.    ***Disbursement Accounts***.    The White Rose Entities maintain five disbursement accounts at BofA, each of which is automatically funded by the WR Funding Account: (i) a White Rose operating account, (ii) a White Rose "funding restricted" account, (iii) a White Rose payroll account, (iv) a Rose Trucking payroll account and (v) a Rose Trucking general operating account (collectively, the "WR Disbursement Accounts").  All of the WR Disbursement Accounts are "zero balance" accounts with the exception of the "funding restricted" account.  The Debtors maintain a minimal amount of funds in "funding restricted" account, which are used for New York state sales taxes, garnishment obligations and amounts owed to Liberty Mutual Insurance Corp. for certain workers' compensation obligations.

d.    ***Banco Popular Account***.    White Rose maintains a separate operating account at Banco Popular that contains deposits from customers of White Rose Puerto Rico LLC.  These deposits are in turn transferred periodically to the WR Concentration Account.

e.    ***Coupon Deposits Account***.    White Rose maintains an independent account at WestStar Bank for the purpose of receiving deposits from vendors for coupons.  These deposits are in turn transferred periodically to the WR Concentration Account.

86.    As part of their Cash Management System, the Debtors maintain their prepetition Bank Accounts and utilize numerous preprinted business forms (the "Business Forms") in the ordinary course of their businesses.  For example, all of the Debtors' Bank Accounts have preprinted check stock.  The Debtors also maintain books and records to document, among other things, their revenues and expenses (collectively, the "Books and Records").  To minimize expenses to their estates and avoid confusion on the part of employees, customers and vendors, the Debtors request that the Court authorize them to continue to use all correspondence and business forms (including, without limitation, letterhead, purchase orders, invoices and preprinted checks) as such forms were in existence immediately before the Petition Date – without reference to the Debtors' status as debtors in possession – rather than requiring the Debtors to incur the expense and delay of ordering entirely new business forms.  The Debtors

shall replace existing stock with new forms identifying their status as debtors in possession as existing check stock is depleted.

87. Because of the nature and scope of the Debtors' business operations and the large number of suppliers of goods and services with whom the Debtors deal on a regular basis, I believe that it is important that the Debtors be permitted to continue to use their Business Forms without alteration or change, until their existing forms are depleted.

88. Next, from time to time, in the ordinary course of business, the Debtors engage in certain intercompany transactions (the "Intercompany Transactions")[10]. For example, as explained above, the White Rose Entities periodically transfer to AWI the amounts paid to vendors by AWI on the White Rose Entities' behalf in order to "reimburse" AWI for paying the vendors up front through the "one-check process." Prior to the Petition Date, the Debtors maintained accurate records of all Intercompany Transactions. The Debtors will continue to maintain records related to the Intercompany Transactions so that transactions can be ascertained, traced and accounted for on applicable intercompany accounts. The Debtors respectfully submit that these transfers are necessary to preserve and enhance the value of their estates, including the value of their non-debtor affiliates, and therefore represent an appropriate exercise of their business judgment.

89. To ensure each individual Debtor will not fund, at the expense of its creditors, the operations of another entity, the Debtors, by the Cash Management Motion, respectfully request

---

[10] Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among enterprises like that of the Debtors, the Debtors believe the Intercompany Transactions are ordinary course transactions within the meaning of Bankruptcy Code section 363(c)(1) and do not require the Court's approval. Nevertheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions on a postpetition basis. Moreover, the continued performance of the ordinary course Intercompany Transactions is integral to ensure the Debtors' ability to operate their businesses as debtors in possession.

that, pursuant to the Bankruptcy Code sections 503(b)(1) and 364(b), all claims against a Debtor by another Debtor or the Debtors' affiliates arising after the Petition Date as a result of Intercompany Transactions through the Cash Management System (collectively, "Intercompany Claims") be accorded administrative priority expense status. If Intercompany Claims are accorded administrative priority expense status, each entity utilizing funds flowing through the Cash Management System should continue to bear the ultimate repayment responsibility for such ordinary course transactions.

90. Based on the foregoing, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors and other parties in interest.

**Motion of the Debtors for or the Entry of an Order (a) Authorizing the Debtors to Pay Certain Prepetition (i) Wages, Salaries, Bonuses and other Compensation, (ii) Reimbursable Employee Expenses, and (iii) Employee Medical and Similar Benefits, (b) Confirming the Debtors May Continue Certain Prepetition Employee Programs in the Ordinary Course of Business, and (c) Directing Banks and Other Financial Institutions to Honor All Related Checks and Electronic Payment Requests (the "Wage Motion")**

91. Collectively, the Debtors currently employ approximately 2,236 employees (the "Employees"). Of these, 1,459 are employed by the AWI Entities (the "AWI Employees"), 1,019 of which are employed by AWI, 9 of which are employed by Co-Op and 431 of which are employed by Nell's. Approximately 1,108 AWI Employees (76%) are paid on an hourly basis and approximately 351 AWI Employees (24%) are salaried. Moreover, approximately 529 AWI Employees are unionized. AWI is a party to three collective bargaining agreements ("CBAs") that govern, *inter alia*, rates of pay, hours of work and conditions of employment for its union employees: (a) an agreement with Teamsters Local Union No. 429 ("Local 429"), covering 423 warehouse employees and drivers at the Debtors' facility in Robesonia, PA, which expires in

1643903.6 09/09/2014

January 2017; (b) an agreement with Local 429 covering 39 maintenance and sanitary employees at the Robesonia facility, which expires in January 2015; and (c) an agreement with Teamsters Local Union No. 776 ("Local 776"), covering 67 warehouse employees at the Debtors' facility in York, PA, which expires in May 2015.

92.    White Rose and Rose Trucking (together, the "White Rose Entities") together employ approximately 777 employees (the "White Rose Employees, and together with the AWI Employees, the "Employees"), 122 of which are employed by Rose Trucking and 655 of which are employed by White Rose. Approximately 654 White Rose Employees are paid on an hourly basis, while approximately 123 White Rose Employees are salaried. Moreover, 588 White Rose Employees are unionized. The White Rose Entities are parties to five CBA's: (a) an agreement with Teamsters Local Union No. 97 ("Local 97"), covering 284 grocery warehouse employees, which expires in September 2017; (b) an agreement with Teamsters Local Union No. 641 ("Local 641"), covering 53 grocery trucking employees, which expires in April 2017; (c) an agreement with Teamsters Local Union No. 863 ("Local 863"), covering 131 dairy warehouse employees, which expires in November 2017; (d) an agreement with Local 863, covering 39 dairy trucking employees, which expires in November 2017; and (e) an agreement with Teamsters Local Union No. 805 ("Local 805"), covering 59 frozen warehouse employees and 22 frozen trucking employees, which expires in January 2016.

93.    The Employees perform a variety of critical functions, such as shipping, storage and logistics services, sales and marketing, distribution and maintenance services, procurement, call center/retail support services, computer and technology services and retail grocery and merchandising services. Furthermore, the Employees perform various clerical and administrative functions for the Debtors. The Employees' skills and their knowledge and

understanding of the Debtors' operations and infrastructure are essential to the effective going concern value of the Debtors' businesses.

94.     Just as the Debtors depend on their Employees to operate, the Employees depend on the Debtors. The vast majority of the Debtors' Employees rely on their compensation and benefits to continue to pay their daily living expenses, and these Employees will be exposed to significant financial difficulties if the Debtors are not permitted to pay them their full unpaid compensation, benefits and reimbursable expenses in the ordinary course of business.

95.     To maintain the going concern value of the Debtors' businesses, to minimize the personal hardship that the Employees would suffer if prepetition Employee-related obligations are not paid when due or as expected, and to maintain morale and stability in the Debtors' workforce during this critical time, the Debtors, by the Wage Motion, seek authority to pay and honor, in their sole discretion, certain prepetition claims for, among other items, wages, salaries, commissions, bonuses and other compensation, expense reimbursements, federal and state withholding taxes and other amounts withheld (including garnishments and taxes), health benefits, insurance benefits, workers' compensation benefits, vacation time, sick leave, life insurance, long-term disability coverage and all other benefits that the Debtors have historically provided in the ordinary course of business (collectively, and as more fully described below, the "Employee Obligations"), and to pay all costs incident to the foregoing. In an abundance of caution, the Debtors request the right to modify, change and discontinue any of their employee compensation programs, policies and benefits, and to implement new programs, policies and benefits in the ordinary course of business during these Chapter 11 Cases in their sole discretion without the need for further Court approval.

1643903.6 09/09/2014

### Employee Obligations

*Unpaid Compensation*

96.     In the ordinary course of business, the Debtors incur payroll obligations to the Employees.  Such obligations comprise wages, salaries and, for certain salaried Employees, commissions.  AWI Employees are paid on a weekly basis, one week in arrears.  Salaried White Rose Employees are paid on a current basis each week, and hourly White Rose Employees are paid on a weekly basis, one week in arrears.  Approximately 79% of the AWI Employees receive their wages and salaries by direct deposit through an electronic transfer of funds directly to the employees' accounts ("Direct Deposit"), with the other 21% receiving payroll checks.  Approximately 74% of the White Rose Employees receive their wages and salaries by Direct Deposit, with 26% receiving payroll checks.

97.     On average, the AWI Entities have gross payroll expenses of approximately $6,177,245 per month, or $1,485,144 per week.  The last gross payroll for AWI Employees, in the approximate amount of $1,448,121.45 (including all employee deductions, withholding and employer-paid taxes and benefits) was paid on September 4, 2014 for the pay period ending August 30, 2014.

98.     On average, the White Rose Entities have gross payroll expenses of approximately $4,744,129 per month, or $1,124,275 per week.  The last gross payroll for salaried White Rose Employees, in the approximate amount of $205,560.57 (including all employee deductions, withholding and employer-paid taxes and benefits) was paid on September 4, 2014 for the pay period ending September 4, 2014.  The last gross payroll for hourly White Rose Employees, in the approximate amount of $838,525.47 (including all employee deductions, withholding and employer-paid taxes and benefits) was paid on September 4, 2014 for the pay period ending August 30, 2014.

1643903.6 09/09/2014

99. In the ordinary course of business, the Debtors incur compensation obligations to temporary employees. The Debtors pay approximately $48,000 per week (the "Temporary Agency Fees") to four temporary agencies on account of the work performed by approximately 60 temporary employees currently providing services to the Debtors.

100. In addition, certain of the Debtors' Employees receive commissions (the "Commissions"). Specifically, sales and service representatives of AWI may earn Commissions in connection with the sale of non-food items, such GM/HBC products, to retail stores. Certain of these employees also earn commissions by stocking GM/HBC merchandise in retail stores, setting up product displays and managing store inventory. Commission rates vary depending upon the type of non-food merchandise sold and the type of services provided by the Employee.

101. Employees of Co-Op also earn Commissions for producing new or renewed business with the company. The amount of these Commissions depends on the types of policies placed and the amount of the premiums to be paid under the policies. The Debtors estimate that as of the Petition Date, $21,000 in Commissions have accrued in connection with their incentive programs.

102. Because most of the Employees are paid in arrears, as of the Petition Date, many Employees may have not been paid all of their prepetition wages and compensation. Additionally, some Employees may be entitled to compensation because (a) discrepancies may exist between the amounts paid and the amounts that should have been paid and (b) some checks issued to Employees prior to the Petition Date may not have been presented for payment or may not have cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date (the "Uncashed Checks").

1643903.6 09/09/2014

103. The Debtors estimate that, as of the Petition Date, approximately $3,687,584.43 in prepetition accrued wages, salaries, Temporary Agency Fees, Commissions, bonuses, expense reimbursements and other compensation (but excluding vacation pay) earned prior to the Petition Date remains unpaid (together with the Uncashed Checks, the "Unpaid Compensation").

104. The Debtors submit that no Employees are owed Employee Unpaid Compensation in excess of the $12,475 statutory priority cap imposed by sections 507(a)(4) and (5) of the Bankruptcy Code. To the extent any Employee Unpaid Compensation exceeds the statutory priority cap imposed by sections 507(a)(4) and (5) of the Bankruptcy Code, such payments would be de minimis. Nonetheless, the Debtors are not seeking authority to pay any of the Employees on account of prepetition accrued wage or benefit obligations in excess of the $12,475 priority cap.

*Deductions and Withholdings*

105. During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, (a) garnishments, child support, and similar deductions, and (b) other pre-tax and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed herein (such as an Employee's legally ordered deductions, union dues, 401(k) contributions, voluntary deductions, certain local taxes, health and dental insurance, fees and assessments and other, miscellaneous deductions) (collectively, the "Deductions"). The Debtors forward the amount of the Deductions to the appropriate third-party recipients. On average, the Debtors have deducted approximately $192,000 from the Employees' paychecks per each weekly payroll. Due to the commencement of the Chapter 11 Cases, however, certain Deductions that were deducted from Employees' earnings may not have been forwarded to the appropriate third-party recipients prior to the Petition Date. The Debtors

estimate that as of the Petition Date, $216,779.18 in Deductions will be due to the appropriate third-party recipients.

106.    Further, the Debtors are required by law to withhold from an Employee's wages amounts related to federal, state and local income taxes, social security and Medicare taxes for remittance to the appropriate federal, state or local taxing authority (collectively, the "Withheld Amounts"). The Withheld Amounts are approximately $432,481.33 per each weekly payroll. The Debtors must then pay social security and Medicare taxes, and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively, the "Employer Payroll Taxes"). The Employer Payroll Taxes are approximately $154,781.75 per weekly payroll.

107.    Prior to the Petition Date, the Debtors withheld the appropriate amounts from Employees' earnings for the Withheld Amounts and the Employer Payroll Taxes (collectively, the "Payroll Taxes"), but such funds may not yet have been forwarded to the appropriate taxing authorities. The Debtors estimate that as of the Petition Date, $227,444.83 in Payroll Taxes (which comprise the Withheld Amounts and Employer Payroll Taxes) have not been forwarded to the appropriate taxing authorities.

*Honoring Checks for, and Payment of, Reimbursable Expenses*

108.    Prior to the Petition Date, and in the ordinary course of their businesses, the AWI Entities and Rose Trucking reimbursed their Employees for certain reasonable and customary expenses incurred on behalf of the Debtors in the scope of their employment (the "Reimbursable Expenses"). The Reimbursable Expenses are paid on a weekly basis through accounts payable and include reimbursements for meals, supplies, vehicle mileage, tolls and "extraordinary expenses" such as air travel and lodging. As of the Petition Date, the Debtors do not have any pending requests for expense reimbursements. Still, it is possible that certain Employees may

have incurred prepetition expenses for which they have not yet submitted requests for reimbursement and will submit such requests to the Debtors after the Petition Date. The Debtors estimate that the amount of postpetition requests for reimbursement of prepetition expenses will not exceed $238,000.

### Employee Benefits

109.    The Debtors offer Employees the ability to participate in a number of insurance and benefits programs, including medical and dental plans, vacation time and other paid leaves of absence, retirement savings plans, tuition reimbursement, employee assistance programs, severance benefits, workers' compensation, union contributions, life insurance, accidental death and dismemberment insurance, and long- and short-term disability insurance (collectively, the "Employee Benefit Programs").

*Medical, Vision and Dental Plans*

110.    The Debtors offer health insurance to their Employees for medical, vision and dental coverage (as specified below collectively, the "Health Insurance Plans").

### a.    Health Insurance for Non-Union Employees

#### i.    *AWI Entities' Non-Union Plans*

1)    AWI Entities' Non-Union Medical Plan. The AWI Entities maintain a self-insured medical/prescription plan for non-union employees that is administered through Highmark Blue Shield (the "AWI Non-Union Medical Plan"). The plan includes a $150,000 individual stop/loss policy that is provided through Zurich American Insurance Company ("Zurich"). Two options are available to employees under the AWI Non-Union Medical Plan, with differing payroll deductions, deductibles and levels of coverage: (i) a 90/70 PPO plan with a flexible spending account option, in which 329 employees currently participate; and (ii) an 80/60 PPO Qualified High Deductible Plan with health savings account and limited flexible savings account options, in which 208 employees currently participate. Rates under the AWI Non-Union Medical Plan range from $0 to $89

39

per weekly payroll period, depending upon the type of coverage and the number of individuals covered. The average monthly payments under the AWI Non-Union Medical Plan are $24,000. The AWI Entities also pay administrative fees associated with the plan to administer the stop-loss (the "Stop-Loss Administrative Fees"), which are approximately $25,000 per month.

2) AWI Non-Union Vision Plan. The AWI Entities offer vision coverage (the "AWI Non-Union Vision Plan") to their non-union employees through Davis Vision Incorporated ("Davis Vision"). Approximately 481 employees have enrolled in the plan, which covers all or a portion of the cost of examinations and other services at participating Davis Vision providers. Rates under the plan, which range from $.95 to $2.85 per weekly pay period, depend upon the level of coverage and whether employee family members are included in the plan. There is no cost to the AWI Entities for the plan; participating employees pay the full amount of the premium.

3) AWI Non-Union Dental Plan. The AWI Entities offer dental coverage (the "AWI Non-Union Dental Plan") to their non-union employees through United Concordia Dental Insurance. Approximately 507 employees have enrolled in the plan, which covers all or a portion of the cost of various dental services, with a maximum annual dental benefit of $1,500 per year and a lifetime maximum benefit for orthodontics at $1,500 per year. Rates under the plan, which range from $5.33 to $18.12 per weekly pay period, depend upon the level of coverage and whether employee family members are included in the plan. There is no cost to the AWI Entities for the plan; participating employees pay the full amount of the premium.

*ii.* ***White Rose Entities' Non-Union Plans***

1) White Rose Entities' Non-Union Medical Plan. Similar to AWI, the White Rose Entities maintain a self-insured medical/prescription plan for their non-union employees that is administered through Highmark Blue Shield (the "White Rose Non-Union Medical Plan"). The plan includes a $150,000 individual stop/loss policy that is provided through Zurich. Two options are available to employees under the White Rose Non-Union Medical Plan, with differing payroll deductions, deductibles and levels of coverage: (i) a 90/70 PPO plan with a flexible spending

account option, in which 168 employees currently participate; and (ii) an 80/60 PPO Qualified High Deductible Plan with health savings account and limited flexible savings account options, in which 35 employees currently participate. Rates under the White Rose Non-Union Medical Plan range from $0 to $89 per weekly payroll period, depending upon the type of coverage and the number of individuals covered. The average monthly premium under the plan is $10,000. The White Rose Entities also pay certain administrative fees associated with the plan, including Stop-Loss Administrative Fees, which are included with their monthly premium payments.

2) <u>White Rose Non-Union Vision Plan</u>. The White Rose Entities offer vision coverage (the "<u>White Rose Non-Union Vision Plan</u>") to their non-union employees through Davis Vision. Approximately 163 employees have enrolled in the plan, which covers all or a portion of the cost of examinations and other services at participating Davis Vision providers. Rates under the plan, which range from $.95 to $2.85 per weekly pay period, depend upon the level of coverage and whether employee family members are included in the plan. There is no cost to the White Rose Entities for the plan; participating employees pay the full amount of the premium.

3) <u>White Rose Non-Union Dental Plan</u>. The White Rose Entities offer dental coverage (the "<u>White Rose Non-Union Dental Plan</u>") to their non-union employees through Delta Dental of New Jersey, Inc. ("<u>Delta Dental</u>"). Approximately 192 non-union employees have enrolled in this plan, which covers all or a portion of the cost of various dental services, with a maximum annual dental benefit of $1,500 per year and a lifetime maximum benefit for orthodontics at $1,500 per year. Rates under the plan, which range from $7.51 to $27.35 per weekly pay period, depend upon the level of coverage and whether employee family members are included in the plan. There is no cost to the White Rose Entities for the plan; participating employees pay the full amount of the premium.

b. <u>Health Insurance for Union Employees</u>

i. *<u>AWI Union Plans</u>*

1) <u>AWI Union Health Insurance Plan</u>. AWI maintains a combined medical, prescription, dental and vision plan for

41

union employees (the "AWI Union Health Insurance Plan) that is administered through Highmark Blue Shield. The plan includes a $150,000 individual stop/loss policy that is provided through Zurich. Two options are available to employees under the AWI Union Health Insurance Plan, with differing payroll deductions, deductibles and levels of coverage: (i) a 100/80 PPO plan, in which 38 union employees currently participate; and (ii) a 90/70 PPO plan, in which no employees currently participate. Rates under the plan range from $0 to $112.50 per weekly payroll period, depending upon the type of coverage and the number of individuals covered. On an annual basis, the average cost to AWI per employee for coverage under the AWI Union Health Insurance Plan is approximately $12,500. The average monthly administrative fee under the plan is $1,600. In addition, AWI pays certain Stop-Loss Administrative Fees, which are approximately $1,750 per month.

ii. **_White Rose Union Plans_**

1) White Rose Union Medical Plan. The White Rose Entities maintain a self-insured medical/prescriptions plan for union employees that is administered through Highmark Blue Shield (the "White Rose Union Medical Plan"). The plan includes a $150,000 individual stop/loss policy that is provided through Zurich. Three options are available to union employees under the plan depending upon the union in which the employee is a member, and with each option providing for different deductible rates: (i) a 100/80 coverage plan for grocery trucking employees in the Local 641, in which 53 members of Local 641 currently participate; (ii) an 80/0 plan for dairy warehouse and trucking employees in Local 863, in which 39 members currently participate; and (iii) a 100/0 plan for members of Local 863, in which 131 employees currently participate.[11] None of these plans require employee contributions, and the average monthly premium under the plans is $14,200. The White Rose Entities also pay certain administrative fees associated with the plan, including Stop-Loss Administrative Fees, which are included with their monthly premium payments.

---

[11]    Employees in Local 805 and Local 97 are covered by benefit plans offered through their respective unions.

1643903.6 09/09/2014

2) <u>White Rose Union Vision Plan</u>. The White Rose Entities offer vision coverage (the "<u>White Rose Union Vision Plan</u>") to their union employees through Highmark Blue Shield. The plan covers one annual routine examination per covered participant, and no employee contribution is required. Members of Local 641 may receive up to $400 per year from White Rose as a reimbursement for glasses and/or contact lenses, and approximately 53 employees belonging to Local 641 participate in this program. Members of Local 863 may receive up to $40 per year from the company for glasses and/or contact lenses. Approximately 170 employees belonging to Local 863 participate in the White Rose Union Vision Plan. The plan costs the White Rose Entities approximately $13,415 per year.

3) <u>White Rose Union Dental Plan</u>. The White Rose Entities offer dental coverage (the "<u>White Rose Union Dental Plan</u>") to their union employees through Delta Dental. Approximately 53 employees belonging to Local 641 participate in the White Rose Union Dental Plan, which provides maximum annual dental benefits to such employees of $3,000 per year, and a maximum lifetime maximum benefit for orthodontics in the amount of $2,000. In contrast, approximately 170 employees belonging to Local 863 participate in the White Rose Union Dental Plan, which provides maximum annual dental benefits of $7,500 per year, and a lifetime maximum benefit for orthodontics of $2,000. The plan costs the White Rose Entities approximately $395,800 per year.

111. By the Wage Motion, the Debtors seek authority, in their sole discretion, to (a) continue the Health Insurance Plans for Employees in the ordinary course of business, (b) continue making the above-described contributions to such benefit programs, and (c) pay any amounts related thereto, including the Stop-Loss Administrative Fees and any other amounts on account of any premiums, claim amounts and administration fees to the extent that they remain unpaid as of the Petition Date.

1643903.6 09/09/2014

*Workers' Compensation*

112. The Debtors provide workers' compensation insurance for their Employees at the statutorily-required level for each state (the "Workers' Compensation Program") through five providers described below (together, the "Workers' Compensation Providers"):

a. **AWI/Nell's Employees**. Workers' compensation benefits are provided to Employees of AWI and Nell's through Liberty Mutual Insurance Corp. ("Liberty Mutual"). AWI and Nell's pay approximately $466,826 plus tax in premium for this policy each year.

b. **White Rose Employees.** White Rose provides workers' compensation benefits to its employees through a workers' compensation policy that is self-insured up to $500,000 and administered by Helmsman Management Services LLC. As required under New Jersey law, White Rose, as principal, and Liberty Mutual, as surety, have issued a surety bond (the "Liberty Bond") in favor of the State of New Jersey to secure White Rose's obligations under its self-insured workers' compensation program.[12] In addition, White Rose maintains an excess workers' compensation policy through Liberty Mutual, for which it pays an annual premium of $335,293, plus certain additional charges.

For employees working in the State of New York, White Rose maintains a New York State Disability Benefits Policy through the First Rehabilitation Life Insurance Company of America, which applies to all employees entering New York state. The annual premium under the policy is $3,460.

c. **Co-Op Employees**. Co-Op provides workers' compensation benefits to its employees through State Auto Insurance Company. Co-Op pays $3,275 as annual premium under this policy, plus a tax/surcharge assessment.

113. Under the Workers' Compensation Programs, the Debtors are obligated to pay an annual premium that is calculated based on the Debtors' projected payroll, subject to certain

---

[12] Prior to the Liberty Bond, White Rose's predecessor, Di Giorgio Corporation ("Di Giorgio"), as principal, and Travelers, as surety, issued a surety bond to the State of New Jersey, which covers any open claims that arose prior to the Liberty Bond that are subject to Di Giorgio's self-insured workers' compensation plan.

additional debits or credits.[13] The providers of the Workers' Compensation Programs perform an audit of the Debtors' payroll at the conclusion of each policy year. If the Debtors' actual payroll exceeds the amounts used to calculate the estimated premium, the Debtors must pay an additional "true-up" premium to the providers. If actual payroll is less, the Debtors will receive a refund from the providers for the difference. The costs associated with the Workers' Compensation Program fluctuate according to the various claims submitted.

114. At this time, the Debtors have 13 Employees receiving workers' compensation benefits and are not aware of any Employees that plan to file a workers' compensation claim. It is possible, however, that an Employee may have a workers' compensation claim that accrued prepetition but was not submitted to the Debtors prior to the Petition Date. For the claims administration process to operate in an efficient manner and to ensure that the Debtors comply with their state law requirements, claim assessment, determination and adjudication must continue.

115. Although the Debtors believe that, as of the Petition Date, they are current with respect to obligations arising under the Workers' Compensation Programs, out of an abundance of caution, the Debtors, by the Wage Motion, seek authority, but not direction, to pay all undisputed premiums and related charges arising before or after the Petition Date, as they come due in the ordinary course of business.

---

13    The Debtors' obligations under certain of the Workers' Compensation Programs are secured by letters of credit issued in favor of various insurers. The Debtors are not seeking any relief with respect to these letters of credit through the Wage Motion. *See In re S-Tran Holdings, Inc.*, 414 B.R. 28, 32 (Bankr. D. Del. 2009) (citing *OHC Liquidation Trust v. Discover Re (In re Oakwood Homes Corp.)*, 342 B.R. 59, 67 (Bankr. D. Del. 2006) (stating that it is well-established that a letter of credit and the proceeds therefrom are not property of the debtor's estate).

*Vacation, Sick Leave and Other Leaves of Absence*

116.    The Debtors provide vacation time to their Employees as a paid time-off benefit (the "Vacation Time"). Specifically, the Debtors' non-union Employees receive paid time off ("PTO") for both Vacation Time and time for personal business and sick days. The amount of a non-union Employee's PTO depends upon the Employee's length of service and their status as a part-time or full-time employee. For all other Employees, the amount of Vacation Time available to a particular Employee and the rate at which such Vacation Time accrues is generally determined by the Employee's length of employment, the facility at which the Employee works and the terms of the relevant CBA. Although the Debtors estimate that approximately $3,224,951.03 of earned but unused Vacation Time (including PTO for non-union employees) will have accrued as of the Petition Date, the Debtors believe that Employees will use such Vacation Time in the ordinary course of business.

117.    The Debtors also provide all of their Employees with holidays as a paid time-off benefit, which, for union Employees, includes one day off for an Employee's birthday ("Holidays"). Certain CBA's also include personal days as Holidays. The Debtors estimate that approximately $539,212.12 in Holiday pay will have accrued as of the Petition Date; however, the Debtors believe that Employees will use such Holidays in the ordinary course of business.

118.    In addition, in the ordinary course of business, certain Employees are eligible for sick leave due to illness or injury ("Sick Leave"). As indicated above, Sick Leave is included in PTO for non-union Employees. With respect to union Employees, whether Sick Leave is available to a particular Employee and the procedures for requesting Sick Leave varies depending upon the terms of the relevant CBA.

119.    Next, the Debtors allow their Employees to take certain leaves of absence for personal reasons, many of which are required by law ("Leaves of Absence"). Leaves of Absence

46

include family medical leaves, pregnancy, military leaves and bereavement leaves. The Debtors also provide their Employees with paid leaves to attend jury duty or a funeral. Employees further receive personal days each year to take care of personal matters such as moving, religious holidays or personal emergencies ("Personal Days"). As indicated above, Personal Days are included in a non-union Employee's PTO. In addition, Personal Days are considered Holidays for certain union Employees under certain CBAs. The Debtors believe that Employees will use Personal Days in the ordinary course of business.

120. By the Wage Motion, the Debtors request that they be authorized, but not directed, to continue to honor their Vacation Time (including PTO for non-union Employees), Holidays, Sick Leave, Leaves of Absence and Personal Days policies in the ordinary course of business, and to honor and pay any prepetition amounts related thereto. Moreover, the Debtors anticipate that their Employees will utilize any accrued Vacation Time, Holidays, Sick Leave, Leaves of Absence and Personal Days in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' normal payroll obligations.

*Tuition Reimbursement*

121. The Debtors offer tuition reimbursement to non-unionized Employees (the "Tuition Reimbursement Program") requesting credit for a job-related degree or a job-related college course. In order to receive this benefit, the Employees must have regular full-time status and at least twelve months of active service. Eligible Employees may be reimbursed only for courses of study that are directly related to the Employee's present job or a job within the company for which they are preparing. Employee reimbursement for eligible educational assistance is typically based upon the grade received for the course. In addition, the maximum reimbursement amount per employee per fiscal year is $2,000.

1643903.6 09/09/2014

122.    Currently, there are no Employees participating in the Tuition Reimbursement Program and thus no outstanding reimbursement amounts will have accrued as of the Petition Date.

### Additional Employee Benefits

*Life Insurance, Accidental Death and Dismemberment Insurance and Long- and Short-Term Disability Benefits*

123.    AWI and White Rose each provide their non-union employees with group term life insurance coverage (including dependent life insurance) and accidental death and dismemberment coverage ("AD&D") through Principal Financial Services, Inc. (the "Life Insurance/AD&D Plans"). Approximately 653 non-union employees of AWI participate in a Life Insurance/AD&D Plan, which costs AWI approximately $5,600 per month. Approximately 224 non-union employees of White Rose participate in a Life Insurance/AD&D Plan, which costs White Rose approximately $3,525 per month. Under both plans, AWI and White Rose cover (i) the costs of term life insurance coverage for the employee in an amount equal to 1 times the employee's basic annual salary, up to a maximum amount of $200,000 or 300% of one's salary, whichever is lower, (ii) $10,000 in coverage for an eligible spouse; and (iii) $1,000 in coverage for an eligible child. Additional optional coverage is available to an employee and/or his or her dependents or spouses, which coverage is fully paid by the employee.

124.    White Rose also provides a Life Insurance/AD&D Plan to certain of its union employees through Principal Financial Services Inc. Approximately 53 employees belonging to Local 641 participate in the Life Insurance/AD&D Plan, which provides for a payment of $20,000 to a covered employee's beneficiary, and $10,000 to an employee, if his or her dependent dies. Approximately 170 employees belonging to Local 863 also participate in a Life

1643903.6 09/09/2014

Insurance/AD&D Plan, which provides for a payment of $25,000 to a covered employee's beneficiary and $10,000 to an employee if his or her dependent dies.

125.    Next, the AWI Entities and the White Rose Entities each provide their full-time non-union Employees with voluntary long-term disability benefits administered through Prudential Insurance Company (the "Long-Term Disability Benefits"). Approximately 491 non-union AWI Employees participate in a Long-Term Disability Benefits Plan, and approximately 123 non-union White Rose Employees participate in a Long-Term Disability Benefits Plan. Under both Long-Term Disability Benefits Plans, after a six month disability period, an employee may receive a maximum of 60% of his or her base salary per month, not to exceed $10,000 per month. Moreover, participating employees pay the full amount of the premiums for this coverage, without any contribution from the Debtors. Rates for this coverage vary depending upon the age of the employee and the amount of salary covered.

126.    Finally, the Debtors provide certain full-time non-union Employees with short-term disability benefits (the "Short-Term Disability Benefits"). Specifically, the AWI Entities offer Short-Term Disability Benefits to full-time non-union AWI Employees and no employee contributions are required. Approximately 653 non-union AWI Employees have opted for these benefits, which enable an employee to receive a weekly benefit of up to 60% of his or her weekly base salary/wages, for a period of up to 26 weeks over a rolling 12-month period.

127.    The White Rose Entities similarly offer Short-Term Disability Benefits to non-union White Rose Employees, in coordination with a New Jersey-sponsored temporary disability program. Approximately 224 non-union White Rose Employees have opted for these benefits, under which an employee may apply to the state program for benefits. The weekly benefit from the state is 2/3 of the employee's average weekly wage, up to a maximum of 60% of the

49

employee's weekly pay. White Rose and Rose Trucking will thereafter supplement the state benefit if the benefit is less than 60% of the employee's weekly pay; however, the total combined payment from the White Rose Entities and the state program will never exceed 60% of the employee's weekly base pay.

*Severance Benefits*

128. AWI, Co-Op, White Rose and Rose Trucking offer full-time, non-union Employees who have been permanently laid off with severance benefits (the "Severance Benefits") in accordance with a payment schedule that is based on years of continuous service:

| Years of Service | (No. of Weeks) |
|---|---|
| 0-2 | Not eligible |
| 2-5 | 2 weeks |
| 5 Plus | 1 week for every completed year of service, up to a maximum of 20 weeks |

129. Severance payments are made in weekly increments, less legal deductions, and after all obligations to the Debtors are satisfied. By the Wage Motion, the Debtors request authority, but not direction, to pay any Severance Benefits owed as of the Petition Date and to continue to pay such benefits in the ordinary course of business.

*Contributions on Behalf of Union Employees*

130. On a monthly basis, White Rose and Rose Trucking deduct approximately $29,504 from unionized Employees for union dues, while AWI deducts approximately $25,227 from unionized Employees for union dues. The Employee contributions held by the Debtors for transfer to the respective Unions are included in the Deductions.

1643903.6 09/09/2014

*401(k) Retirement Plans*

131.    Certain of the Debtors offer their Employees a 401(k) defined contribution plan (the "401(k)").  Both the AWI Entities and White Rose offer their non-union employees a 401(k) through Fidelity Investments.[14]  Approximately 692 non-union AWI Employees participate in a 401(k), and approximately 224 non-union White Rose employees participate in a 401(k).  Under the terms of both 401(k) plans, AWI and White Rose make a 3% non-elective contribution to the plans for participating employees, and match 100% of up to 2% of the amounts contributed by employees.  The maximum company contribution to the 401(k) for non-union employees under both plans is 5% of an employee's weekly pay.

132.    AWI also offers a 401(k) to each of its three unions, and the White Rose Entities likewise contribute to a 401(k) for Employees in Local 863.  AWI's contributions to each 401(k) vary depending upon the relevant union and the terms of the relevant CBA.  Additionally, Nell's offers a 401(k) to its regular non-union employees who have completed at least 1 year of employment with 1,000 hours of service.  Under the terms of the Nell's 401(k) plan, Nell's makes a 1% non-elective contribution to the plan for participating employees, and matches 100% of up to 2% of the amounts contributed by employees.

*Pension Plans*

133.    AWI participates in one multi-employer pension plan called the Central Pennsylvania Teamsters Pension Fund (the "AWI Pension Plan"), which covers all three of the unions that are active at AWI facilities.  AWI made $2.7 million in contributions to the plan in 2013.  Approximately 491 unionized employees of AWI participate in the AWI Pension Plan.

---

14      In connection with these 401(k)s), White Rose, AWI and Nell's have posted a fidelity bond through Travelers to insure against employee dishonesty.

1643903.6 09/09/2014

134. White Rose sponsors one defined benefits plan (the "Defined Benefits Plan"), which covers substantially all of its non-union employees. The Defined Benefits Plan was frozen in April 2005, at which time participants in the plan ceased earning additional service credit for purposes of calculating their respective benefits. No new employees have been added to the plan. In fiscal years 2013 and 2012, White Rose contributed $3.3 million and $6.2 million to the Defined Benefits Plan, respectively. As of the end of the 2013 fiscal year, White Rose's benefit obligations to the Defined Benefit Plan were $74.7 million, with a fair value of plan assets totaling $53.7 million. The Defined Benefits Plan was accordingly underfunded by $21 million.

135. Additionally, as a result of a legal settlement between the former stockholders of White Rose and AWI, an escrow fund was established to fund future pension contributions to the Defined Benefits Plan until such escrow funds are fully depleted or the Defined Benefits Plan is terminated, whichever occurs first. As of the end of fiscal year 2013, the escrow fund's value was approximately $8.8 million.

136. White Rose also participates in three multi-employer pension plans (the "White Rose Pension Plans," and together with the Defined Benefits Plan and AWI Pension Plan, the "Pension Plans"): (i) the Local 805 Pension and Retirement Fund, to which the Debtors contribute approximately $26,815 per month, and in which 74 White Rose Employees currently participate; (ii) the Teamsters Local 641 Pension Trust, to which the Debtors contribute approximately $35,857.60 per month, and in which 50 White Rose Employees currently participate; and (iii) the Teamsters Local 11 (Local 97) Pension Fund, to which the Debtors contribute approximately $51,281.01 per month, and in which 280 White Rose Employees currently participate.

1643903.6 09/09/2014

*Employee Assistance Program*

137.    The Debtors offer an employee assistance program (the "Employee Assistance Program") to assist employees with certain "life challenges." For example, the Employee Assistance Programs provide support for those seeking to address family issues, substance abuse problems, harassment, violence and other issues. The services are provided to (i) the AWI Employees through a contract with Inroads, a local employee assistance program that is offered through the Family Guidance Center of Wyomissing, Pennsylvania; and (ii) White Rose's full-time, non-union employees through an agreement with Magellan Health, Inc. The Employee Assistance Program costs the AWI Entities approximately $23,679 per year and the White Rose Entities approximately $5,600 per year.

*Safety Award Program*

138.    White Rose offers a safety award program (the "Safety Award Program") for certain of its union Employees, in which the employees may earn points for participating in voluntary safety-related activities, or for remaining injury-free or accident-free for a certain period of time. The Safety Award Program costs White Rose approximately $168,200 per year.

*Credit Cards*

139.    The Debtors currently maintain various company credit cards (the "Credit Card Obligations"). Specifically, Co-Op has a company card through Fulton Bank, N.A. with a maximum balance of $2,500. This card is held by Co-Op's accounting manager and is used only for purchases such as advertising, office supplies and telephone payments. Nell's maintains two credit cards through Home Depot Credit Services with maximum balances of $3,500 each. Each card is held by a maintenance associate employed by Nell's. White Rose maintains one company card through Home Depot, which has a maximum balance of $10,000. Lastly, AWI maintains (i) 80 company cards issued by Fulton Bank, N.A., which each have a maximum

53

balance of $1,000, and which are held by certain Employees involved in, *inter alia*, merchandising, marketing, retail systems, sales and administration; and (ii) 22 Sunoco Suntrack gas cards, which have a combined total spending limit of $10,000.

140. For all of the foregoing reasons, the relief requested in the Wage Motion will benefit the Debtors' estates and creditors by allowing the Debtors' businesses to continue to operate efficiently and effectively without interruption. In the absence of such payments, the Debtors believe that their Employees may seek alternative employment opportunities. Such a development would result in a costly distraction at a time when the Debtors need to focus on maximizing the value of the estates. Accordingly, the Debtors must be able to pursue all reasonable measures to retain their Employees by, among other things, continuing to honor all wage, benefits and related obligations.

141. Accordingly, I believe that the relief requested in the Wage Motion is in the best interests of the Debtors' estates, their creditors and other parties in interest.

**Motion of the Debtors for Entry of Interim and Final Orders Pursuant to Sections 105 and 366 of the Bankruptcy Code (I) Determining that Utility Providers are Adequately Assured of Future Performance, (II) Enjoining Utility Providers from Altering, Refusing, Discontinuing or Interfering with Utility Service, and (III) Establishing Procedures for Determining Requests for Additional Adequate Assurance (the "Utility Motion")**

142. The Debtors incur expenses for sewage, water, natural gas, electricity and other similar utility services (collectively, the "Utility Services") provided by approximately 30 utility providers (as such term is used in section 366 of the Bankruptcy Code, collectively, the "Utility Providers"). Through the Utilities Motion, the Debtors seek entry of an Interim Order and a Final Order (i) finding that the Utility Providers are adequately assured of future performance by the procedures set forth herein; (ii) enjoining Utility Providers from altering, refusing, discontinuing or interfering with service to the Debtors; and (iii) establishing procedures for

determining requests for additional adequate assurance.  A list of the Utility Providers who rendered services to the Debtors as of the Petition Date is attached as **Exhibit "A"** to the Utility Motion.  The Debtors' forecasted, postpetition run rate for the Utility Services is approximately $500,000 per month.

143.    Uninterrupted utility services are essential for securing the Debtors' various locations and preserving the collateral therein.  Any interruption of utility services, even for a brief period of time, would negatively affect the Debtors' businesses and would seriously jeopardize the Debtors' ability to conduct an efficient bidding process to sell substantially all of their assets.  It is therefore critical that utility services continue uninterrupted during these Chapter 11 Cases.

144.    The Debtors intend to pay all postpetition obligations owed to the Utility Providers in a timely manner, consistent with the ordinary course of their businesses.  The Debtors expect that the funding to be obtained through the use of cash collateral and under proposed postpetition financing will be sufficient to pay postpetition obligations related to their Utility Services, as set forth in the cash collateral and proposed financing budgets.  Additionally, to provide adequate assurance of payment for future services as required by section 366(c) of the Bankruptcy Code, the Debtors propose to deposit (within twenty (20) days of the Petition Date) into an interest-bearing, newly-created, segregated account an amount equal in the aggregate to two weeks of the forecasted postpetition monthly run rate for the Utility Providers (the "Adequate Assurance Deposit"), pending further order of the Court.  Because the Debtors' forecasted, postpetition run rate for the Utility Services is approximately $500,000 per month, the initial Adequate Assurance Deposit will be approximately one half of that amount, or $250,000.

1643903.6 09/09/2014

145.    Accordingly, I believe that the relief requested in the Utility Motion is in the best interests of the Debtors' estates, their creditors and all parties in interest.

### Motion of the Debtors for Entry of an Order Authorizing the Debtors to Maintain, Renew, Cancel or Replace Existing Insurance Programs and Pay all Premiums, Fees and Costs in Connection Therewith (the "Insurance Motion")

146.    In connection with the operation of their businesses, the Debtors maintain several insurance policies providing coverage for, *inter alia*, commercial general liability, warehouse legal liability, crime, ocean marine liability, umbrella liability, automobiles, motor truck cargo, property, fiduciary liability, directors' and officers' liability and storage tank liability (collectively, the "Policies") through several different insurance carriers (the "Insurance Carriers"). A list of the Policies, Insurance Carriers and brokers is attached to the Insurance Motion as **Exhibit "B."**[15] These Policies are essential to the preservation of the Debtors' businesses, properties and assets, and, in many cases, such insurance coverages are required by various regulations, laws and contracts that govern the Debtors' business conduct.

147.    The Debtors believe it is in the best interests of their estates to permit the Debtors to honor their obligations under their current insurance contracts (including related brokers' fees and surcharges). Any other alternative would likely require considerable additional cash expenditures and would be detrimental to the Debtors' efforts to preserve and maximize the value of their estates.

---

[15]    In addition to the Policies listed on **Exhibit "B"** to the Insurance Motion the Debtors maintain other insurance policies and programs with respect to workers' compensation and employee benefits. These programs and policies are addressed in the Wage Motion. In addition, the Debtors have issued letters of credit to secure their obligations under certain of the Policies to various insurers. Because these letters of credit are not property of the Debtors' estates, the relief sought in the Insurance Motion neither pertains to nor impacts any letter of credit obligations. *See In re S-Tran Holdings, Inc.*, 414 B.R. 28, 32 (Bankr. D. Del. 2009) (citing *OHC Liquidation Trust v. Discover Re (In re Oakwood Homes Corp.)*, 342 B.R. 59, 67 (Bankr. D. Del. 2006) (stating that it is well-established that a letter of credit and the proceeds therefrom are not property of the debtor's estate).

1643903.6 09/09/2014

148. In the Insurance Motion, the Debtors seek the entry of an order, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, authorizing, but not directing, the Debtors to: (i) continue their Policies on an uninterrupted basis in accordance with the same practices and procedures as were in effect prior to the Petition Date, and to renew or cancel such Policies or seek new insurance coverage as the Debtors, in their reasonable business judgment, deem necessary, appropriate or desirable, without the need to seek leave of Court, and (ii) pay, in their sole discretion, all undisputed premiums, administrative fees and broker fees necessary to maintain the insurance coverage provided under the Policies, regardless of whether such costs relate to the period arising before or after the Petition Date (collectively, the "Insurance Obligations").

149. The Debtors also request, as a precaution, that the Court authorize and direct the Debtors' banks, at the Debtors' instruction, to receive, honor, process and pay, to the extent of funds on deposit, any and all checks or electronic fund transfers relating to the Insurance Obligations that may not have been honored prior to the Petition Date

150. The Debtors also request, as a precaution, that the Court authorize and direct the Debtors' banks, at the Debtors' instruction, to receive, honor, process and pay, to the extent of funds on deposit, any and all checks or electronic fund transfers relating to the Insurance Obligations that may not have been honored prior to the Petition Date.

151. The continuation of the Insurance Programs, on an uninterrupted basis, and the payment of all undisputed prepetition and postpetition Insurance Obligations arising under the Insurance Programs are essential to preserve the Debtors' businesses and preserve the value of the Debtors' estates for all creditors.

152. For the foregoing reasons, I believe that the Insurance Motion should be granted.

**Motion of Debtors for Entry of an Order Authorizing Debtors to Pay, in the Ordinary Course of Business, (A) Prepetition Claims of Shippers and Warehousemen and (B) Prepetition Claims for Goods Delivered Postpetition (the "Shipper Motion")**

153.    The Debtors, in the ordinary course of business, rely upon common carriers, shippers, freight forwarders and truckers (collectively, the "Shippers") to ship, transport and deliver their products and goods. Servicers that allow the Debtors to store their products, goods and other inventory in certain warehouse facilities (the "Warehousemen") also support the Debtors' distribution network..

154.    By the Shipper Motion, the Debtors seek the entry of an order authorizing the Debtors to pay Shippers and Warehousemen as the Debtors, in their sole discretion, determine is necessary or appropriate in order to maintain their shipping and warehousing network, assure an uninterrupted flow of goods and obtain the release of the goods and inventory held by such Shippers and Warehousemen.    The Debtors seek authority to make such payments in the amounts and to the extent necessary to satisfy nondisputed prepetition Shipping and Warehousing charges and to satisfy any potential, asserted, or actual possessory liens, if any, on the goods and inventory that may be held by Shippers and Warehousemen pending the payment of such charges.    In the Shipper Motion, the Debtors also seek entry of an order authorizing, but not directing, payment of outstanding prepetition orders for goods that are to be delivered postpetition (the "Outstanding Orders"), as administrative expense claims.    Many of these goods are in transit as of the Petition Date.

**Shippers and Warehousemen**

155.    As a leading food wholesaler and distributor, the Debtors receive products purchased from hundreds of manufacturers and distributors each day at their four distribution facilities located in Robesonia and York, Pennsylvania and Carteret and Woodbridge, New

58

Jersey (the "Distribution Facilities"). In turn, the Debtors distribute those products to hundreds of supermarkets, specialty stores, convenience stores and superettes located throughout the mid-Atlantic states of Pennsylvania, New York, New Jersey, Delaware, Maryland, Virginia, West Virginia and Ohio.

156.    To assist the Debtors with the constant movement of products between and among the Debtors' facilities, warehouses and customers, within their distribution network, the Debtors employ several Shippers and Warehousemen.  As of the Petition Date, the Debtors owe approximately $80,000 to the Shippers and Warehousemen for shipping and storage costs incurred prior to the Petition Date.

157.    Under applicable state law, including, but not limited to, the Uniform Commercial Code as enacted in the various states,[16] the Shippers or Warehousemen may have a lien on goods in their possession that secure the charges or expenses incurred in connection with the transportation or storage of such goods.  In addition, pursuant to section 363(e) of the Bankruptcy Code, Shippers or Warehousemen, as bailees, may be entitled to adequate protection for a valid possessory lien.

158.    In the event that, as of the Petition Date, Shippers or Warehousemen have outstanding invoices for goods transported or stored prior to the Petition Date, the Shippers and Warehousemen will likely argue that they have possessory liens for transportation or storage costs, and may refuse to deliver or release those goods held in their possession until their

---

[16]    For example, section 7-307 of the Uniform Commercial Code provides that a "carrier has a lien on the goods covered by a bill of lading or on the proceeds thereof in its possession for charges after the date of the carrier's receipt of the goods for storage or transportation, including demurrage and terminal charges, and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law." U.C.C. § 7-307(a); *see e.g.* 13 PA Cons. Stat. Ann. § 7307(a) (2008).

1643903.6 09/09/2014

invoices are paid and their liens are redeemed. The Shippers and Warehousemen may further be unwilling to release the goods in their possession to which they may be entitled to liens since this may result in their claims against the Debtors becoming unsecured.

159.     Moreover, even absent a perfected lien, a Shipper or Warehouseman's refusal to deliver the Debtors' goods and supplies would severely disrupt the Debtors' operations and cause the Debtors to lose revenue, future business, and goodwill. Indeed, the Debtors have established an excellent reputation in the industry for meeting delivery schedules and must maintain this reputation in order to maintain their customer base and strengthen the value of the Debtors' businesses.

### Outstanding Supply Orders

160.     Prior to the Petition Date, the Debtors ordered approximately $12 million worth of goods in the ordinary course of business for which delivery will not occur until after the Petition Date. Many of these goods are in transit as of the Petition Date.

161.     Upon learning of the commencement of these Chapter 11 Cases, the Debtors' suppliers may be concerned that amounts owed for goods ordered prior to the Petition Date but delivered after the Petition Date will be treated as general unsecured claims against the Debtors' estates. These Suppliers may also refuse to ship or transport goods subject to the Outstanding Orders, or recall the shipments of such goods, unless the Debtors issue substitute purchase orders postpetition or obtain a Court order confirming the administrative expense priority of payments for the goods.

162.     To avoid these results, the Debtors, by the Shipper Motion, request the entry of an order, pursuant to sections 105(a) and 503(b) of the Bankruptcy Code, authorizing, but not

directing, the Debtors to pay, as administrative expense claims, prepetition claims based on the Outstanding Orders.

163. For the foregoing reasons and to preserve the value of the Debtors businesses, I believe that it is important that the Shipper Motion be granted.

**Motion of the Debtors, Pursuant to Sections 105(a) and 503 of the Bankruptcy Code and Bankruptcy Rules 3002 and 3003, for an Order Establishing Procedures for the Assertion of Claims Arising Under Section 503(b)(9) of the Bankruptcy Code (the "503(b)(9) Procedures Motion")**

164. In the ordinary course and on a regular basis, the Debtors purchase and receive a variety of goods for use in connection with their food distribution and retail operations. In due course, certain goods were received by the Debtors within the twenty days before the Petition Date (the "Twenty-Day Period"). The Debtors estimate that within the Twenty-Day Period, the Debtors received goods from suppliers with a value of approximately $23.1 million. Many of these suppliers have not yet been paid for these goods. Through the 503(b)(9) Procedures Motion, the Debtors seek entry of an order establishing procedures for the assertion of section 503(b)(9) claims (the "503(b)(9) Claims") by suppliers whose goods were received by the Debtors during the Twenty-Day Period.

165. Although section 503(b)(9) of the Bankruptcy Code provides a priority status for prepetition claims for the value of goods received within the Twenty-Day Period, these 503(b)(9) Claims in all other respects are identical to other prepetition claims. As such, there is no reason to differentiate between the procedures by which 503(b)(9) Claims and other prepetition claims are filed, objected to and adjudicated. To eliminate any uncertainty regarding the procedures to be used by claimants asserting 503(b)(9) Claims (the "503(b)(9) Claimants"), and to avoid piecemeal litigation by 503(b)(9) Claimants, the Debtors seek to establish, at the outset of these

1643903.6 09/09/2014

cases, procedures for the assertion (and determination) of 503(b)(9) Claims (the "503(b)(9) Procedures").

166.     The Debtors anticipate that after their schedules of assets and liabilities and statements of financial affairs have been filed, they will ask the Court to set a bar date for the filing of prepetition claims at an appropriate time. To maintain uniformity and consistency, the Debtors seek entry of an order establishing the 503(b)(9) Procedures for the assertion (and determination) of 503(b)(9) Claims pursuant to the normal prepetition claims process in these cases and subject to the general bar date to be set by the Court in these cases for the filing of all prepetition claims (the "General Bar Date"), as follows:

a.     All 503(b)(9) Claims shall be filed by the General Bar Date, which will be set for all prepetition claims in these cases by a subsequent order of the Court, and in accordance with Bankruptcy Rules 3002 and 3003 and Rule 3001-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

b.     503(b)(9) Claimants shall utilize the proof of claim form to be developed by the Debtors in connection with the general bar date process, which form will permit all parties to assert the amount and priority of their claims (including priority under section 503(b)(9) of the Bankruptcy Code) in one standardized form.

c.     The 503(b)(9) Claimants shall **not** file motions to compel allowance or payment of administrative expenses for their 503(b)(9) Claims or schedule a hearing to consider such claims. Consistent with section 502(a) of the Bankruptcy Code, all timely filed 503(b)(9) Claims shall be deemed accepted and allowed unless objected to by the Debtors or any other party in interest pursuant to section 502 of the Bankruptcy Code, Bankruptcy Rule 3007 or in accordance with further procedures for addressing claims as may be established by the Court ("Claims Procedures"). If such an objection to a 503(b)(9) Claim is filed, such claim shall be adjudicated and allowed in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any Claims Procedures established by the Court.

d.     To the extent that a 503(b)(9) Claim is allowed, the claim shall be paid pursuant to, and as set forth in, the applicable chapter 11 plan confirmed by this Court.

1643903.6 09/09/2014

e.   Nothing in these 503(b)(9) Procedures shall affect the rights and remedies of the Debtors, any official committee appointed in these cases or any other party in interest with regard to avoidance actions, and nothing in these 503(b)(9) Procedures shall provide a 503(b)(9) Claimant a *prima facie* defense to any avoidance actions.

167.   The Debtors request that the 503(b)(9) Procedures be the sole and exclusive method for creditors to assert, seek determination of and obtain payment of the 503(b)(9) Claims. The Debtors further request that all 503(b)(9) Claimants be prohibited from seeking any other means for the allowance or treatment of their 503(b)(9) Claims, unless leave is specifically granted by the Court.

168.   Additionally, the Debtors request that all motions or other proceedings initiated by 503(b)(9) Claimants to assert rights related to 503(b)(9) Claims, except those proceedings initiated by the Debtors in accordance with the 503(b)(9) Procedures, be stayed and be resolved exclusively by the 503(b)(9) Procedures.

169.   The proposed 503(b)(9) Procedures will provide clear guidance to all parties as to how 503(b)(9) Claims shall be filed in these cases and will streamline the process for consideration of such claims.  Requiring 503(b)(9) Claimants to participate in the normal claims adjudication process will also provide the Debtors the opportunity to address the allowance of claims in an orderly and efficient way, will not impair in any way the substantive rights of any parties and will ensure that similarly situated creditors receive equal treatment.

170.   I accordingly believe that it is in the best interest of the Debtors' estates that the 503(b)(9) Procedures Motion be granted.

### Motion of the Debtors for the Entry of an Order: (I) Authorizing the Payment of Prepetiton Claims Asserted Under the Perishable Agricultural Commodities Act; and (II) Granting Related Relief (the "PACA Motion")

171.   The Debtors, in the PACA Motion, seek entry of an order authorizing, but not compelling, the payment of pre-petition claims arising under the under the Perishable

1643903.6 09/09/2014

Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 499a *et seq.* ("PACA"), and granting certain related relief. The Debtors believe that a certain portion of the products they have purchased but not yet paid for may qualify as "perishable agricultural commodities" under PACA.

172. Under PACA, the term perishable agricultural commodity is generally defined as "fruits and fresh vegetables of every kind and character [whether or not frozen or packed in ice]." 7 U.S.C §499a(b)(4). PACA provides various protections to fresh fruit and vegetable sellers, including the establishment of a statutory constructive trust (the "PACA Trust") consisting of a buyer's entire inventory of food or other derivatives of perishable agricultural commodities, the products derived therefrom and the proceeds related to any sale of the commodities or products (collectively, the "PACA Trust Assets"). See 7 U.S.C. § 499e(c)(2). Assets subject to a PACA Trust are preserved as a non-segregated floating trust and may be commingled with non-trust assets. Funds held in a PACA Trust are not property of a debtor's estate.

173. The Debtors purchase many goods from suppliers that may be entitled to the protections under PACA (the "PACA Claimants"). The Debtors estimate that PACA Claimants held approximately $2.9 million in unpaid claims as of the Petition Date (the "PACA Claims"). Accordingly, and by the PACA Motion, the Debtors seek authority to pay valid, pre-petition PACA Claims ("Allowed PACA Claims")[17] in the ordinary course of business. To be clear, not

---

[17] The Debtors do not believe that their vendors have sold them "livestock," "poultry" or any other eligible goods covered by the Packers and Stockyards Act of 1921 as amended, 7 U.S.C. § 181 *et seq.* ("PASA"), which prescribes the conditions of operations for businesses dealing in livestock. In the unlikely event, however, that any supplier claims fall under PASA, the Debtors submit that it is in the best interests of the Debtors' estates, creditors and parties-in-interest to treat such claims in a manner identical to the Allowed PACA Claims. PASA creates a statutory trust scheme that is virtually identical to PACA in respect of delivery of livestock and other eligible goods. *See In re W.L. Bradley Co.,* 75 B.R. 505, 509 (Bankr. E.D.

(Continued...)

1643903.6 09/09/2014

every claim, however, held by a supplier that supplied perishable agricultural commodities will be entitled to the protection of PACA. In addition, any supplier asserting a PACA Claim must comply strictly with the notice requirements set forth in the PACA statute. As such, the Debtors seek only the authority to pay Allowed PACA Claims, without prejudice to their right to challenge any of the PACA Claims.

174. The payment of Allowed PACA Claims is warranted under sections 105(a), 363, 507 and 541 of the Bankruptcy Code because assets governed by PACA do not constitute property of the Debtors' estates. As a result, the distribution of assets to the PACA Claimants falls outside the priority scheme of the Bankruptcy Code, and the PACA Claimants holding Allowed PACA Claims are, thus, entitled to payment from the PACA Trust ahead of the Debtors' other creditors. Nevertheless, the disposition of PACA Trust Assets is subject to the jurisdiction of the bankruptcy court.

175. Because the funds held in a PACA Trust are not property of the Debtors' estates, the relief requested in the PACA Motion does not prejudice the Debtors' creditors. In fact, payment made to PACA Claimants on account of Allowed PACA Claims is consistent with the intent of PACA and, moreover, will inure to the benefit of the Debtors and all parties in interest by (i) facilitating the continued purchase and receipt of fresh and frozen produce and other products and (ii) avoiding potential disruption to the Debtors' business operations.

---

Pa. 1987) ("The Legislative history expressly notes that the [PACA Trust] was modeled on the trust amendment to the Packers and Stockyards Act."); *In re H.R. Hindle & Co., Inc.*, 149 B.R. 775, 784 (Bankr. E.D. Pa. 1993) (PACA clearly an attempt to create iron clad trust in the manner of PASA). Accordingly, for the purposes of this Motion and any related orders, the term "Allowed PACA Claims", and the Debtors' ability to pay such claims in the ordinary course of business, shall also incorporate any claims arising under PASA.

176. Further, in certain circumstances, shareholders, officers, or directors of a corporate entity who are in a position to control trust assets but breach the fiduciary duty to preserve those assets may be held personally liable under PACA. Thus, to the extent that any valid obligations arising under PACA remain unsatisfied by the Debtors, the Debtors' officers and directors or members may be subject to lawsuits during the pendency of these chapter 11 cases. Any such lawsuit (and the ensuing potential liability) would distract the Debtors and their officers and directors in their attempt to implement a successful reorganization strategy and, moreover, could lead to the assertion of substantial indemnification claims under the Debtors' governing documents, employment agreements, and applicable laws to the detriment of all parties in interest.

177. Finally, payment of Allowed PACA Claims will inure to the benefit of the Debtors' estates by preserving goodwill between the Debtors and certain of the vendors of fresh and frozen produce. Without implementation of these procedures, the Debtors could be subject to numerous claims and adversary proceedings, including motions by PACA Claimants for relief from the automatic stay and/or injunctive relief, which would result in the unnecessary expenditure of time, effort, and money by the Debtors.

178. In light of the foregoing, I respectfully submit that the relief requested in the PACA Motion is: (i) necessary and essential for the Debtors' reorganization; (ii) in the best interests of the Debtors, their estates and their creditors; and (iii) necessary to prevent immediate and irreparable harm to the Debtors and their estates.

1643903.6 09/09/2014

**Motion of the Debtors for Entry of an Order Authorizing the Debtors to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Certain Prepetition Customer Practices and Programs in the Ordinary Course of Business (the "Customer Programs Motion")**

179.     Prior to the Petition Date, in the ordinary course of business, and as is customary in the industry in which the Debtors operate, the Debtors implemented a variety of customer-related programs (collectively, the "Customer Programs").

180.     By way of the Customer Programs Motion, the Debtors seek the entry of an order, authorizing, but not directing, the Debtors, in their sole discretion, to: (i) honor outstanding obligations earned by and owing to their customers under the Customer Programs; and (ii) provide refunds, credit adjustments and/or discounts to their customers in satisfaction of accrued prepetition obligations incurred by the Debtors under their Customer Programs that include but are not limited to the following:

**Rebate Programs**

181.     The Debtors offer a variety of rebate programs to their customers (the "Rebate Programs"). Generally, pursuant to the Rebate Programs, the Debtors will issue a rebate or credit to their customers based on a number of factors, including the volume of a customer's purchases and/or the percentage of sales made by a customer for a particular product. The Debtors also offer specialized Rebate Programs in connection with the sale of, among other things, turkey, meat, cigarettes, candy and general merchandise. The Debtors spend approximately $5 million in connection with Rebate Programs each year.

182.     The Rebate Programs are a critical component of the Debtors' Customer Programs and are essential in both maintaining customer relationships and promoting active marketing for the Debtors.

### Damaged Goods Programs

183.    Next, the Debtors facilitate two types of "damaged goods" programs offered by manufacturers (collectively, the "Damaged Goods Programs"). First, certain manufacturers offer "swell allowances" to customers, which are upfront discounts that are meant to account for damages that may occur as a result of inherent risks associated with the storage and transportation of goods. When a swell allowance is available, customers automatically receive 2/3 of the swell allowance (i.e. the amount of the discount) to compensate for any potential damages incurred, and the Debtors receive 1/3 of the allowance for their damages. To the extent any goods received from the manufacturer are in fact damaged, no return of the goods is permitted since the discounted purchase price already accounts for the risk of damage.

184.    In the alternative, for manufacturers who do not offer "swell allowances," customers of the Debtors may return damaged goods by sending the goods to a third party that processes the return and records the nature of the damages. The customers then receive a credit based on what was returned and the terms of the arrangement. The Debtors do not incur any costs in facilitating the Damaged Goods Programs.

### Coupon Programs

185.    In order to induce customers to purchase their products, the Debtors facilitate a variety of coupon programs for the benefit of their customers and consumers (the "Coupon Programs"). First, White Rose uses a third party clearing house to process and track manufacturer coupons presented to their customers (i.e. the grocery stores) by consumers. White Rose then in turn credits its customers for the discounts given to consumers, and deducts the amount of these credits from amounts that it owes to the relevant manufacturers. Likewise, AWI generally facilitates two types of Coupon Programs, which are referred to as "ad programs:"

1643903.6 09/09/2014

(i) similar to White Rose, AWI will credit its customers for discounts given to consumers for the purchase of certain items during an advertisement period and thereafter receive a reimbursement from the manufacturer for the amount of this credit; and (ii) under the "count/recount" program, AWI offers a discount to its customers, who then determine whether they would like to pass this discount on to consumers. In all Coupon Programs, the Debtors serve simply as a "middle man;" the Debtors incur no cost in facilitating the programs.

### Customer-Specific Loyalty Incentives

186.    The Debtors pay certain large retail customers a loyalty incentive fee (the "Loyalty Incentive Fees"). The fees are paid as an inducement to the customers to continue to maintain a high volume of business with the Debtors. The Debtors pay approximately $193,000 per year in Loyalty Incentive Fees.

### Seasonal Promotions

187.    The Debtors offer additional price discounts based on seasonal timeframes and events in order to promote increased volumes ("Seasonal Promotions"). These Seasonal Promotions generally correspond to timeframes preceding and during events that are widely recognized by their target customers, such as widely recognized holidays.

### Gift Cards and Gift Certificates

188.    An important component of the Debtors' Customer Programs is the sale of gift cards (the "Gift Cards") and gift certificates (the "Gift Certificates"). Gift Cards allow customers to pay in advance, as a deposit, for the right to buy merchandise from store inventory in the future, up to a certain pre-determined amount. Debtor Nell's Inc. ("Nell's") offers Gift Cards to its store customers in two ways. First, customers can purchase Gift Cards directly from Nell's store locations. Second, Nell's offers Gift Cards through an organizational fundraising

program, under which certain organizations (namely, nonprofit organizations and schools) purchase Gift Cards from Nell's at a discounted rate and in turn sell such Gift Cards to their members at full price in order to raise funds for their respective organizations. The Debtors' Gift Card programs are administered through First Data Corporation. As of the Petition Date, approximately $92,000 in Gift Cards remains outstanding, which the Debtors seek to honor in the ordinary course of business.

189. Additionally, in the ordinary course of business, White Rose issues gift certificates (the "Gift Certificates") to its customers (i.e. grocery stores) prior to the Petition Date. The Debtors' customers in turn pass the benefits of these Gift Certificates to consumers based on consumer participation in various store loyalty programs. The Debtors estimate that approximately $25,000 in Gift Certificates remain outstanding as of the Petition Date, and seek to honor such Gift Certificate obligations in the ordinary course of business.

### Nell's Gas Program

190. Nell's offers its customers a "gas cash" program under which customers, for every $400 spent, may earn a $10 gift certificate for the purchase of gas or future grocery purchases (the "Gas Program").

191. The success and viability of the Debtors' businesses and the Debtors' ability to successfully maximize value for parties in interest in these cases is dependent in large part upon the patronage and loyalty of their customers. The Customer Programs are critical in maintaining this patronage and loyalty by ensuring customer satisfaction and generating goodwill, which in turn results in repeat business and increased revenues for the Debtors. The ability to continue the

Customer Programs following the Petition Date is thus vital not only to the Debtors' ongoing relationships with current and future customers, but to their ability to operate in a manner that will maximize the value of their estates for the benefit of all parties in interest.

192.    I accordingly believe it is essential that the Court enter an order granting the relief sought in the Customer Programs Motion and permit the Debtors to preserve the relations with their customers.

**Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors' Incurrence of Post-Petition Secured Indebtedness with Administrative Superpriority, (II) Granting Liens, (III) Authorizing the Debtors' Use of Cash Collateral and Providing for Adequate Protection, (IV) Modifying the Automatic Stay and (V) Scheduling a Hearing (the "DIP Motion")**

193.    As discussed above, the Debtors have filed a motion seeking entry of interim and final orders authorizing certain of the Debtors to enter into a debtor-in-possession credit agreement (the "DIP Credit Agreement") with the financial institutions that are or may from time to time become parties to the agreement, including C&S (together with their respective successors and assigns, the "Lenders"), and Bank of America, N.A., in its capacity as "Issuing Bank" and agent (the "Agent," and together with the Lenders, the "DIP Secured Parties").

194.    The Debtors are seeking to conduct an efficient auction process to sell substantially all of their assets with the goal of confirming and consummating a chapter 11 plan. In order to manage and preserve their assets and properties while achieving an orderly liquidation, preserve value by allowing the Debtors to continue to operate pending consummation of a sale and fund other costs needed to administer the Debtors' estates, the Debtors require liquidity and working capital.

195.    The Debtors, however, do not have sufficient available sources of working capital to continue to operate their businesses without additional financing. Simply put, without an immediate infusion of working capital, the Debtors will have no choice but to liquidate their

assets immediately in a "free fall" bankruptcy. This would destroy the Debtors' remaining businesses and harm the Debtors' employees, customers, vendors and other creditors.

196.    In light of the Debtors' financial condition, the Debtors were unable to obtain additional equity financing or unsecured financing prior to the Petition Date. Additionally, the Bank Group would not consent to the Debtors obtaining third party financing secured by liens in the Pre-Petition Collateral senior to, or *pari passu* with, their liens on such collateral, and would only agree to provide further financing in the context of a chapter 11 debtor-in-possession financing facility. As such, the Debtors negotiated with the DIP Secured Parties concerning the terms of a possible financing arrangement.

197.    Through these negotiations, the Bank Group indicated that it was only willing to provide post-petition financing up to a certain amount. This threshold became problematic for C&S, however, which premised its willingness to serve as stalking horse bidder in these Chapter 11 Cases on the Debtors continuing to meet certain agreed-upon working capital projections, retaining customers and otherwise maintaining the value of their businesses until the closing of a Sale.

198.    Upon determining that the financing offered by the Bank Group may not be sufficient to enable the Debtors to alleviate C&S's concerns, C&S agreed to provide additional secured funding to the Debtors that is junior in priority to the "Bank Lenders" (as defined in the DIP Credit Agreement). Accordingly, after continued arm's length and good faith negotiations, the Debtors were ultimately able to procure a commitment for post-petition financing (the "DIP Facility") from two sources - the Bank Lenders and C&S - subject to the  terms and conditions set forth in the DIP Credit Agreement.

1643903.6 09/09/2014

199. The Debtors, with my assistance, have further prepared a budget (as amended from time to time to the extent permitted under the DIP Credit Agreement, the "Budget") that reflects the Debtors' projected operating cash expenditures during the period from the Petition Date to November ____, 2014 (as may be extended from time to time, the "Budget Period"). The Debtors' cash on hand as of the Petition Date and receipts from operations will be insufficient to satisfy their operating cash needs during the Budget Period. Accordingly, additional financing is necessary in order to permit the Debtors to conduct their Chapter 11 Cases. Given their financial circumstances, I believe that the DIP Facility is the only available source of such financing.

200. The terms of the DIP Credit Agreement are reasonable under the circumstances and were: (a) negotiated by the parties in good faith and at arm's length; and (b) instituted for the purpose of enabling the Debtors to meet ongoing operational expenses while in chapter 11 and consummate the Sale of the company in accordance with the Bid Procedures. In the absence of such financing, the Debtors will suffer immediate and irreparable harm because they will be forced to wind down their operations and liquidate their assets piecemeal, which will undoubtedly yield less value for the Debtors' estates than sale of the assets through the proposed Sale.

201. Furthermore, during the ordinary course of operations, the Debtors generate cash collateral from the use of the Pre-Petition Collateral (the "Cash Collateral"). The Debtors use Cash Collateral in the normal course of their businesses in order to continue to finance their operations, make essential payments such as employee payroll and taxes, and purchase goods and services essential to their businesses. It is imperative that the Debtors obtain authority to use Cash Collateral, in accordance with the Interim Order and the DIP Credit Agreement, because

1643903.6 09/09/2014

the use of Cash Collateral is necessary in conjunction with the financing provided by the DIP Credit Agreement in order to fund the continued business operations.

202. Based on current capital market conditions and the Debtors' financial condition, the Debtors determined that postpetition financing on an unsecured basis would be unobtainable in amounts necessary to fund the Debtors' operations during the course of these Chapter 11 Cases. Moreover, because substantially all of the Debtors' assets are subject to the liens of the Bank Group, the Debtors were unable to obtain financing secured by liens in their unencumbered assets.

203. I believe that the DIP Facility is absolutely essential to the Debtors' ability to conduct their Chapter 11 Cases and their ability to maximize value by conducting an orderly liquidation of their assets. Without the infusion of additional capital, the Debtors will suffer immediate and irreparable harm, including the cessation of their operations and the orderly wind-down currently in progress. Accordingly, entry of the Interim Order is necessary to preserve the Debtors' estates.

204. The terms of the DIP Credit Agreement were negotiated by the Debtors and the DIP Lenders in good faith and at arm's length, and I believe that they are fair and reasonable under the circumstances.

205. Accordingly, I believe that the relief requested in the DIP Motion is in the best interests of the Debtors' estates, their creditors and all parties in interest.

## PART III: CONCLUSION

206. For the reasons stated herein and each of the First Day Pleadings, the relief sought therein is in the best interests of the Debtors, their creditors and estates. Therefore, on behalf of the Debtors, I respectfully request that the relief requested in each of the First Day Pleadings be granted.

1643903.6 09/09/2014

I declare under penalty of perjury that, to the best of my knowledge, and after reasonable inquiry, the foregoing is true and correct.

Dated: September 8, 2014

Respectfully submitted,


Douglas A. Booth, on behalf of himself and the affiliated Debtors and Debtors-in-Possession


Name: Douglas A. Booth
Title:   Chief Restructuring Officer

1643903.5 09/08/2014