# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AWI Delaware, Inc.,[1] | ) | Case No. 14-12092 (___) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Associated Wholesalers, Inc., | ) | Case No. 14-12093 (___) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Nell's Inc., | ) | Case No. 14-12094 (___) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Co-Op Agency Inc., | ) | Case No. 14-12095 (___) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Associated Logistics, Inc., | ) | Case No. 14-12096 (___) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| White Rose Inc., | ) | Case No. 14-12097 (___) |
| | ) | |
| Debtor. | ) | |
| | ) | |

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: AWI Delaware, Inc. (3683); Associated Wholesalers, Inc. (7857); Nell's, Inc. (1195); Co-Op Agency Inc. (4081); Associated Logistics, Inc. (1506); White Rose Inc. (1833); Rose Trucking Corp. (2630); WR Service Corp. (5698); WR Service II Corp. (9444); WR Service V Corp. (4224); and White Rose Puerto Rico, LLC (4914). The Debtors' address is Associated Wholesalers, Inc. c/o Douglas A. Booth, Route 422, P.O. Box 67, Robesonia, PA 19551.

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| Rose Trucking Corp., | ) | Case No. 14-12098 (___) |
| Debtor. | ) | |
| In re: | ) | Chapter 11 |
| WR Service Corp., | ) | Case No. 14-12099 (___) |
| Debtor. | ) | |
| In re: | ) | Chapter 11 |
| WR Service II Corp., | ) | Case No. 14-12100 (___) |
| Debtor. | ) | |
| In re: | ) | Chapter 11 |
| WR Service V Corp., | ) | Case No. 14-12101 (___) |
| Debtor. | ) | |
| In re: | ) | Chapter 11 |
| White Rose Puerto Rico, LLC, | ) | Case No. 14-12102 (___) |
| Debtor. | ) | Joint Administration Requested |

## MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, (B) APPROVING ASSET PURCHASE AGREEMENT AND (C) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), by and through their proposed undersigned counsel, hereby move the Court (the "Sale Motion") for the entry of an order, pursuant to sections 105(a), 363, 365 and 503 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), and rules 2002, 6004, 6006, 9007 and 9008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule

635412.4 09/09/2014

6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"): (a) authorizing the sale (the "Sale") of substantially all of the Debtors' assets, free and clear of all Liens, Claims, Encumbrances and Interests (defined below) to either (i) the Purchaser (as defined in the Bid Procedures) or (b) the Successful Bidder or Successful Bidders (as defined in the Bid Procedures); and (b) approving either (i) the Agreement attached as **Exhibit 1** to the proposed order or (ii) the Successful Bid or Successful Bids (as defined in the Bid Procedures). In support of this Sale Motion, the Debtors rely on the Declaration of Douglas A. Booth in Support of First Day Motions for Relief (the "Booth Declaration")[2] which is being filed contemporaneously herewith, and respectfully state as follows:

### Jurisdiction

1.      This Court has jurisdiction over this Sale Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1408 and 1409. The Debtors confirm their consent pursuant to Local Rule 9013-1(f) to the entry of a final order by the Court in connection with this Sale Motion if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      The statutory predicates for the relief requested herein are sections 105, 363, 365 and 503 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007 and 9008, and Local Rule 6004-1.

---

[2]      Terms utilized but not otherwise defined herein shall have the meanings ascribed to them in the Booth Declaration the Bid Procedures, or the Agreement, as applicable.

635412.4 09/09/2014

## Background

3.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.     No request for the appointment of a trustee or examiner has been made in these chapter 11 cases (the "Chapter 11 Cases") and, as of the date of the filing of this Sale Motion, no official committees (the "Committee") have been appointed or designated.

5.     The factual background relating to the Debtors' commencement of these Chapter 11 Cases is set forth in detail in the Booth Declaration, which is incorporated herein by reference.

**A.     The Debtors' Liquidity Constraints and Lack of Alternatives to a Sale**

6.     As explained more fully in the Booth Declaration, in light of the continued deterioration of the Debtors' cash position, liquidity and lack of realistic restructuring options, the Debtors, in the exercise of their reasonable business judgment, ultimately determined that the most effective way to maximize the value of the Debtors' estates for the benefit of their constituents was to seek bankruptcy protection, in order to sell the Debtors' business and assets through the Sale pursuant to section 363 of the Bankruptcy Code.  The Sale is supported by the Agent under the DIP Credit Facility.  C&S will serve as the stalking horse purchaser for the Acquired Assets, subject to higher and better bids, at a section 363 sale of substantially all of the Debtors' assets.  The Debtors believe, in the exercise of their business judgment, that such Sale provides the best restructuring alternative for all of their creditor constituencies and stakeholders.

7.     In order to maintain the support of the Debtors' customers and vendors, it is in the best interests of the Debtors and their estates to move expeditiously with a sale process, as

4

discussed herein. The Debtors' business is a customer service business, and maintaining customer confidence is crucial for its viability. Given its liquidity constraints, the Debtors have had difficulty in providing the required service levels. The Debtors believe that the additional liquidity provided by the DIP Credit Facility, including, but not limited to the C&S DIP Credit Amount, will allow the Debtors to improve their customer service levels. However, a prolonged sale process in a lengthy chapter 11 proceeding would serve only to erode customer confidence and would consequently prove detrimental to the Debtors' business. In addition, given the Debtors' ongoing liquidity constraints, it will need to close prior to the busy holiday season.

8.      In December 2013, AWI retained Carl Marks Advisory Group LLC to conduct a third-party business review of the company and to facilitate the development of strategic options for White Rose. Although this process led to the identification of several initiatives that could improve profitability and stability in the businesses, the Borrowers ultimately experienced additional defaults under the Pre-Petition Credit Facility.

**B.      The Debtors' Sale and Marketing Efforts to Date**

9.      On May 13, 2014, the Debtors hired Lazard Middle Market, LLC ("LMM") as their exclusive investment banker to find a buyer for the White Rose Debtors or substantially all of their assets. Upon its retention, LMM prepared marketing materials and an extensive electronic data room. On June 6, 2014, LMM began actively marketing the White Rose Debtors, sending teasers and non-disclosure agreements to 18 strategic buyers and 37 financial buyers.

10.      As LMM proceeded to market the White Rose Debtors for sale, it found, based on discussions and feedback from potential buyers, that many potential strategic buyers were only interested in the purchase of the AWI Debtors' assets, or that such buyers would only consider a purchase of the White Rose Debtors' assets as part of a purchase of all of the Debtors' assets. At

the same time, the AWI Debtors' business continued to decline and it became clear that AWI would not be able to absorb the debts likely to remain after the sale of the White Rose Debtors' assets. Based upon these events, the Debtors modified the engagement of LMM to incorporate a sale of all of the Debtors' assets, including AWI.

11.     Since expanding the scope of the sale process to incorporate all of AWI's assets, LMM has sent teasers to 40 strategic buyers and 42 financial buyers. Moreover, since initiating the marketing process, substantial interest has been expressed by strategic and financial buyers in acquiring the assets. Thirty-six parties have executed non-disclosure agreements to conduct due diligence in connection with a possible acquisition. LMM has also distributed a Confidential Information Memorandum to these parties and provided access to an extensive electronic data room. The data room contains significant information about all aspects of the business, and the Debtors and LMM have been responding to requests for additional information from interested parties. In addition, LMM and the Debtors' management conducted in-person meetings with potential bidders to show them the facilities and further explore their interest in purchasing all or a portion of the assets.

12.     Following this wholesome marketing process, the Debtors received letters of intent from three potential strategic buyers. LMM, along with the Debtors, their counsel and financial advisors, carefully evaluated and compared the offers to identify the highest and best bids. Thereafter, following extensive arms-length negotiations, the Debtors entered into the Agreement. Pursuant to the Agreement, the Acquired Assets are to be sold free and clear of all mortgages, restrictions, hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, options, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, liens (including, without limitation, mechanics', materialmens' and other

consensual and non-consensual liens and statutory liens), judgments, demands, encumbrances, rights of first refusal, offsets, set-offs, contracts, recoupment, rights of recovery, claims for reimbursement, contribution, indemnity, exoneration, products liability, alter-ego, environmental, pension, or tax liabilities, decrees of any court or foreign or domestic governmental entity, or charges and interests of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, debts arising in any way in connection with any agreements, acts, or failures to act, of the Debtors or the Debtors' predecessors or affiliates, claims (as that term is used in the Bankruptcy Code), reclamation claims, obligations, liabilities, demands, guaranties, options, rights, contractual and other commitments, restrictions, interests and matters of any kind and nature, whether known or unknown, choate or inchoate, filed or unfilled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity or otherwise, including claims arising under any doctrines of successor liability or alter-ego (collectively, "Liens, Claims, Encumbrances and Interests"), other than Permitted Liens and Permitted Encumbrances, with such Liens, Claims, Encumbrances and Interests to attach to the proceeds of the Sale to be received by the Debtors in accordance with the Agreement in the same priority and subject to the same defenses and avoidability, if any, as before the Closing.

13.     Purchaser has made it clear to the Debtors that it would not have entered into the Agreement if the Sale was not free and clear of all Liens, Claims, Interests and Encumbrances of any kind or nature whatsoever as set forth in the Agreement (other than Permitted Exceptions

and Permitted Liens), or if Purchaser would, or in the future could, be liable for any such Liens, Claims, Interests and Encumbrances or Excluded Liabilities (other than Permitted Exceptions and Permitted Liens).

## Proposed Sale

### A.    **Summary of the Agreement**[3]

14.    The following briefly summarizes certain provisions and/or key aspects of the Agreement, as well as any provisions required to be highlighted under Local Rule 6004-1(b)(iv):

| Purchase Price (Sections 3.1; 3.1(b)) | Subject to certain potential adjustments, the Purchase Price consists of: <br><br> (i) the <u>lesser</u> of: <ul><li>the amount of the Bank Debt, and</li><li>$152,110,000, <u>plus</u></li></ul> (ii) the <u>lesser</u> of <ul><li>an amount equal to amounts owed to LMM as of the Closing Date, and</li><li>$1.9 million, <u>plus</u></li></ul> (iii) the <u>lesser</u> of <ul><li>$8,610,000, and</li><li>an amount equal to 105% of the amount of certain outstanding letters of credit as of the Closing Date, <u>plus</u></li></ul> (iv) the <u>lesser</u> of <ul><li>the amount of wages accrued for the benefit of all of the Sellers' employees for the Stub Wage Period, and</li><li>$2.5 million, <u>plus</u></li></ul> (v) a "credit bid" of the Purchaser's $18 mllion participation in the DIP Credit Facility, <u>plus</u> <br><br> (vi) $5 million, <u>minus</u> <br><br> (vii) any Unreinvested Insurance Recovery. |

---

[3]    This description of the Agreement is intended as a summary only. Any conflict between the description of the Agreement in this Sale Motion and the Agreement should be resolved in favor of the Agreement. Capitalized terms used in this summary of the Agreement that are not defined herein shall have the meaning given in the Agreement.

| | |
|---|---|
| **Good Faith Deposit**<br>**(Section 3.3)** | Within two (2) Business Days after (i) confirmation by the Escrow Agent that an account has been opened to maintain the Deposit, and (ii) execution of the Escrow Agreement by the Sellers and the Escrow Agent, Purchaser shall deposit with the Escrow Agent an amount equal to $15 million as an earnest money deposit (together with all interest earned thereon, the "Deposit"). |
| **Right to Credit Bid**<br>**(Bid Procedures)** | As set forth above and in the Agreement, the Purchase Price includes a "credit bid" of the Purchaser's $18 mllion participation in the DIP Credit Facility. |
| **Releases**<br>**(the Sale Motion and Proposed Sale Order)** | The Agreement does not contain a release provision; however, as described in paragraph 15 of this Motion, paragraph __ of the proposed Sale Order contains a proposed release of the Purchaser. |
| **Competitive Bidding/Auction**<br>**(Section 8.1)** | The Agreement contemplates an Auction to be conducted in accordance with the Bid Procedures Order. |
| **Acquired Assets/Excluded Assets**<br>**(Sections 2.1 and 2.2)** | The assets to be sold are substantially all of the assets of the Sellers, other than the Excluded Assets. Excluded Assets include:<br><br>• Corporate seals, minute books, stock books, Tax Returns or other records having to do with the corporate organization of the Seller;<br>• All rights and interest in connection with any Employee Benefit Plan;<br>• All insurance policies and rights under such insurance policies;<br>• All contracts that are not Assigned Contracts;<br>• Permits that are not transferable at Closing;<br>• All shares of capital stock or other equity interests in any Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests.<br>• Any right to refunds or credits with respect to a Tax Return;<br>• All cash or cash equivalents;<br>• Certain enumerated causes of action (See Agreement Schedule 2.2(k));<br>• Pre-paid expenses and deposits, including security deposits, to the extent related to the Excluded Assets or Excluded Liabilities.<br>• Certain enumerated Avoidance Actions (See Schedule 2.1(o)); |

9

| | |
|---|---|
| | <ul><li>Records related to Excluded Assets, Excluded Liablties and employees other than the Transferred Employees, as well as all records which related solely to the formation and governance of the Debtors or that by Law any Debtor is required to maintain in its possession;</li><li>Loans owed to any Debtor by any employee, director, or shareholder/member that do not represent and that is not in lieu of an Accounts Receivable of any Debtor, and any inter-company loans;</li><li>Executive, or incentive compensation, bonus, deferred compensation, pension, profit sharing, savings, retirement, stock option, stock purchase, group life, health or auto insurance or other Benefit Plan;</li><li>Bank accounts;</li><li>Utility Deposits pursuant to Section 366 of the Bankruptcy Code;</li><li>Intercompany receivables;</li><li>Any writing or other item protected from disclosure by privleges and/or the work product doctrine;</li></ul> |
| **Sale of Avoidance Actions (Sections 2.1(o))** | Except for those causes of action listed on Schedule 2.1(o), the Acquired Assets include all rights, demands, claims and actions under Chapter 5 of the Bankruptcy Code (collectively, "Avoidance Actions") that any Seller may have against any suppliers of Inventory or any customer of the Business. Notwithstanding the foregoing, any Avoidance Action with respect to any supplier of Inventory, or with respect to any customer, with a Contract that is not an Assigned Contract, is retained for Sellers if Purchaser is not conducting material business with such supplier or customer as of the date of Closing or as of the date that is thirty (30) days after the day on which the Auction concludes. |
| **Assumed Liabilities (Section 2.3)** | Purchase will assume the following Assumed Liabilities: <ul><li>Liabilities and obligations under the Assigned Contracts arising after the Closing;</li></ul> |

10

| | |
|---|---|
| | <ul><li>Purchaser shall assume obligations for the payment of rent related to an Acquired Asset subject to a lien under a capital lease or a purchase money security interest that is a Permitted Lien, if such capital lease, operating lease or purchase money security interest is not capable of assumption pursuant to Section 365(e)(1)(2)(B) of the Bankruptcy Code, solely to the extent that Purchaser and such applicable lessor under such capital lease, operating lease or purchase money security interest reach terms on the parties' rights and obligations with respect to such Acquired Asset that are satisfactory to Purchaser in its sole and absolute discretion.</li><li>Certain specific liabilities and obligations identified in Schedule 2.3(c) to the Agreement; and</li><li>Liabilities relating to cure amounts for the Assigned Contracts.</li></ul> |
| **Excluded Liabilities/Limits on Successor Liability (Section 2.4, with limits on successor liability in section 2.4(i))** | Purchaser shall not be obligated for any of the Excluded Liabilities, including the following (as listed in Section 2.4 of the Agreement):<ul><li>any and all liabilities and obligations for Taxes of any of the Sellers, including, Taxes arising from or with respect to the Acquired Assets or the Business to the extent attributed to the operation of the Business on or before the Closing Date or the transactions contemplated by the Agreement;</li><li>any and all liabilities for indebtedness of Sellers with respect to borrowed money;</li><li>any and all liabilities and obligations arising under any Environmental Law or any other Law (including as a result of any action or inaction of Sellers or of any third party) relating to the storage, use or operation of the Acquired Assets;</li><li>any and all liabilities and obligations for any violation of any Law;</li><li>any and all liabilities and obligations for: (i) costs and expenses incurred by Sellers or owed in connection with the administration of the Bankruptcy Cases; and (ii) all costs and expenses of Sellers incurred in connection with the negotiation, execution and consummation of the transactions contemplated under this Agreement;</li></ul> |

635412.4 09/09/2014

- any liabilities of any Seller under those Contracts and Permits which constitute Excluded Assets or which are not assigned to Purchaser pursuant to the provisions of the Agreement;

- in addition to liabilities and obligations retained by Sellers in accordance with Section 6.4, all ordinary accruals for vacation days and sick days of the Transferred Employees that accrued prior to the Petition Date, and all liabilities and obligations (i) relating to worker's compensation claims which remain unpaid as of the Closing Date (whether reported or not), (ii) relating to the exempt or non-exempt status of any Transferred Employee, (iii) relating to the classification of employees as independent contractors, (iv) relating to litigation, including without limitation any claims for wrongful termination, any claims under Title VII of the Civil Rights Act of 1964, as amended, or similar state Law, and any whistleblower claims, and (v) relating to any obligations pursuant the WARN Act or claims made under the WARN Act.

- any and all liabilities and obligations (w) that are the subject of any dispute, litigation, arbitration, judgment, order, decree or other proceeding as of the Closing Date, (x) with respect to periods prior to the Closing Date and are or could be asserted as a claim in litigation or arbitration after the Closing Date, (y) relating to any bodily injury, or damage to property, incurred by any Person arising as a result of actions or omissions with respect to services provided to customers prior to the Closing (including, without limitation, all matters noticed or pending and scheduled on Schedule 4.14);

- 
- any liabilities or obligations based on any "defacto merger", "business continuation" or "successor-in-interest" theories of liability;

- those specific liabilities and obligations of Sellers identified on **Schedule 2.4(k)**;

- any liability or obligation of any Seller to its respective equity holders or Affiliates;

- any costs and expenses that may be recovered from Acquired Assets on account of the operation of Section 506(c) of the Bankruptcy Code;

12

|  |  |
|---|---|
|  | • any and all liabilities and obligations of any Seller to the extent that their existence or magnitude constitutes or results in a breach of a representation, warranty or covenant made by any Seller to Purchaser under the Agreement; <br><br> • any liabilities arising out of any representations, warranties, actions or failure to act by Sellers in connection with any Assumed Contract, including any claims by any person or entity other than the counter-party to such Assumed Contract, and in each case unless constituting Cure Amount; <br><br> • the obligations and liabilities of Sellers under the Agreement, the Ancillary Agreements and all other instruments and agreements executed in connection therewith; <br><br> • all liabilities or obligations arising under any Employee Benefit Plan or CBA that is not an Assigned Contract. <br><br> • without limitation by the specific enumeration of the foregoing, any and all liabilities and obligations of any Seller or arising out of or related to the Acquired Assets or the Business or otherwise that are not expressly assumed by Purchaser pursuant to the provisions of Section 2.3 of the Agreement. |
| **Use of Proceeds** <br> **(proposed form of order)** | The sale proceeds are proposed to be used as follows, in the indicated order of priority: <br> • *first*, to the Debtors, to be used to pay any accrued and unpaid wages for the Stub Wage Period (as defined in the Agreement) for the Debtors' employees in an amount not to exceed the lesser of (i) the Stub Period Wage Amount (as defined in the Agreement) and (ii) $2.5 million; <br> • *second*, to the Debtors, to be used to pay any fees and expense reimbursement that may be allowed to Lazard Middle Market LLC, in an amount equal to the lesser of (i) the Lazard Amount and (ii) $1.9 million; |

| | |
|---|---|
| | • *third*, for the full payment of the Pre-Petition First Lien Debt and the full payment of the DIP Obligations (as such terms are defined in or by the Final DIP Order); provided, however, that the Agent shall at the closing of the Sale, from Sale proceeds payable to the Agent, pay the Carve-Out, as and to the extent provided in the Final DIP Order, to counsel to the Debtors (Saul Ewing LLP) to be held by Saul Ewing LLP and used solely for the payment of allowed professional fees in the Debtors cases; and <br><br> • *fourth*, to the extent additional funds remain from the proceeds of the Sale, such funds shall be available for the Debtors' estates. |
| **Sale Free and Clear of Unexpired Leases** <br> **(See Sections 2.1 and 2.2)** | The Sellers seek to transfer, and Purchaser seeks to purchase, the Acquired Assets free and clear of all Liens, Claims, Encumbrances and Interests to the fullest extent permitted by Section 363 of the Bankruptcy Code, but subject to Permitted Exceptions and Permitted Liens. |
| **Interim Arrangements with Proposed Buyer** <br> **(Section 6.3(a)(iv))** | Following the execution of the Agreement, Purchaser and the Sellers will negotiate a transition services agreement pursuant to which Purchaser shall, at its sole cost and expense, provide certain transition services to Sellers to the extent set forth in such agreement. <br><br> Apart from the Agreement, Purchaser is a "first-in-last-out" participant in the Debtors' DIP Credit Facility, pursuant to the terms contained therein. The anticipated amount of the Purchaser's advances to the Sellers under the DIP Credit Facility is $18.0 million. <br><br> In addition, Purchaser has agreed to supply products to the Debtors on Purchasers' terms and conditions, and if necessary, serve as a primary or secondary supplier to the Debtors' customers if such support is necessary to meet customer demands. |
| **Record Retention** <br> **(Section 6.3(a))** | The Agreement requires Purchaser and the Sellers to keep, preserve and maintain in the ordinary course of business, all books, records, documents and other information in the possession or control of such party until the expiration of any applicable statute of limitations In addition, neither party shall destroy or otherwise dispose of any such records unless it provides sixty (60) days' prior written notice to the other party of the intent to seek or destroy such items. |

635412.4 09/09/2014

| | For a period of 18 months following the Closing Date, or for such shorter period of time as Sellers may request, Purchaser shall provide to Sellers sufficient space to permit up to 5 individuals to engage in all activities related to these Chapter 11 Cases at Sellers' facilities, provided, however, that such arrangement shall not expose Purchaser to any liability. |
|---|---|
| **Representations and Warranties (Articles 4 and 5)** | The Agreement contains certain representations and warranties by the Debtors and Purchaser. |
| **Deadlines for Closing and Certain Bankruptcy Undertakings (Sections 8.1 and 11.1)** | The Agreement includes the following requirements:<br>• The Debtors must file a Bid Procedures Motion and Sale Motion within one (1) business day after the Petition Date.<br>• The Auction must be concluded on or prior to fifty five (55) days from the Petition Date.<br>• The Sale Order must be entered on or prior to sixty-two (62) days from the Petition Date and the Debtors shall use Best Efforts to obtain approval of the Sale Order within two (2) days from the Auction.<br>• The deadline for objections to Cure Amounts and/or the assumption and assignment of a contract must not be less than 3 business days before the Sale Hearing.<br>• Closing must occur, generally, within 100 days from the date Purchaser and the Sellers enter into the Agreement. |
| **Conditions Precedent to Obligations of Sellers and Buyer (Section 9.1 and 9.2)** | <u>Conditions Precedent to Performance by Sellers</u>: Conditions precedent to the Sellers' performance under the Agreement include the following:<br>• Purchaser's representations and warranties must be true and correct;<br>• All agreements and covenants of Purchaser to be performed or complied with at or prior to Closing shall have been performed or complied with in all material respects.<br>• The Sale Order must have been entered by the Bankruptcy Court and not be subject to any stay.<br>• There shall be no preliminary or permanent injunction or other order of a Governmental Authority that prevents consummation of the Sale.<br>• To the extent that the HSR Act is applicable, any waiting period applicable to the consummation of the contemplated transactions must have expired or been earlier terminated.<br>• Purchaser must have delivered to Sellers all deliverables specified in section 10.3 of the Agreement. |

635412.4 09/09/2014

- The Bid Procedures must have been entered by the Bankruptcy Court.
- The Bankruptcy Court must have authorized the assumption and assignment of the Assigned Contracts in the Sale Order.

<u>Conditions Precedent to Performance by Purchaser</u>: Conditions precedent to Purchaser's performance under the Agreement include the following:

- The Sellers' representations and warranties must be true and correct;
- All agreements and covenants of Sellers to be performed or complied with at or prior to Closing shall have been performed or complied with in all material respects.
- The Sellers must have delivered to Purchaser all deliverables specified in section 10.2 of the agreement;
- There shall be no preliminary or permanent injunction or other order of a Governmental Authority that prevents consummation of the Sale.
- The Sale and Bid Procedures Orders must have been entered by the Bankruptcy Court.
- To the extent that the HSR Act is applicable, any waiting period applicable to the consummation of the contemplated transactions must have expired or been earlier terminated.
- The Schedules Delivery and the Exhibits Delivery pursuant to Section 6.3(c) shall have occurred on or prior to the Execution Date.
- The Sellers shall have delivered to the Purchaser a certificate signed by the Chief Financial Officer of the Sellers (i) attesting to the fact that the service levels with respect to customers of the Business, in the aggregate across all product categories, for the period between October 7, 2014 and the earlier of the Closing Date or October 24, 2014, shall have been at a level of at least 92% for AWI and 90% for White Rose, and (ii) if the Closing occurs after October 24, 2014, also attesting to the fact that the service levels with respect to customers of the Business, in the aggregate across all product categories, for the period between October 25, 2014 and the Closing Date, shall have been at a level of at least 90% for AWI and 88% for White Rose, in each case, as measured by Sellers' internal policies and methodologies, which policies and methodologies shall be similar in all material respects to the policies and methodologies used by the Sellers to measure customer service levels on the Execution Date.

16

| | |
|---|---|
| | <ul><li>Purchaser shall have obtained such licenses to, and other rights of use, maintenance and support of, Intellectual Property, products and services under any Intellectual Property owned or licensed by any of Retailer Owned Research Company, Inc., Shurfine Eastern Corporation or Western Family Holding Company (or any of their respective Affiliates) under terms that are reasonably satisfactory to the Purchaser.</li><li>Since the Execution Date, other than loss of volume resulting from (i) the termination of the Krasdale agreement, or (ii) the rejection of any customer agreement, Sellers shall not have experienced customer cancellations or loss of purchase volume that constitute, in the aggregate, one hundred eighty million dollars ($180,000,000) or more on an annualized run-rate basis, except to the extent such volume has been transitioned to direct purchases from Purchaser.</li><li>Purchaser shall have obtained such licenses to, and other rights of use, maintenance and support of, Intellectual Property, products and services under any Intellectual Property owned or licensed by any of Retailer Owned Research Company, Inc., Shurfine Eastern Corporation or Western Family Holding Company (or any of their respective Affiliates) under terms that are reasonably satisfactory to the Purchaser.</li><li>The Bankruptcy Court must have authorized the assumption and assignment of the Assigned Contracts in the Sale Order.</li><li>The Agent under the DIP Credit Agreement shall have filed, or shall have agreed to file all termination statements with respect to collateral security the repayment of any obligation owed to such lenders as its relates to the Acquired Assets.</li></ul> |
| **Termination Events (Section 11.1)** | There are several circumstances in which the Agreement may be terminated, which include the following:<br><br>(a) by mutual written consent of the Sellers and Purchaser;<br><br>(b) automatically, if, among other things, a Governmental Authority issues a final order to prohibit the transfer of the Acquired Assets, or the Bankruptcy Court approves an Alternate Transation;<br><br>(c) by Purchaser, if the Bid Procedures Order is not entered within 24 days after the Petition Date;<br><br>(d) by Purchaser, if the Acution is not concluded on or before 55 days after the Petition Date; |

635412.4 09/09/2014

| | |
|---|---|
| | (e) by Purchaser, if the Court has not entered a Sale Order on or before 62 days from the Petition Date; |
| | (f) by Purchaser or the Sellers, if there has been a material breach of the Agreement by either party of any representation, warranty or covenant that is not waived by either party and/or not cured within seven (7) days following receipt of notice thereof; |
| | (g) by Purchaser or Sellers if the Closing has not occured within 100 days after the Execution Date (provided, however that such failure is not a result of a material violation or breach by the party seeking to terminate), subject to extension if Purchaser is deemed a back-up bidder solely to the extent set forth in the Agreement; |
| | (h) by Purchaser if, prior to Closing, any Debtor's Bankruptcy Case shall be dismissed or converted to a case under Chapter 7 or if a trustee or examiner with expanded powers is appointed; |
| | (i) by the Sellers, if the Federal Trade Commission or the Department of Justice issues a second request in the HSR Act review of the transaction contemplated by the Agreement; and |
| | (j) by Purchaser if the Amount of Working Capital, as determined pursuant to Section 3.2(b) of the Agreement, is less than $167,000,000. |
| **Bank Escrow Letter (Sections 6.2(e) and 10.3(b))** | Upon execution of the Agreement, the Purchaser shall provide to the DIP Agent an executed copy of the Bank Escrow Letter, in the form attached to the Agreement as Exhibit "G". At the Closing, the Purchaser is to provide to the DIP Agent the Bank Escrow Agreement and shall transfer $3.5 million to the Escrow Agent to be held and released pursuant to the terms of the Bank Escrow Letter. The Bank Escrow Letter provides the DIP Agent with certain protections with respect to PACA claims and White Rose Customer Reserve Fund claims.

The Sellers are not a party to the Bank Escrow Letter. |
| **Employee Issues (Section 6.4)** | Purchaser shall offer employment to substantially all of Sellers' employees. The terms of employment offered to employees shall further be determined by the Purchaser in its sole and absolute discretion.

Sellers shall retain all liabilities and obligations with respect to any "employee benefit plans" within the meaning of Section 3(3) of ERISA and any other employee benefit plan or program maintained or contributed to by a Seller or any ERISA Affiliate. |

635412.4 09/09/2014

| | |
|---|---|
| | Neither Purchaser nor any of its Affiliates shall be obligated to provide any severance, separation pay or other payments or benefits, including any key employee retention payments, to any Employee on account of any termination of such Employee's employment on or before the Closing Date, and all such severance, separation pay and other payments and benefits (if any) shall remain obligations of Sellers. |
| | Sellers shall be responsible for (and Purchaser shall not be liable for) any wages or other remuneration, including, without limitation, with respect to paid time off, due to any Non-Transferred Employee, whether with respect to their services as an Employee through the Closing Date or otherwise. |
| | Immediately following the Execution Date, Sellers shall reasonably cooperate with Purchaser to prepare for, facilitate and arrange meetings among Sellers, Purchaser and the respective collective bargaining agents for each of the Sellers' unions, at such locations, dates and times reasonably designated by Purchaser. |
| | Sellers shall make available sufficiently senior level employees of the Sellers who have experience and knowledge relating to the specific collective bargaining agreement and work (e.g., warehouse, transportation, maintenance) at issue, to be present at, and participate in, each such meeting consistent with the instructions of Purchaser's representatives. |
| | Nothing in the Asset Purchase Agreement shall be deemed to create any right to employment or continued employment or to a particular term or condition of employment with Purchaser or any of its Affiliates, including whether or not Purchaser has communicated with any Employee Communication as set forth in Section 6.4(f) of the Asset Purchase Agreement. |
| **Relief from Bankruptcy Rule 6004(h)** | The Debtors seek relief pursuant to Bankruptcy Rule 6004(h), as set forth below. |

## B.    Additional Provisions

*Releases*

15.    The proposed order approving this Sale Motion provides, that, effective upon the

Closing, each Debtor, on behalf of itself and its estate, shall acknowledge that it has no known

claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature

19

whatsoever against the Purchaser (collectively, the **"Released Claims"**). Should any Released Claims nonetheless exist, the proposed order further provides that each Debtor, on behalf of itself and its estate, shall (i) releases and discharges the Purchaser from any claim, cause of action, liability or obligation whatsoever with respect to the Released Claims and (ii) releases, waives and discharges all of the Released Claims against the Purchaser, provided however, that the proposed release shall not apply to any claim or cause of action of any kind or nature (a) arising under or relating to the Agreement; or (b) for indemnification or contribution related to any third-party claim.

### *Name Change*

16.     The Debtors hereby request the authority, upon and in connection with the Closing, to change their corporate names and the caption of these Chapter 11 Cases, consistent with applicable law. The Debtors shall file a notice of change of case caption, containing the new caption and the proposed new corporate names of the applicable Debtors, within five (5) business day of the Closing, and the change of case caption for these Chapter 11 Cases shall be deemed effective as of the Closing.

### The Bid Procedures

17.     On the Petition Date, the Debtors sought to establish procedures for the Sale of the Acquired Assets by filing the *Motion of the Debtors for Entry of an Order (A) Approving Bid Procedures Relating to the Sale of Substantially All of Debtors' Assets; (B) Scheduling Hearing to Consider Sale and Approving the Form and Manner of Notices; (C) Approving Expense Reimbursement Provision and Break-Up Fee, if Applicable; and (D) Granting Related Relief* [fix title consistent with changes to Bid Procedures Motion](the "Bid Procedures Motion").

18.     Pursuant to the bid procedures attached to the Bid Procedures Motion (the "Bid Procedures"), Qualified Bidders (as defined in the Bid Procedures) must submit a Qualified Bid

(as defined in the Bid Procedures Motion) in accordance with the Bid Procedures. The Qualified Bid that the Debtors, in consultation with the Consultation Parties (as defined in the Bid Procedures), select as the highest and best offer will constitute the Baseline Bid (as defined in the Bid Procedures Motion) for the Acquired Assets and will serve as the opening bid at the Auction.

19.     At the Auction, Qualified Bidders who submitted a Qualified Bid will be invited to offer a Qualified Bid that is higher and better than the Baseline Bid pursuant to the terms of the Bidding Procedures. If no Qualified Bids are submitted other than Agreement, the Auction shalll be cancelled and the Agreement shall be the Successful Bid (as defined in the Bidding Procedures).

20.     By this Motion, the Debtors seek the entry of an order (a) authorizing the Sale to (i) the Purchaser or (ii) a Successful Bidder or Successful Bidders; and (b) approving either (i) the Agreement or (ii) the Successful Bid or Successful Bids. If approval of the Sale to the Purchaser is pursued at the Sale Hearing, the proposed order also includes the Release noted above.

### Applicable Authority

### I.     The Proposed Sale is Proper and Should Be Approved.

21.     The Debtors submit that ample authority exists for approval of the proposed Sale of the Acquired Assets pursuant to either the (i) Agreement or (ii) the Success Bid, as applicable. Section 363(b)(1) of the Bankruptcy Code, which authorizes a debtor to sell assets of the estate other than in the ordinary course of business free and clear of liens, claims and encumbrances, provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1); *see also* Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction.").

21

22.     Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets if the sale is based upon the sound business judgment of the debtor.  *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 39 (3rd Cir. 1996); *In re W.R. Grace & Co.*, 45 B.R. 34, 77-78 (Bankr. D. Del. 2012); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991).

23.     Courts typically consider the following factors in determing whether a proposed sale satisfies this standard: (i) whether a sound business justification exists for the sale; (ii) whether adequate and reasonable notice of the sale was given to interested parties; (iii) whether the sale will produce a fair and reasonable price for the property; and (iv) whether the parties have acted in good faith.  See *In re Del. & Hudson Ry.*, 124 B.R. at 176; *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987).  The *Delaware & Hudson Railway* court further held that:

> Once a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the purchaser [or proposed purchaser] is proceeding in good faith.

*In re Delaware & Hudson Ry.*, 124 B.R. at 176.

24.     In accordance with *Delaware & Hudson Railway*, a sound business purpose dictates the relief requested herein, which is also supported by adequate and reasonable notice, a fair and reasonable sale price and a sale negotiated in good faith.

635412.4 09/09/2014

### C. A "Sound Business Purpose" Supports the Sale and the Release is Appropriate.

25.     Before the Petition Date, the Debtors' operations were not generating sufficient revenue to maintain the Debtors' businesses as a going concern, and thus the Debtors concluded that the best way to maximize value of their estates was through a sale of substantially all of their assets. In addition to the thorough marketing efforts that were conducted prepetition by LMM, as described above, the Bid Procedures have provided the Debtors with a mechanism to seek out potential purchasers of the Acquired Assets that will compete to purchase such assets at the Auction. This enables the Debtors to test the market value for the Acquired Assets and ensure that the Sale will maximize the value of such assets for the benefit of the Debtors' creditors and parties in interest. In addition, the approval of the Release is appropriate given that the incluson of the Release in the proposed order approving this Sale Motion was part of the give and take leading to the Agreement.

### D. Ample Notice of the Proposed Sale Will Be Provided to Interested Parties

26.     The Debtors will employ various methods of notification to ensure that all interested and potentially effected parties will be informed of the Sale and to maximize exposure of the Acquired Assets to interested parties. In order to generate the greatest number of bidders possible for the Acquired Assets and to satisfy the requirements of Bankruptcy Rule 2002, the Debtors propose to serve by first class mail, no later than two (2) days after the entry of the Bid Procedures Order, the Sale Notice (as defined in the Bid Procedures Motion) shall be served upon Sale Notice Parties.

27.     In addition, within seven (7) days after the Court enters the Bid Procedures Order, the Debtors will cause the Sale Notice to be published in one daily edition of either *USA Today*

or *The Wall Street Journal* national editions, or such other similar national publication selected by the Debtors.

### E. The Proposed Sale is for a Fair and Reasonable Price

28.     The Debtors, with the assistance of LMM (i) conducted a comprehensive marketing process with respect to the sale of the Debtors' businesses in order to maximize value, (ii) solicited the interest of various potential strategic and financial buyers and (iii) entertained offers for the purchase of the Debtors' assets and the satisfaction of the outstanding obligations under the Credit Facility.  Numerous potential buyers conducted due diligence with respect to a potential transaction and certain potential buyers provided letters of intent with respect to potential transactions.  In addition, the Debtors have proposed Bid Procedures that will ensure that the highest and best offer for the Acquired Assets is attained.

29.     Because the purchase price of the Acquired Assets will be determined by the Auction, it will be fair and reasonable as contemplated by section 363 of the Bankruptcy Code. *See, e.g.*, *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 149 (3d. Cir. 1986) (finding that "[g]enerally speaking, an auction may be sufficient to establish that one has paid 'value' for the assets of a bankrupt"); *In re Nat'l Health & Safety Corp.*, No. 99-18339DWS, 1999 WL 703208, at *2 (Bankr. E.D. Pa. Sept. 02, 1999) (citing *Abbotts Dairies* for the proposition that an auction may be sufficient to establish that one has paid value for the assets of a debtor, and relying upon auction results to verify that the purchase price represented value).

### F. The Proposed Sale Has Been Negotiated in Good Faith

30.     Section 363(m) of the Bankruptcy Code provides that:

> [t]he reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such property in

24

good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

31.     Although the Bankruptcy Code does not define "good faith purchaser," courts construing section 363(m) of the Bankruptcy Code have stated that "the phrase encompasses one who purchases in 'good faith' and for 'value.'" *Abbotts Dairies*, 788 F.2d at 147. To constitute lack of good faith, a court must find fraud or collusion between a purchaser and a debtor in possession, trustee or other bidders. *See Kabro Associates of West Islip v. Colony Hill Associates (In re Colony Hill Associates)*, 111 F.3d 269, 276 (2d Cir. 1997) ("Typically, the misconduct that would destroy a [purchaser]'s good faith status at a judicial sale involves fraud, collusion between the [purchaser] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *see also 255 Park Plaza Associates. Ltd. P'shp. v. Conn. Gen. Life Ins.*, 100 F.3d 1214 (6th Cir. 1996) (citing *In re Onouli-Kona Land Co.*, 846 F.2d 1170, 1173 (9th Cir. 1988)); *Miami Ctr. Ltd. P'ship v. Bank of New York*, 838 F.2d 1547 (11th Cir. 1988); *Hoese Corp. v. Vetter Corp. (In re Vetter Corp.)*, 724 F.2d 52, 56 (7th Cir. 1983); *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978); *In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *Matter of Perona Bros., Inc.*, 186 B.R. 833, 839 (D.N.J. 1995). Due to the absence of a bright-line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings." *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting *Rock Indus. Mach.*, 572 F.2d at 1198).

32.     As required by section 363(m) of the Bankruptcy Code, the Debtors and Purchaser have engaged in intense, arm's length negotiations. There has been no fraud or

25

collusion. Furthermore, the Bid Procedures establish a process whereby interested parties compete to establish the value of the Acquired Assets. As such, the Auction will result in a bid for the Acquired Assets that represents substantial value to the Debtors' estates because it will provide favorable terms for the disposition of such assets for a price that represents the market value of the assets. *See Abbotts Dairies*, 788 F.2d at 149. Thus, for the foregoing reasons, the Debtors respectfully request that the Court find that the Purchaser, or to the extent applicable, the Successful Bidder or Successful Bidders, are entitled to the protections of section 363(m) of the Bankruptcy Code.

## II. Sale of the Acquired Assets Free and Clear of Liens, Claims, Encumbrances and Interests

33. The Debtors propose to sell the Acquired Assets pursuant to sections 363(b) and 363(f) of the Bankruptcy Code, which, among other things, authorize a debtor to sell property outside the ordinary course of business, free and clear of any interest, lien, claim, encumbrance or security interest of any other party, including, but not limited to, any administrative expense or priority claim asserted in these Chapter 11 Cases. Specifically, section 363(f) of the Bankruptcy Code states that a trustee may sell property free and clear of any interest in such property of an entity other than the estate, only if:

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding to accept a money satisfaction of such interest.

635412.4 09/09/2014

11 U.S.C. § 363(f); *see also In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) (stating that section 363(f) is written in the disjunctive and explaining that a court may approve a sale "free and clear" so long as one of the statutory subsections is met); *In re Shary*, 152 B.R. 724, 725 (Bankr. N.D. Ohio 1993).

34.     The Sale satisfies the criteria set forth in section 363(f) of the Bankruptcy Code. First, the Bank Group has constented to the sale of the Acquired Assets pursuant to the Agreement and has agreed to release its Liens, Claims, Encumbrances or Interests to the Acquired Assets pursuant to the terms of the Agreement; thereby satisfying the requirements of section 363(f)92) of the Bankruptcy Code.  Second, to the extent any other Liens, Claims, Encumbrances or Interests, other than Permitted Liens and Permitted Exceptions, exist, either (a) such entity could be compelled, in a legal or equitable proceeding, to accept a monetary satisfaction equal to the amount of their Lien, Claim, Encumbrance or Interest, or (b) such interest is a Lien and the value of the Acquired Assets to be sold are greater than the aggregate value of all liens on such property.

35.     In addition, the Debtors will send the Sale Notice to all of the Sale Notice Parties, including all parties who could potentially assert any Lien, Claim, Encumbrance or Interest against the Acquired Assets.  Accordingly, the Debtors submit that the Sale of the Acquired Assets free and clear of any Liens, Claims, Encumbrances and Interests satisfies the statutory prerequisites of section 363(f) of the Bankruptcy Code.

## III.     The Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Authorized.

36.     Bankruptcy Code section 365(a) provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a).  The standard governing bankruptcy court

635412.4 09/09/2014

approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g., In re Stable Mews Assoc., Inc.,* 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. *See Group of Institutional Investors v. Chicago M St. P. & P.R.R. Co.,* 318 U.S. 523 (1943); *Sharon Steel Corp.,* 872 F.2d 36, 39-40 (3d Cir. 1989). The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.),* 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *Stable Mews Assoc.,* 41 B.R. at 596). Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank, NA.,* 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to Bankruptcy Code section 365(b)(1), for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

37.     Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract. *See In re Rickel Home Centers, Inc.,* 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); *see also In re Headquarters Dodge, Inc.,* 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

635412.4 09/09/2014

38.    Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that a trustee may assign an executory contract or unexpired lease of a debtor only if:

> (A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

39.    Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Moreover, section 365(b) of the Bankruptcy Code codifies the requirements for assuming an executory contract of a debtor. This provision provides that:

> (b) (1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
> (A)    cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
>
> (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

40.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each such case, but should be given "practical pragmatic construction." *EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe World-Wide Corp.),* 139 B.R. 585, 592 (S.D.N.Y. 1992), aff'd, 993 F.2d 300 (2d Cir. 1993). Typically, "the

assurance of future performance is adequate if performance is likely (i.e. more probable than not)," which notably "falls considerably short of an absolute guarantee of performance." *See In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).

41.     Furthermore, adequate assurance, among other things, may be provided by demonstrating the assignee's financial health and resources and experience in the industry. Adequate assurance may also be shown when the assignee has expressed a willingness to devote sufficient resources to fund the business. *In re Bygraph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986).

42.     As set forth in the Agreement or as shall be set forth in any Qualified Bid, to the extent any defaults exist under any executory contracts or unexpired leases sought to be assumed by the Debtors and assigned to either Purchaser or the Successful Bidder or Successful Bidders, if applicable (the "Assigned Contracts"), such defaults are required to be cured as required under section 365(b)(1) of the Bankruptcy Code.

43.     Based on information received from Purchaser, the Debtors, in consultation with the Consulation Parties, believe that Purchaser has the financial capability to satisfy any and all obligations it will incur in connection with the Assigned Contracts.  In addition, to be a Qualified Bid, any Qualified Bidder must also establish it has the financial capability to satisfy any and all oblgiations it will incur in connection with the Assigned Contracts.  In addition, facts will be further adduced at the Sale Hearing to show the financial credibility of Purchaser, or the Successful Bidder or Successful Bidders, the experience in the industry and its willingness and ability to perform under the Assigned Contracts.  Because the Sale Hearing will provide the Court with an opportunity to evaluate the ability of Purcahser, or the Successful Bidder or Successful Bidders, if applicable, to provide adequate assurance of future performance under the

Assigned Contracts, as required by section 365(b)(1)(C) of the Bankruptcy Code, the Debtors submit that the Court should authorize the assumption and assignment of the Assigned Contracts by the Debtors, effective upon the closing of the proposed Sale.

44.     The Debtors' proposed Bid Procedures provide that all of the counterparties to contracts and leases with the Debtors will be given notice of this Sale Motion, informed whether or not their contracts or leases are Assigned Contracts and provided with the Debtors' proposed cure amounts with respect to their contracts and leases. The Debtors accordingly believe that their proposed procedures with respect to contracts and leases comply with all requirements of Bankruptcy Rule 6006(c).

45.     Based on the foregoing, the Debtors respectfully submit that their assumption and assignment of the Assigned Contracts satisfies the requirements under Bankruptcy Code sections 365(f)(2)(A) and (B).

## IV.    Bankruptcy Rule 6003 is Satisfied and Relief from the Fourteen Day Waiting Periods Under Bankruptcy Rule 6004(h) and 6006(d) is Appropriate

46.     The Debtors further submit that because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein and in the Booth Declaration, Bankruptcy Rule 6003 has been satisfied and the relief requested herein should be granted

47.     Specifically, Bankruptcy Rule 6003 provides:

> Except to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant relief regarding the following: . . . (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition, but not a motion under Rule 4001.

31

48. The Third Circuit Court of Appeals has interpreted the "immediate and irreparable harm" language in the context of preliminary injunctions. In that context, irreparable harm has been interpreted as a continuing harm that cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation. *See, e.g., Norfolk S. Ry. Co. v. City of Pittsburgh*, 235 Fed. Appx. 907, 910 (3d Cir. 2007) (citing *Glasco v. Hills*, 558 F.2d 179, 181 (3d Cir. 1977)). Further, the harm must be shown to be actual and imminent, not speculative or unsubstantiated. *See, e.g., Acierno v. New Castle County*, 40 F.3d 645, 653-55 (3d Cir. 1994).

49. The Debtors further seek a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Rule 6004(h) of the Bankruptcy Rules, "[an] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." As set forth above, the relief requested herein is essential to prevent irreparable damage to the Debtors' operations, going-concern value, and their efforts to pursue a Sale.

50. Pursuant to Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 14 days after entry of the order. *See* Fed. R. Bankr. P. 6004(h). The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. Pro. 6004(g).

51. Similarly, Bankruptcy Rule 6006(d) stays all orders authorizing a debtor to assign an executory contract or unexpired lease pursuant to section 365(f) of the Bankruptcy Code for 14 days, unless the court orders otherwise.

635412.4 09/09/2014

52. To preserve the value of the Acquired Assets and limit the costs of administering and preserving such assets, it is critical that the Debtors close the Sale of the Acquired Assets as soon as possible after all closing conditions have been met or waived. In particular, in light of the limited funding provided by the DIP Credit Facility, it is in the best interest of the Debtors' bankruptcy estates to consummate a sale in accordance with either the Agreement, or the Successful Bid or Successful Bids as the case may be, so that the funding arrangement under the DIP Credit Facility does not terminate as a result of timing defaults or excess costs that might be incurred in connection with a prolonged process. Accordingly, the Debtors hereby request that the Court waive the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d)

53. Based upon the foregoing, the Debtors submit that the relief requested herein is necessary and appropriate, is in the best interests of the Debtors and their estates, and should be granted in all respects.

### Notice

54. The Debtors have provided notice of this Sale Motion to the Sale Notice Parties. In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary

### No Prior Request

55. No previous motion for the relief requested herein has been made to this or any other court.

WHEREFORE the Debtors respectfully request that the Court enter an order: (i) authorizing the Debtors' Sale of the Acquired Assets, free and clear of Liens, Claims, Encumbrances and Interests to either (a) the Purchaser or (b) the Successful Bidder or

635412.4 09/09/2014

Successful Bidders; (ii) approving either the (a) Agreement or (b) a Successful Bid or Successful

Bids; and (iii) granting such other and further relief as the Court deems just and proper.

Dated:  September 9, 2014                    **SAUL EWING LLP**

Mark Minuti (DE Bar No. 2659)
Lucian B. Murley (DE Bar No. 4892)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE  19899
Telephone: (302) 421-6840
Facsimile: (302) 421-5873
mminuti@saul.com
lmurley@saul.com

-and

Jeffrey C. Hampton
Robyn F. Pollack
Monique Bair DiSabatino
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Telephone: (215) 972-7777
Facsimile: (215) 972-7725
jhampton@saul.com
rpollack@saul.com
mdisabatino@saul.com

*Proposed Counsel for Debtors*
*and Debtors in Possession*

635412.4 09/09/2014