## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AWI Delaware, Inc., *et al.*,[1] | Case No. 14-12092 (KJC) |
| Debtors. | Jointly Administered<br>**Hearing Date: October 3, 2014 at 10:00 a.m. (EST)**<br>**Objection Deadline: September 26, 2014 at 4:00 p.m. (EST)** |

## MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER, PURSUANT TO 11 U.S.C. §§ 105, 363(b) AND 503(c), AUTHORIZING AND APPROVING DEBTORS' EMPLOYEE INCENTIVE PLAN AND PAYMENTS THEREUNDER

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), by and through their proposed undersigned counsel, hereby submit this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit "A"** (the "Proposed Order"), pursuant to sections 105(a), 363(b) and 503(c) of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (the "Bankruptcy Code"), approving the Debtors' implementation of a key employee incentive plan for certain employees (the "Proposed Incentive Plan") and authorizing the payments contemplated thereunder (the "Proposed Incentive Payments"). In support of this Motion, the Debtors respectfully state as follows:

### Jurisdiction

1.  This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper in this judicial district under 28 U.S.C. §§ 1408 and 1409. The Debtors confirm their consent

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: AWI Delaware, Inc. (3683); Associated Wholesalers, Inc. (7857); Nell's, Inc. (1195); Co-Op Agency Inc. (4081); Associated Logistics, Inc. (1506); White Rose Inc. (1833); Rose Trucking Corp. (2630); W.R. Service Corp. (5698); W.R. Service II Corp. (9444); W.R. Service V Corporation (4224); and White Rose Puerto Rico, LLC (4914). The Debtors' address is Associated Wholesalers, Inc. c/o Douglas A. Booth, Route 422, P.O. Box 67, Robesonia, PA 19551.

pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Procedure for the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.     The statutory bases for the relief requested herein are sections 105(a), 363(b) and 503(c) of the Bankruptcy Code.

## Background

3.     On September 9, 2014 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases (the "Chapter 11 Cases") and, as of the date of the filing of this Motion, no official committees have been appointed or designated.

4.     Associated Wholesalers, Inc. ("AWI"), a Pennsylvania corporation, together with Nell's Inc., Co-Op Agency Inc., Associated Logistics, Inc. and AWI Delaware, Inc. (collectively with AWI, the "AWI Debtors"), is a leading cooperative food distributor that provides distribution and retail services to member retailers. Founded in 1962 and headquartered in Robesonia, Pennsylvania, AWI currently services 800 supermarkets, specialty stores, convenience stores and superettes with grocery, meat, produce, dairy, frozen foods and general merchandise/health and beauty care ("GM/HBC") products. AWI also provides a wide array of retail services to its customers. AWI primarily serves the mid-Atlantic United States, with customers in Pennsylvania, New Jersey, Delaware, Maryland, Virginia, West Virginia and Ohio.

-2-

It owns two distribution facilities: one in Robesonia, Pennsylvania and one in York, Pennsylvania. The AWI Debtors further have approximately 1,366 employees.

5.    White Rose Inc. ("White Rose"), a wholly owned subsidiary of AWI, together with Rose Trucking Corp., W.R. Service Corp., W.R. Service II Corp., W.R. Service V Corporation and White Rose Puerto Rico, LLC (collectively with White Rose, the "White Rose Debtors"), is a leading independent food wholesaler and distributor serving the greater New York metropolitan area. White Rose distributes an assortment of more than 19,000 food and non-food items, as well as a highly-regarded private label offering, to its approximately 495 customers. White Rose distributes products in three categories: grocery, frozen and dairy products. These products are purchased from more than 850 manufacturers and distributors, and White Rose sources its own private label products from producers, manufacturers and packers that are licensed by White Rose. White Rose maintains three distribution facilities: two in Carteret, New Jersey and one in Woodbridge, New Jersey. The company has approximately 800 employees.

6.    Debtors AWI, Nell's Inc., Associated Logistics, Inc. and White Rose (the "Borrowers") are parties to a Second Amended and Restated Credit Agreement dated as of June 30, 2010 (as amended, the "Credit Facility") with a group of lenders that are, or may become, parties to the Credit Facility (collectively, the "Lenders"), Bank of America, N.A., as successor by merger to LaSalle Bank, N.A. ("BofA"), Banc of American Securities LLC, as sole lead arranger and joint book runner, Wells Fargo Capital Finance, LLC, as joint book runner and syndication agent, and RBS Business Capital, as documentation agent (collectively with the Lenders and BofA, the "Bank Group"). In addition to being a member of the Bank Group, BofA also serves as lender, issuer and agent for the Bank Group with respect to the Credit Facility.

-3-

7.     Debtors AWI Delaware, Inc., Co-Op Agency Inc. and Rose Trucking Corp. (together, the "Guarantors") are guarantors under the Credit Facility.

8.     Each of the Borrowers and Guarantors is jointly and severally liable for all of the obligations owed under the Credit Facility. In addition, the obligations owes to the Bank Group under the Credit Facility are secured by liens on substantially all of the Debtors' assets.

9.     On February 28, 2014, the Borrowers, the Guarantors, the Lenders and BofA entered into a Waiver and Fourth Amendment[2] to the Credit Facility, which, among other things, waived certain existing defaults under the Credit Facility and provided for the sale of certain real estate.

10.     As of the Petition Date, the Debtors owe the Bank Group an aggregate principal amount of not less than $131,857,966 (inclusive of outstanding letters of credit), plus accrued interest.

11.     The Debtors estimate that they also have approximately $72 million of trade debt as of the Petition Date.

## I.     Events Leading to Filing

12.     Following AWI's acquisition of the Di Giorgio Corporation (later renamed White Rose, Inc.) in June 2006, AWI and its affiliates, including White Rose, faced significant economic challenges. Indeed, at the time that it acquired White Rose, AWI believed that the companies could be integrated to take advantage of certain synergies that would enhance both businesses. Unfortunately, AWI was never able to capitalize on the perceived benefits of the combining the businesses. In addition, at the same time, White Rose's customer base continued to erode as a result of a number of factors, including compressed margins and fierce competition.

---

[2]     The Borrowers, the Guarantors, the Lenders and BofA had entered into a series of prior amendments to the Credit Facility, namely the First Amendment dated as of January 6, 2012, the Second Amendment dated as of September 12, 2012, and the Third Amendment dated as of December 4, 2013.

-4-

AWI itself was not immune from these industry conditions, and saw a decline in business beginning in 2013.

13.     In December 2013, AWI retained Carl Marks Advisory Group LLC ("Carl Marks") to conduct a third-party business review of the company and to facilitate the development of strategic options for White Rose. Although this process led to the identification of several initiatives that could improve profitability and stability in the businesses, the Borrowers ultimately experienced additional defaults under the Credit Facility.

## II.     Sale and Marketing Efforts

14.     On May 13, 2014, the Debtors hired Lazard Middle Market, LLC ("LMM") as their exclusive investment banker to find a buyer for the White Rose Debtors or substantially all of their assets.

15.     As LMM proceeded to market the White Rose Debtors for sale, however, it found that many potential strategic buyers were only interested in the purchase of the AWI Debtors' assets, or that such buyers would only consider a purchase of the White Rose Debtors' assets as part of a purchase of all of the Debtors' assets. At the same time, the AWI Debtors' businesses continued to decline and it became clear that AWI would not be able to absorb the debts likely to remain after the sale of the White Rose Debtors' assets. Based upon these events, the Debtors ultimately concluded that the best way to maximize value for all of their constituents was to market all of their businesses and assets for sale.

16.     Since expanding the scope of the sale to include AWI's assets, thirty-six parties have executed non-disclosure agreements to conduct due diligence in connection with a possible acquisition. LMM has also distributed a Confidential Information Memorandum to these parties and provided access to an extensive electronic data room.   The Debtors and LMM have been

-5-

responding to requests for additional information from interested parties. In addition, LMM and the Debtors' management have conducted in-person meetings with potential bidders to show them the facilities and further explore their interest in purchasing all or a portion of the assets.

17.     Following a wholesome marketing process, the Debtors entered into an Asset Purchase Agreement with C&S Wholesale Grocers, Inc. ("C&S") on September 9, 2014 (the "Asset Purchase Agreement"). Subject to Court approval, C&S will serve as the stalking horse bidder in a competitive bidding process before this Court in connection with the sale of substantially all of the Debtors' assets (the "Sale").

## III.    The DIP Facility

18.     The auction and sale process proposed by the Debtors in these Chapter 11 Cases is contemplated by the Debtors' proposed postpetition debtor-in-possession financing facility (the "DIP Facility"), which requires the Debtors' to meet certain "milestones" with respect to the Sale, including (a) the entry of an order approving bid procedures within twenty-four (24) days after the Petition Date, and (b) the consummation of a Sale not later than December 1, 2014. In addition, the DIP Facility requires the Debtors to comply with certain financial projections set forth in a debtor in possession budget that was negotiated in connection with the DIP Facility (the "DIP Budget").

## IV.    The Debtors' Management

19.     Prior to and since the commencement of these Chapter 11 Cases, the Debtors were and continue to be guided by a core management team that is responsible for making substantially all executive, managerial and operational decisions vital to the preservation and maintenance of the going concern value of the Debtors' estates. Each of these employees supplies the Debtors with a distinctive and extensive knowledge of the nature of the Debtors'

-6-

businesses and the grocery wholesale and distribution industries in general, and the Debtors have benefited from this vast experience and knowledge. It is this very knowledge and core group of people that has enabled the Debtors to maintain a loyal customer base and a competitive position in the market.

20. Furthermore, the critical role played by these management employees in the successful operation of the Debtors' businesses will help to ensure that the Debtors attain the highest possible sale price for their assets at auction. Indeed, as described above, during the marketing process, and throughout the Debtors' negotiations with C&S and other potential stalking horse purchasers, certain of the Debtors' managerial employees worked closely with LMM and a number of potential bidders to identity a bidder that would be ready, willing and able to consummate a sale that would maximize the value of the Debtors' assets. The active role played by the Debtor's management in this sale and marketing process was, and continues to be, essential to the success of a sale. Additionally, these managerial employees have managed and continue to manage the Debtors' operations under challenging circumstances so as to preserve the Debtors' going concern value. As such, the Debtors seek to treat these managerial employees as participants in the Proposed Incentive Plan.

### Relief Requested

21. By this Motion, the Debtors respectfully request the entry of an order, pursuant to sections 105(a), 363(b) and 503(c) of the Bankruptcy Code, authorizing and approving the Debtors' implementation of the Proposed Incentive Plan and authorizing the Proposed Incentive Payments. The Debtors submit that the implementation of the Proposed Incentive Plan and the contemplated payments thereunder: (i) constitutes a valid exercise of the Debtors' business judgment; (ii) is justified under the facts and circumstances of these Chapter 11 Cases; and

-7-

(iii) serves the best interests of the Debtors' estates because such measures have and will continue to incentivize the participating employees to achieve the maximum possible value for the Debtors' assets in the Sale and manage the businesses to meet, or beat, the projections set forth in the DIP Budget.

## The Proposed Incentive Plan

22.     Under the Proposed Incentive Plan, two types of Proposed Incentive Payments are potentially available to employees participating in the plan (collectively, the "Participants"), which amounts shall be funded through the DIP Facility. First, the Proposed Incentive Plan provides that Participants may receive incentive payments equal to a certain percentage of their respective salaries if the Debtors close a sale of substantially all of their assets (the "Sale Incentive Payments") with C&S or a higher or better bidder. To be eligible for the Sale Incentive Payments, Participants must be employed by the Debtors as of the date of the closing of the Sale.

23.     Second, the Plan provides that Participants may receive incentive payments equal to a certain percentage of their respective salaries if the Debtors meet or exceed certain financial projections set forth in the DIP Budget (the "Budget Incentive Payments").

24.     Of the Debtors' approximately 2,200 employees, only fifteen insider and non-insider managerial employees of the Debtors will serve as Participants in the Proposed Incentive Plan, though not all Participants are eligible for a Sale Incentive Payment. Moreover, included in the Participants are three officers of the Debtors, each of whom are involved in the day-to-day operations of the Debtors' businesses and have been, and will be, intimately involved in both working to achieve the operating goals contemplated by the DIP Budget and the consummation of a Sale.

-8-

25. Payments to Participants under the Proposed Incentive Plan generally range from 5% to 20% of a Participant's base salary for each type of Proposed Incentive Payment. The percentages used to determine the amounts of the Proposed Incentive Payments further vary depending upon the position of the Participant and the level of the Participant's involvement in consummating a Sale or satisfying the projections set forth in the DIP Budget. The more critical a Participant to achieving a certain objective, the greater the payment that he or she will receive if the requirements for earning the Sale and/or Budget Incentive Payments are met.

26. Notably, if the requirements for earning the Proposed Incentive Payments are met, the Participants will receive the payments *in lieu of* any severance benefits to which they would otherwise be entitled. In addition, the total Proposed Incentive Payments will not exceed $584,252, which is a small fraction of the Debtors' average gross monthly payroll expenses of $10.9 million, and such payout will be reduced if Participants fail to satisfy the requirements for earning the Sale and/or Budget Incentive Payments

## Basis for Relief Requested

## I. The Proposed Incentive Plan is an Appropriate Exercise of the Debtors' Business Judgment.

27. The Court may authorize the Debtors to make the Proposed Incentive Payments under section 363(b)(1) of the Bankruptcy Code, which provides in pertinent part that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate[.]" *See* 11 U.S.C. § 363(b)(1).[3] In the Third Circuit, a debtor in possession's disposition of estate property pursuant to section 363(b) of the Bankruptcy Code is governed by the business judgment rule. *See, e.g., Myers v. Martin (In re Martin)*, 91 F.3d 389,

---

[3] Additionally, section 105(a) of the Bankruptcy Code empowers a court to "issue any order, process, or judgment that is necessary to carry out the provisions of [the Bankruptcy Code]. *See* 11 U.S.C. § 105(a).

395 (3d Cir. 1996) (noting that under normal circumstances, courts defer to a trustee's judgment concerning use of property under section 363(b) when there is legitimate business justification); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (affirming bankruptcy court approval of key employee retention program and stating that "in determining whether to authorize the use, sale, or lease of property of the estate under [section 363(b)], courts require the debtors to show that a sound business purpose justifies such actions"); *In re Del. & Hudson R.R. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (explaining that Third Circuit has adopted "sound business purpose" test to evaluate motions brought pursuant to section 363(b)). Under the business judgment rule, once a chapter 11 debtor has articulated a valid business justification for the proposed use of estate property, the debtor's judgment is shielded from judicial second-guessing. *See, e.g., Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (citing *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

28. "Compensation issues are normally governed by the business judgment standards, i.e., proof that there is a broad business purpose for an action." *In re Global Home Products, LLC*, 369 B.R. 778, 783-84 (Bankr. D. Del. 2007). In addition, "[t]he reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment." *Id.* at 784. As such, courts in this district and others generally approve the imposition of incentive or bonus plans upon finding that such plans are reasonable. *See, e.g., In re Global Home Products, LLC*, 369 B.R. at 787 (determining that incentive plans proposed by debtors were reasonably intended to incentivize management and were consistent with debtors' proper exercise of business judgment); *In re Allied Holdings, Inc.*, 337 B.R. 716, 724 (Bankr. N.D. Ga. 2005) (holding that key employee retention program was reasonable exercise of

-10-

debtors' business judgment); *In re EaglePicher Holdings, Inc.*, No. 05-12601, 2005 WL 4030132, at *3-5 (Bankr. S.D. Ohio April 26, 2005) (finding that implementation of key employee retention plan for certain management employees was exercise of sound business judgment).

29. This Court has identified several factors to be considered when determining whether a debtor's proposal to pay bonus compensation is reasonable and satisfies the business judgment standard. These factors include:

- Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance?

- Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?

- Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?

- Is the plan or proposal consistent with industry standards?

- What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?

- Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*In re Global Home Products, LLC*, 369 B.R. at 786 (citing *In re Dana Corp.*, 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006)).

30. For the reasons set forth below, an application of the above-stated factors to the circumstances of these Chapter 11 Cases reveals that the Proposed Incentive Plan constitutes a reasonable exercise of the Debtors' business judgment and should be approved.

-11-

### A. The Proposed Incentive Plan is Reasonably Calculated to Maximize the Sale Price for the Debtors' Assets and Ensure Compliance with the DIP Budget.

31. First, the Sale Incentive Payments contemplated by the Proposed Incentive Plan are calculated to maximize the Sale proceeds by incentivizing the Participants to help market the Debtors' assets, support the due diligence process and induce parties to submit competing bids. Moreover, any successful Sale of the Debtors' assets will be tied to the Debtors' ability to satisfy and maintain customers, who can then be transferred to a Successful Bidder. Each of the Participants are critical to customer retention and will earn Sale Incentive Payments only if they help to achieve and consummate a Sale with a Successful Bidder. Likewise, the Budget Incentive Payments are calculated to encourage the Participants to help achieve and comply with the projections set forth in the DIP Budget, which in turn benefits the Debtors' estates and creditors by ensuring that the Debtors possess the level of working capital required to consummate a Sale to a Successful Bidder.

32. In addition to continuing to operate their businesses and administer the estates, the Debtors' success in meeting financial projections, obtaining competing bids and consummating the Sale is highly dependent upon the experience, expertise and active involvement of the Incentive Plan Participants. The Incentive Plan Participants have many years of industry expertise and maintain an irreplaceable knowledge of the industry that is essential to maximizing value for the Debtors' estates. The Incentive Plan Participants are also the only personnel with the skill and knowledge needed to successfully ensure compliance with the DIP Budget, respond to and negotiate with potential purchasers and maintain motivated employees and a robust customer base, all of which are key ingredients in both maximizing the value of the Debtors' assets as a going concern and ensuring the success of these Chapter 11 Cases.

-12-

33.     While the Incentive Plan Participants each receive a base salary as compensation for their day-to-day operational and managerial responsibilities, the demands of operating a chapter 11 debtor in possession, particularly during a going concern sale process, far exceed these responsibilities. As Judge Sontchi recognized in *In re Diamond Glass, Inc.*:

> [A]ll the covered employees are performing above and beyond their normal job responsibilities, some extraordinarily so. I don't think that's particularly surprising.    Chapter 11 is … an expensive and time consuming process for management. That is the nature of Chapter 11, and that's, you know, I take issue with [counsel for the creditors' committee's] sort of blanket statement that every Chapter 11 [case] doesn't deserve some sort of incentive management program. Certainly not every case can afford it, and some cases maybe call out for it more than others.    A business like this [automotive glass supplier] where we're talking about a very volatile, competitive, people-intensive business is really a poster child for a management incentive program, especially in a sales process where people are working themselves out of a job.

Tr. of Hearing on May 8, 2008 at 88:13 to 89:4, *In re Diamond Glass, Inc.*, Case No. 08-10601 (CSS) (Bankr. D. Del. June 6, 2008) (approving payment of incentive awards to twenty-one senior managers upon consummation of sale to stalking horse bidder).    The present circumstances fit squarely within Judge Sontchi's analysis. As in *Diamond Glass*, the Debtors' businesses in the present case are volatile, competitive and people-intensive businesses, and as a result, the Incentive Plan Participants will certainly be required to perform "above and beyond their normal job responsibilities" to ensure the Debtors' continued operations, compliance with the DIP Budget and a successful Sale process.

34.     Accordingly, based on the foregoing, the Debtors submit that the Proposed Incentive Payments are reasonably calculated to maximize the Sale price and ensure performance in relation to in the DIP Budget through the efforts of the Participants.

-13-

**B.**     **The Proposed Incentive Payment Amounts are Reasonable.**

35.     The aggregate costs of the Proposed Incentive Payments, which are at most $584,252, are more than reasonable in the context of the value that will be obtained through consummation of the Sale and the fact that the payments are a small fraction of the Debtors' average payroll obligations. The Debtors further believe that the value added by the diligence and expertise of the Incentive Plan Participants likely exceeds the aggregate amount of Proposed Incentive Payments that will be earned. *See, e.g.*, *In re New Century TRS Holdings Inc.*, Case No. 07-10416 (KJC) (Bankr. D. Del. May 25, 2007) ("[T]he total amount to be paid is about $3.3 million . . . . But this amount is a fraction of the total value to be achieved and preserved by this Estate, and it's a small fraction. So it seems to me that in the Debtor's business judgment, if it spends this amount of money, it can preserve literally tens of millions of dollars, or potentially more, worth the value for the Estate, it seems to me to be a very small amount of money well spent."). Accordingly, the Debtors submit that the Proposed Incentive Payments represent a reasonable exercise of their business judgment.

**C.**     **The Proposed Incentive Plan and Proposed Incentive Payments are Reasonable in Scope and Do Not Discriminate Unfairly.**

36.     Next, the Proposed Incentive Payments are narrowly tailored to incentivize only those employees who have been and will be significantly involved in the Sale process and in managing operations to meet agreed-upon financial projections. Also, such payments do not discriminate unfairly since the Incentive Plan Participants are uniquely positioned among the Debtors' employees to directly impact the Debtors' operations and the ultimate price that the estates obtain from the Sale.

37.     Courts frequently approve incentive awards to a small number of senior and key managers in the context of a sale of all or substantially all of a debtor's assets. *See, e.g.*, *In re*

-14-

*Global Aviation Holdings Inc.*, Case No. 13-12945 (MFW) (Bankr. D. Del. May 28, 2014) (approving incentive payments to 5 members of the Debtors' management team); *In re AgFeed USA, LLC*, Case No. 13-11761 (BLS) (Bankr. D. Del. Aug. 29, 2013) (approving incentive payments to a total of 6 executives and senior management employees based upon success of sale process); *In re Evergreen Solar, Inc.*, Case No. 11-12590 (MFW) (Bankr. D. Del. Sept. 6, 2011) (approving sale-incentive payments to seven senior management employees, including five executives); *In re PCAA Parent, LLC*, Case No. 10-10250 (MFW) (Bankr. D. Del. Feb. 16, 2010); (approving sale-incentive payments to three senior management executives and seven regional management employees); *In re Leiner Health Prods, Inc.*, Case No. 08-40446 (KJC) (Bankr. D. Del. April 14, 2008) (approving sale-incentive payments to ten senior managers). Accordingly, the Debtors submit that the Proposed Incentive Payments are fair and reasonable and do not discriminate unfairly among the Debtors' employees.

## D. The Proposed Incentive Payments are Consistent with Incentives Provided in Recent Cases Involving Performance Targets.

38.     The Proposed Incentive Payments are generally consistent with other incentive payments approved by this Court that are tied to going concern sales or other performance targets. *See, e.g., In re Coldwater Creek Inc.*, Case No. 1410867 (BLS) (Bankr. D. Del. June 6, 2014) (approving incentive payments tied to performance in relation to DIP Budget in context of orderly wind down of operations); *In re Longview Power, LLC*, Case No. 13-12211 (BLS) (Bankr. D. Del. Dec. 19, 2013) (approving incentive payments to senior executives based on achievement of goals driven by chapter 11 timeline and desire to limit costs); *In re AgFeed USA, LLC*, Case No. 13-11761 (BLS) (Bankr. D. Del. Aug. 29, 2013) (approving incentive payments tied to consummation of sale); *In re Evergreen Solar, Inc.*, Case No. 11-12590 (MFW) (Bankr. D. Del. Sept. 6, 2011) (approving sale-incentive payments to senior employees based on

-15-

percentage of gross cash proceeds of sale); *In re PCAA Parent, LLC*, Case No. 10-10250 (MFW) (Bankr. D. Del. Feb. 16, 2010) (approving sale-incentive payments to management employees based on amount of aggregate proceeds and increasing percentage of sale proceeds); *In Leiner Health Prods, Inc.*, Case No. 08-10446 (KJC) (Bankr. D. Del. April 14, 2008) (approving incentive payments to ten senior managers in an amount equal to an increasing percentage of the sale price obtained for sale of debtor's assets). Accordingly, based on the foregoing, the Debtors respectfully submit that the Proposed Incentive Payments are reasonable under the circumstances and consistent with industry standards.

### E. The Debtors' Efforts to Structure the Proposed Incentive Payments

39. The Debtors' Chief Restructuring Officer (the "CRO") has undertaken considerable efforts to structure reasonable incentive payments to the Debtors' key management employees. In developing the Proposed Incentive Plan, the CRO considered the particular circumstances of the Debtors' Chapter 11 Cases while also taking into account the terms of the incentive plans and awards that have previously been approved by this Court. Through these efforts, the CRO is confident that the Proposed Incentive Plan and the Proposed Incentive Payments serve the best interests of the Debtors' estates and creditors and constitute a reasonable exercise of the Debtors' business judgment.

### II. The Proposed Incentive Payments Should Be Approved Notwithstanding Section 503(c) of the Bankruptcy Code.

40. Next, section 503(c) of the Bankruptcy Code does not preclude this Court from approving the Proposed Incentive Plan or the Proposed Incentive Payments. As further explained below, none of the statutory subsections of section 503(c) of the Bankruptcy Code, when applied to the circumstances of this case, prohibit the Proposed Incentive Payments.

1642187.2 9/12/14

**A.** **Section 503(c)(1) of the Bankruptcy Code Does Not Apply Because the Proposed Incentive Payments are Not Retentive in Purpose.**

41.     Section 503(c)(1) of the Bankruptcy Code limits retention payments that can be made to insiders of a debtor. Specifically, section 503(c)(1) provides, subject to certain exceptions not applicable in this case, that "[t]here shall neither be allowed, nor paid . . . a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business[.]" 11 U.S.C. § 503(c)(1). Courts interpret section 503(c)(1) of the Bankruptcy Code to prohibit only those payments that have the primary purpose of inducing an insider to remain employed by a debtor. *See, e.g.*, *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 802 (Bankr. D. Del. 2007) (finding that "any payment to an employee, including regular wages, has at least a partial purpose of retaining the employee. Therefore if the Court did not apply a materiality standard, all payments would be subject to section 503(c), which would be an absurd result"); *see also Dana Corp.*, 358 B.R. at 571 (holding that "[b]y presenting an executive compensation package that properly [motivates senior management] to produce and increase the value of the estate, the [debtor has] established that section 503(c)(l) does not apply to [the debtor's motion]").

42.     The fact that the Proposed Incentive Payments may have some retentive effect does not mean that these payments are being made for the primary purpose of retaining the Participants. On the contrary, the primary objective of the Proposed Incentive Payments is to incentivize the Participants to apply their experience and expertise to maximize the value of the Debtors' assets through consummation of a Sale and to meet performance targets, which objectives surpass any retentive effect the payments may have. Thus, because the Proposed Incentive Plan and Proposed Incentive Payments are not primarily intended to induce an insider

-17-

to remain employed by the Debtors, the payments are not subject to section 503(c)(1) of the Bankruptcy Code.

**B.   Section 503(c)(2) of the Bankruptcy Code Does Not Apply Because the Proposed Incentive Payments are Not in the Nature of Severance Payments.**

43.     The Proposed Incentive Payments are also not in the nature of severance payments for insiders and are thus are not subject to section 503(c)(2) of the Bankruptcy Code. The Proposed Incentive Payments do not provide benefits to the Incentive Plan Participants upon the termination of their employment with the Debtors. Rather, upon approval of this Motion, the Incentive Plan Participants would receive compensation upon consummation of the Sale and/or compliance with the projections provided for under the DIP Facility, regardless of whether the Participant remains employed by the Debtors thereafter. Accordingly, the Proposed Incentive Payments are incentive payments, not severance payments, and are not subject to the requirements of section 503(c)(2) of the Bankruptcy Code.

**C.   The Proposed Incentive Plan and Proposed Incentive Payments are Justified by the Facts and Circumstances of this Case and are Not Prohibited by Section 503(c)(3) of the Bankruptcy Code.**

44.     Lastly, section 503(c)(3) of the Bankruptcy Code prohibits the allowance and payment of "other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition." 11 U.S.C. § 503(c)(3). Courts have interpreted this section to be substantially similar to (i) the standard a debtor must meet to use property outside the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code or (ii) the standard for payment of an administrative expense as an actual, necessary cost or expense of preserving the estate pursuant to section 503(b)(1)(A) of the Bankruptcy Code. *See, e.g., Dana Corp.*, 358 B.R.

-18-

at 576 (holding that section 503(c)(3) test is no more stringent than the requirements set forth in section 503(b)(1)(A)); *In re Nobex Corp.*, Case No. 05-20050, 2006 WL 4063024, at *3-4 (Bankr. D. Del. Jan. 19, 2006) (concluding that section 503(c)(3) is nothing more than a reiteration of the standard under section 363(b)). As a result, if this Court concludes that the Proposed Incentive Plan and Proposed Incentive Payments constitute a reasonable exercise of the Debtors' business judgment, the provisions of section 503(c)(3), in addition to section 363(b), should be satisfied.

45.     As described above, an application of the facts and circumstances of these Chapter 11 Cases to the *Global Home* six-part test demonstrates that the Proposed Incentive Plan and Proposed Incentive Payments are necessary in connection with these Chapter 11 Cases and thus constitute a reasonable exercise of the Debtors' business judgment. Therefore, the Proposed Incentive Plan and Proposed Incentive Payments are not prohibited by section 503(c)(3) of the Bankruptcy Code.

## No Prior Request

46.     No prior motion for the relief sought herein has been made by the Debtors to this or any other Court.

## Notice

47.     The Debtors have provided notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) the Office of the United States Attorney for all Districts of the states in which the Debtors conduct business; (c) the Office of the Attorney General for all of the states in which the Debtors conduct business; (d) the Department of Labor for all of the states in which the Debtors conduct business; (e) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed by the Debtors

-19-

pursuant to Bankruptcy Rule 1007(d); (f) counsel to Bank of America, N.A., as issuing bank and agent for the Debtors' pre-petition and post-petition secured lenders; (g) the Internal Revenue Service; and (h) counsel to C&S; (i) the Pension Benefit Guaranty Corporation; (j) the Debtors' unions; and (k) those persons who have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedures. In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

[remainder of page left intentionally blank]

WHEREFORE, the Debtors respectfully request the entry of an order: (i) authorizing and approving the Proposed Incentive Plan and authorizing the Proposed Incentive Payments; and (ii) granting such other and further relief as the Court deems just and proper.

Dated: September 12, 2014

SAUL EWING LLP

Mark Minuti (DE Bar No. 2659)
Lucian B. Murley (DE Bar No. 4892)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6840
Facsimile: (302) 421-5873
mminuti@saul.com
lmurley@saul.com

-and-

Jeffrey C. Hampton
Robyn F. Pollack
Monique Bair DiSabatino
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Telephone: (215) 972-7777
Facsimile: (215) 972-7725
jhampton@saul.com
rpollack@saul.com
mdisabatino@saul.com

*Proposed Counsel for Debtors*
*and Debtors-in-Possession*

1642187.2 9/12/14