## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | CHAPTER 11 |
| | ) | |
| | ) | Case No. 14-12092 (KJC) |
| ADI Liquidation, Inc., *et al.*,[1] | ) | (D.I. 2626, 2304) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## OPINION[2]

## BY: KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

## BACKGROUND

Currently before the Court is the Debtors' Motion for Partial Summary Judgment Pursuant to Fed. R. Civ. P. 56 (Made Applicable by Fed. R. Bankr. P. 7056 and 9014) with Respect to Their Objection to Claim Number 1868 Filed by Fairway Group Central Services LLC (the "SJ Motion," D.I. 2626) to determine whether that portion of proof of claim 1868[3] seeking recovery for alleged "Additional Freight & Upcharges Stemming From Emergency Purchases," "Lost Profits Due to Service Level Breach," and "Los[t] Deals Due to Termination of the Buy and Hold Program," must be disallowed due to the waiver of any claims for consequential and/or incidental damages in the parties' Vendor Supply Agreement (the "Supply Agreement," D.I. 2627 Ex. B).

---

[1] By order dated September 10, 2014, this Court authorized joint administration of the following debtors in these chapter 11 cases: ADI Liquidation, Inc. (f/k/a AWI Delaware, Inc.); AW Liquidation, Inc. (f/k/a Associated Wholesalers, Inc.); NK Liquidation, Inc. (f/k/a Nell's Inc.); Co-Op Agency Inc.; AL Liquidation, Inc. (f/k/a Associated Logistics, Inc.); WR Liquidation, Inc. (f/k/a White Rose, Inc.); RT Liquidation Corp. (f/k/a Rose Trucking Corp.); WRSC Liquidation Corp. (f/k/a WR Service Corp.); WRSC II Liquidation Corp. (f/k/a WR Service II Corp.); WRSC V Liquidation Corp. (f/k/a WR Service V Corp.); and White Rose Puerto Rico, LLC (collectively, the "Debtors"). D.I. 45. Items on the docket for Case No. 14-12092 are referred to as "D.I. ___."

[2] This Opinion constitutes the findings of fact and conclusions of law, as required by Fed. R. Bankr. P. 7052. This Court has jurisdiction to decide this claim objection pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).

[3] D.I. 2304 Ex. A. Attached *infra* as App. A.

(Supply Agreement § 33.) For the reasons that follow, the SJ Motion will be granted, in part, and denied, in part.

**Procedural Background**

On September 9, 2014, the Debtors commenced a voluntary chapter 11 bankruptcy proceeding in this Court. On February 6, 2015, Fairway Group Central Services LLC ("Fairway") timely filed a proof of claim, indexed as number 1868 by the Debtors' claims agent, asserting a claim against one of the Debtors, WR Liquidation, Inc. f/k/a White Rose, Inc. ("White Rose") in the total amount of $1,290,779.66, of which $919,514.75 was designated as an administrative priority claim under § 507(a)(2) of the Bankruptcy Code ("POC 1868"). (D.I. 2627 Ex. A.)

On August 17, 2015, the Debtors filed their Objection to Claim Number 1868 (the "Debtors' 1868 Objection"). (D.I. 2435.) On October 20, 2015, along with Fairway's response to the objection ("Fairway's 1868 Response," D.I. 2435), Fairway filed the Declaration of Pat Sheils in Support of its response (the "First Sheils Decl.," D.I. 2435-1). On November 30, 2015, the Debtors amended their objection (the "Amended 1868 Objection"). (D.I. 2547.)

On December 11, 2015, a scheduling hearing was held, during which I granted the Debtors' request to provide for filing of the present motion (12/14/15 Tr. 17:13-18:16, D.I. 2589), and on December 22, 2015, I entered the scheduling order. (D.I. 2604.) On January 4, 2016, the Debtors filed the SJ Motion, along with the Debtors' Opening Brief in Support of its Motion for Partial Summary Judgment (the "Debtors' Opening Brief"). (D.I. 2627.) On January 25, 2016, Fairway filed its Answering Brief in Opposition to Debtors' Motion for Partial Summary Judgment ("Fairway's Answering Br.," D.I. 2671), along with a Declaration of Pat Sheils in Support of [its] Answering Brief that was nearly identical to the previous Sheils Decl. but significantly altered in certain paragraphs and footnotes (the "Revised Sheils Decl."). (D.I.

2671-1.) On February 8, 2016, the Debtors filed the Debtors' Reply in Support of its Motion for

Partial Summary Judgment (the "Debtors' Reply"). (D.I. 2965.) On June 6, 2016, oral argument

was held regarding the SJ Motion. (6/6/16 Tr., D.I. 2009.)

The Debtors argue that there is no genuine dispute as to material facts, and that they are

entitled to summary judgment as a matter of law with respect to categorizing the damages in

question without first proceeding to discovery.[4]

## FACTS

Fairway, a Delaware limited liability company, and debtor White Rose were parties to a

Supply Agreement dated March 28. 2014. The Supply Agreement provided that Fairway would

"purchase from White Rose substantially all 'Primary Products' (defined in Schedule A)[5] required

by Fairway to stock the current Fairway Stores." (Supply Agreement § 1.1.) The contract also

provided that, "Notwithstanding anything to the contrary herein, the parties acknowledge and

agree that Fairway may engage a third party supplier, without restriction or penalty, for its

requirement of any Primary Products that are not, at the time of purchase, available from White

Rose." (*Id.*) By order dated December 16, 2014, the Supply Agreement was rejected by the

Debtor effective November 26, 2014 (the "Rejection Date"). (D.I. 1198.)

---

[4] Fairway cites *KSW Mech. Servs. v. Johnson Controls, Inc.*, 992 F.Supp. 135, 146-47 (E.D.N.Y. 2014) and *Am. Elec. Power Co. v. Westinghouse Elec. Corp.*, 418 F.Supp. 435, 459-60 (S.D.N.Y. 1976) for the proposition that drawing the line between direct and consequential damages is a question of fact. Fairway's Answering Br. 25. However, damages are regularly categorized at the summary judgment stage. *See, e.g., In re Lehman Bros. Holdings, Inc.*, 544 B.R. 62, 71-72 (Bankr. S.D.N.Y. 2015); *PNC Bank, N.A. v. Wolters Kluwer Fin. Servs., Inc.*, 73 F.Supp.3d 358, 372 (S.D.N.Y. 2014); *Compania Embotelladora del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F.Supp. 2d 314, 322 (S.D.N.Y. 2009). *Biotronik, A.G. v. Conor Medsystems Ireland, Ltd.*, upon which Fairway relies heavily, was similarly a summary judgment motion which decided the characterization of damages as direct vs. consequential. 22 N.Y.3d 799, 804-05 (N.Y. 2014).

[5] "'Primary Products' shall mean the following Product categories: (i) warehouse conventional grocery products and certain organic and specialty grocery products (collectively, 'Grocery Products'), (ii) warehouse dairy products, organic dairy products, and warehouse dairy deli products (collectively, 'Dairy Products'), (iii) warehouse frozen food products, organic frozen food products, and warehouse bakery products (collectively, 'Frozen Food Products'), and (iv) warehouse ice cream products (the[] 'Ice Cream Products'), which Fairway otherwise currently and customarily purchases from White Rose as of the Effective Date of this Agreement.

A "Statement of Damages Incurred by Fairway Due to White Rose's Breach of the Parties' Supply Agreement" (the "Statement of Damages") was attached to POC 1868. The statement consisted of a spreadsheet with six separate headings describing different types or categories of damages incurred both, (1) pre-petition, and (2) post-petition through October 29, 2014. (*Id.*) Each heading in the Statement of Damages had an accompanying footnote that further explained Fairway's theory behind each category of damages. (*Id.*) Each column of the Statement of Damages specified either that the Debtor was liable for the damages or from whom the emergency purchases were made (including "SuperValu," "J&J," "UNFI," and "KeHE,"). (*Id.*) The different categories of damages alleged in POC 1868 were as follows: (1) "Additional Freight & Upcharges Stemming from Emergency Purchases" (the "Freight & Upcharges"); (2) "Increased Product Cost Stemming from Emergency Purchases"; (3) "Lost Profits due to Service Level Breach" (the "Lost Profits"); (4) "Los[t] Deals due to the Termination of the Buy and Hold Program" (the "Lost Deals"); (5) "Reclamation Amounts Owed"; and (6) "Volume Rebates Owed." (*Id.*) No receipts or shipping manifests were attached to POC 1868.

## STANDARDS

### A. Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure, made applicable by Federal Rule of Bankruptcy Procedure 7056 and 9014(c), provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[6] At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.[7]

---

[6] Fed. R. Civ. P. 56(a).
[7] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the burden of establishing the absence of a genuine dispute as to a material fact.[8] When the nonmoving party bears the burden of persuasion at trial, the moving party "may meet its burden . . . by showing that the nonmoving party's evidence is insufficient to carry that burden."[9]

Once the moving party has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts."[10] Summary judgment cannot be avoided by introducing only "a mere scintilla of evidence,"[11] or by relying on "conclusory allegations, improbable inferences and unsupported speculation."[12] "Brash conjecture coupled with earnest hope that something concrete will materialize, is insufficient to block summary judgment."[13]

Substantive law determines which facts are material; only disputes over facts that might affect the outcome of the suit will preclude summary judgment.[14] Moreover, a dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[15] The Court must resolve all doubts and consider the evidence in the light most favorable to the nonmoving party.[16]

---

[8] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (quoting Fed. R. Civ. P. 56(c)) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.").

[9] *Foulk v. Donjon Marine Co., Inc.,* 144 F.3d 252, 258 n.5 (3d Cir. 1998) (quoting *Wetzel v. Tucker,* 139 F.3d 380, 383 n.2 (3d Cir. 1998)).

[10] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[11] *Sarko v. Penn-Del Directory Co.,* 968 F.Supp. 1026, 1031 (E.D. Pa. 1997) (citation omitted), *aff'd* 189 F.3d 464 (3d Cir. 1999).

[12] *J. Geils Band Emp. Benefit Plan v. Smith Barney Shearson, Inc.,* 76 F.3d 1245, 1251 (1st Cir. 1996) (citation omitted).

[13] *Id.* (quoting *Dow v. United Bhd. of Carpenters*, 1 F.3d 56, 58 (1st Cir. 1993)).

[14] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[15] *Id; see also Delta Mills, Inc. v. GMAC Commercial Fin., LLC (In re Delta Mills, Inc.),* 404 B.R. 95, 105 (Bankr. D. Del. 2009) (holding that an issue is genuine "when reasonable minds could disagree on the result.").

[16] *Anderson*, 477 U.S. at 255 ("[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

-5-

### B.  Objection to a Proof of Claim

A claim that is properly filed under Rule 3001 and Bankruptcy Code § 501 is deemed

allowed unless a party in interest objects.[17] When a claim objection is filed in a bankruptcy case,

the burden of proof as to the validity of the claim "rests on different parties at different times."[18]

The Court of Appeals for the Third Circuit described the burden shifting as follows:

> Initially, the claimant must allege facts sufficient to support the claim. If the
> averments in his filed claim meet this standard of sufficiency, it is *"prima facie"*
> valid. In other words, a claim that alleges facts sufficient to support a legal liability
> to the claimant satisfies the claimant's initial obligation to go forward. The burden
> of going forward then shifts to the objector to produce evidence sufficient to negate
> the *prima facie* validity of the filed claim. It is often said that the objector must
> produce evidence equal in force to the *prima facie* case. In practice, the objector
> must produce evidence which, if believed, would refute at least one of the
> allegations that is essential to the claim's legal sufficiency. If the objector produces
> sufficient evidence to negate one or more of the sworn facts in the proof of claim,
> the burden reverts to the claimant to prove the validity of the claim by a
> preponderance of the evidence . . . . The burden of persuasion is always on
> the claimant.[19]

### C.  Governing Law

Section 26 of the Supply Agreement provides that:

> This Agreement shall be deemed made in the State of New York and shall be
> construed in accordance with the laws of the State of New York applicable to
> contracts entirely made and performed therein, without regard to the principles of
> conflicts of law thereof.

### DISCUSSION

### A.  Interpretation of the Supply Agreement

The Debtors' primary contention is that certain of Fairway's claims must be disallowed

due to the waiver of any claims for consequential and/or incidental damages in the parties'

Vendor Supply Agreement. (Supply Agreement § 33.) Fairway claims, despite the plain language

---

[17] 11 U.S.C. §§ 501, 502(a); Fed. R. Bankr. P. 3001.
[18] *In re Allegheny Int'l, Inc.,* 954 F.2d 167, 173-74 (3d Cir. 1992).
[19] *Id.* (citations omitted).

of the contract, either that there was no waiver because a separate provision required that the

Debtors' indemnify and defend Fairway against all losses (Supply Agreement § 22.1) or that the

existence of the indemnification provision renders the contract ambiguous and there must be

discovery to determine the intent of the parties. I conclude that the contract is not ambiguous, and

that the waiver of consequential and incidental damages is valid.

### 1.  Relevant Provisions

The two relevant provisions of the Supply Agreement are sections 22.1 and 33.

Section 22.1, under "Indemnification & Product Guaranty," states, in whole:

> White Rose hereby agrees to indemnify, defend, and hold harmless Fairway, together with its employees, agents and authorized representatives, from and against any and all losses, suits, actions, legal or administrative proceedings, claims, demands, damages, liabilities, interest, legal fees, costs and expenses of whatsoever kind or nature arising from White Rose's Products or services supplied hereunder and in any manner directly or indirectly caused, occasioned or contributed to in whole or in part, by reason of any fault or negligence whether active or passive of White Rose, or of anyone acting under its direction or control or on its behalf in connection with or incidental to the performance of this Agreement. White Rose's aforesaid indemnity and hold harmless obligations, or portions or applications thereof shall apply to the fullest extent permitted by law and shall survive the termination of this agreement. Upon notification of a claim, White Rose shall assume Fairway's defense with counsel reasonably acceptable to Fairway's legal department and shall keep Fairway appraised throughout the handling of the claim.

Supply Agreement § 33, titled "No Consequential Damages" states, in whole:

> Neither party shall be liable to the other for any indirect, special, incidental, punitive, or consequential damages arising out of the breach of this Agreement.

### 2.  Existence of Waiver

The plain meaning of a contract controls its interpretation. "[I]f the language of [a written]

agreement is free from ambiguity, its meaning may be determined as a matter of law on the basis

of the writing alone without resort to extrinsic evidence."[20] "Interpretation of an unambiguous

contract provision is a function for the court, and matters extrinsic to the agreement may not be

considered when the intent of the parties can be gleaned from the face of the instrument."[21] The

initial question is "whether the agreement on its face is reasonably susceptible of more than

one interpretation."[22]

Section 22.1 clearly and unambiguously required the Debtors to defend Fairway against

third party claims; it is a standard indemnification provision found in countless contracts. There is

neither overlap between sections 22.1 and 33 nor ambiguity as to the meaning of either provision.

To interpret section 22.1 as Fairway does, to say that the Debtors must defend Fairway against

claims *by* the Debtors, or when, as here, Fairway is pressing claims *against* the Debtors, is

illogical. Section 33, under the heading "**No Consequential Damages**," clearly and

unambiguously waives consequential and incidental damages between the parties.

### 3. Validity of Waiver

In *Metropolitan Life Ins. Co. v. Noble Lowndes Int'l*, the Court of Appeals of New York

turned to Corbin on Contracts to assess the validity of a limitation on damages between parties:

> [W]ith certain exceptions, the courts see no harm in express agreements limiting
> the damages to be recovered for breach of contract. Public policy may forbid the
> enforcement of penalties against a defendant; but it does not forbid the enforcement
> of a limitation in his favor. Parties sometimes make agreements and expressly
> provide that they shall not be enforceable at all, by any remedy legal or equitable.
> They may later regret their assumption of the risks of non-performance in this
> manner; but the courts let them lie on the bed they made. Where a contract provides
> that damages for breach shall not be recoverable beyond a specified sum, it is
> obvious that the risk of loss beyond that sum is being assumed by the promisee. If

---

[20] *In re Lehman Bros. Holdings, Inc.*, 544 B.R. 62, 71 n.11 (Bankr. S.D.N.Y. 2015) (quoting *Hickman v. Saunders*, 228 A.D.2d 559, 560 (N.Y. App. Div. 2d Dep't 1996)).

[21] *Teitelbaum Holdings v. Gold*, 48 N.Y.2d 51, 56 (N.Y. 1986).

[22] *Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 572-73 (N.Y. 1986).

the law allows him to assume the whole risk, with no remedy whatever, it is obvious that it will allow him to assume a part less than the whole.[23]

The exceptions are contracts of adhesion or when the breach is also tortious.[24]

Here, there are no allegations that the Supply Agreement is a contract of adhesion or that the breach at the time of rejection was tortious. The waiver is therefore valid.[25]

### B. Lost Profits Due to Service Level Breach

The Debtors contend that Fairway's claim for Lost Profits is barred by the section 33 waiver of consequential damages. Fairway responds that the Lost Profits are the "direct and immediate fruits of the contract," and thus direct damages under the Court of Appeals of New York's decision in *Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*[26] As presented in the POC 1868 Statement of Damages, the claim is for "Lost Profits Due to Service Level Breach." As to pre-petition: "Due to White Rose's severe product shortages discussed in footnote 1, which was a direct breach of the service level commitment se[]t forth in Section 9 of the Agreement, Fairway lost out on customer sales of more than $385,000 resulting in lost profits of $127,993.58." (Statement of Damages 1 n.3.) As to post-petition: "Due to White Rose's severe product shortage discussed above, which again was a direct breach of the service level commitment se[]t forth in Section 9 of the Agreement, Fairway lost out on almost $900,000 worth of customer sales, resulting in lost profits of $300,232.46." (Statement of Damages 2 n.10.)

---

[23] 84 N.Y.2d 430, 436 (N.Y. 1994) (quoting 5 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 1068 (1964)).

[24] *Id.* at n.*.

[25] Fairway argues in the alternative (without labeling it as such) that, if section 33 is found to control, the Debtors are estopped from relying on the waiver because of bad faith. Fairway's Answering Br. 26-27. Fairway alleges that the Debtors caused Fairway to continue performance under the Supply Agreement post-petition by "repeatedly promising that Fairway would be 'made whole,'" but that White Rose "had no intention of making Fairway whole," and that a bad faith determination is a factual issue requiring discovery which would preclude summary judgment. *See id.* at 27 & n.21. *But Fairway makes no direct claim that it ever had the right to terminate the Supply Agreement.*

[26] 22 N.Y.3d 799 (N.Y. 2014).

### 1.  Supply Agreement § 9

Throughout its Statement of Damages and Answering Brief, Fairway repeatedly refers to "direct breach[es] of the service level commitment se[]t forth in Section 9 of the Agreement." (Statement of Damages 1 n. 2-3.) Section 9 of the Supply Agreement ("Service Levels") provided that the parties would compare Fairway's orders to White Rose's deliveries, and that, if White Rose did not fulfill a set minimum percentage of the orders, such failure, if not cured within thirty days after written notice, could provide grounds for termination of the Supply Agreement.

Section 9 provides no independent basis for assessing damages or for recharacterizing damages in any way. The only remedy—a separate grounds for termination of the contract—is clearly spelled out. Fairway's repeated invocation of a provision that clearly does not apply has no effect upon the analysis.

### 2.  Consequential Damages

Under the New York Uniform Commercial Code:

§ 2-713 Buyer's Damages for Non-delivery or Repudiation

(1) Subject to the provisions of this Article with respect to proof of market price (Section 2-723), the measure of damages for non-delivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this Article (Section 2-715), but less expenses saved in consequence of the seller's breach.

(2) Market price is to be determined as of the place for tender or, in cases of rejection after arrival or revocation of acceptance, as of the place of arrival.[27]

§ 2-715 Buyer's Consequential Damages

(2) Consequential damages resulting from the seller's breach include

---

[27] N.Y. U.C.C. LAW § 2-713.

(a) Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise . . . .[28]

Consequential damages occur when the non-breaching party "suffers loss of profits on collateral business arrangements,"[29] and seeks "to recover lost profits from lost sales to third-parties that [were] not governed" by the contract.[30] Unlike direct damages, which are the "value of the very performance promised,"[31] and "flow[] as a natural and probable consequence of the breach,"[32] consequential damages are "one step removed from the naked performance promised by the defendant."[33] Put as simply as possible, direct damages emanate from what comprises the "contract price" as evidenced by the plain language of the contract.

### 3. Biotronik

In *Biotronik*, the Court of Appeals of New York held that lost profits are direct rather than consequential damages when the plaintiff pays the defendant for a product at a price calculated as a percentage of the plaintiff's net sales of the product.[34] The court found it dispositive that the "plaintiff's resale price [was] a benchmark for the transfer price."[35] "The contract clearly contemplated that plaintiff would resell defendant's stents."[36] The "profits flow directly from the pricing formula."[37] Both "defendant and plaintiff depended on the product's resale for their respective payments."[38] The court distinguished this as a "quasi-joint venture" and "not a simple resale contract, where one party buys a product at a set price to sell at whatever the market may

---

[28] U.C.C. § 2-715.
[29] *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.* 487 F.3d 89, 109 (2d Cir. 2007).
[30] *Compania Embotelladora del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F.Supp. 2d 314, 322 (S.D.N.Y. 2009).
[31] *Schonfeld v. Hilliard*, 218 F.3d 164, 175 (2d Cir. 2000).
[32] *Am. List Corp. v. U.S. News & World Report, Inc.*, 75 N.Y.2d 38, 44 (N.Y. 1989).
[33] *Schonfeld*, 218 F.3d at 177.
[34] *Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 22 N.Y.3d 799, 803 (N.Y. 2014). Interestingly, though of no legal significance, *Biotronik* was issued the day before the parties signed the Supply Agreement.
[35] *Id.* at 808.
[36] *Id.*
[37] *Id.*
[38] *Id.* at 809.

-11-

bear."[39] The court further compared the relationship between the parties to the explicit joint venture from *Am. List Corp.*[40]

Here, the contract makes clear that there was no direct relationship between White Rose's sales to Fairway and Fairway's subsequent sales to third parties. First, section 19 of the Supply Agreement is titled "Not Joint Venturers," and reads, in full: "Nothing contained herein shall be construed to constitute the parties hereto as partners or as joint venturers and White Rose shall have no power to obligate or bind Fairway in any manner whatsoever or to act or purport to act for Fairway in any respect."[41] This provision negates one of the essential elements of a relationship that could turn lost profits that would otherwise be consequential into direct damages

Second, the price paid by Fairway plainly was not dynamically linked to a measure of its profits. Contrary to Fairway's argument, the link between price and profit must be far more substantial than section 10.1(a) of the Supply Agreement using "Aggregate Retail Price" to determine refunds for damaged products under the Reclamation Program. (Fairway's Answering Br. 29.)  Aggregate Retail Price is defined in Schedule A as the "total retail cost of any Product sold to Fairway hereunder as determined by using the average price charged by the Fairway Broadway store for such Product over the immediately preceding 12 (twelve) month period." This metric does not at all resemble the detailed pricing formula in *Biotronik*, which used "resale price as a benchmark for the transfer price" with percentages specified within the contract.[42]

---

[39] *Id.* at 803, 810 & n.7.

[40] *Am. List Corp. v. U.S. News & World Report, Inc.*, 75 N.Y.2d 38, 43 (N.Y. 1989) ("By express terms of the agreement . . . its appended schedule reflected the 'cost of this joint venture' to defendant and set forth the fees to be paid to plaintiff for a specific number of names to be provided by plaintiff in each of the 10 years contemplated by the contract.").

[41] *See also First Niagara Bank, N.A. v. Mortg. Builder Software, Inc.*, 2016 WL 2962817, at *8 (W.D.N.Y. May 23, 2016) ("But, unlike in *Biotronik*, the agreement here was not akin to a 'joint venture,' and there was no link between the payments First Niagara had agreed to pay and any third-party payments."); *PNC Bank, N.A. v. Wolters Kluwer Fin. Servs., Inc.*, 73 F.Supp.3d 358, 373 (S.D.N.Y. 2014) ("The payment relationship between PNC and WKFS, as contemplated under the [supply agreement], does not, however, resemble that in *Biotronik* . . . .").

[42] *Biotronik A.G.*, 22 N.Y. 3d at 808; *id* at 815 (Read, J., dissenting).

Fairway's argument that resale was a necessary component of the Supply Agreement based on certain sections of the Supply Agreement that apparently only determine the relationship between these two parties (sections 9 and 12) is overly broad and simplistic, and would turn nearly all consequential damages for lost profits into direct damages. The two missing elements, a relationship as at least quasi-joint venturers and dynamic pricing tied directly to profits, conclusively establish that the Supply Agreement, though negotiated by highly sophisticated parties, is a "simple resale contract," and Fairway's sales to its customers and profits derived therefrom were "one step removed from the naked performance promised" by the Debtors. Fairway's profits from sales to its customers were not included in the "contract price."

The claims for Lost Profits are therefore consequential and, as such, waived by section 33 of the Supply Agreement. The SJ Motion will be granted with respect to Lost Profits and such portion of POC 1868 is disallowed.

### C. Lost Deals due to Termination of the Buy and Hold Program

In the Statement of Damages attached to POC 1868, Lost Deals damages are described thusly:

> As of July 24, 2014, White Rose terminated Fairway's forward buying rights established pursuant to Section 6 of the Agreement. As a result, Fairway was unable to take advantage of a number of promotional deals that it otherwise would have if the Buy and Hold program had not been eliminated by White Rose.

(Statement of Reasons 1, n. 4; *see also id.* at 2 n.11.)

Section 6.1 of the Supply Agreement, under the heading "Buy and Hold Program," provides that, "White Rose agrees to purchase and store selected Products in bulk for Fairway . . . in order to provide Fairway with promotional pricing on such Products for time periods beyond the applicable customary promotional cycle."

-13-

### 1.  **Lost Deals as Characterized in POC 1868 are Consequential Damages**

Fairway's damages incurred as a result of the termination of the Buy and Hold Program are clearly consequential. The Debtors accurately describe the Lost Deals as follows:

> Fairway's proof of claim asserts a claim of damages for breach of the Buy and Hold Program as a form of lost profits, as Fairway hoped to benefit from locking in a current low price on an item and then re-selling it later for a higher price if market conditions warranted. This is a quintessential lost profit, and as such is a consequential damage expressly waived by the parties through operation of section 33 of the Supply Agreement. There is no language in the Supply Agreement referencing or giving any indication that Fairway's subsequent resale of products is relevant to the Buy [and] Hold Program, let alone that it was bargained for in connection with the Supply Agreement.

(Debtors' Reply 14.) As characterized in POC 1868, the Lost Deals concern "loss of profits on collateral business arrangements," and are consequential damages barred by section 33 of the Supply Agreement.

For these reasons, the SJ Motion will be granted with respect to Lost Deals.

### 2.  **Subsequent Recharacterizations**

Subsequent to filing POC 1868 and the attached Statement of Damages, Fairway has sought—both at oral argument and in its answering brief—to significantly recharacterize portions of its claim without seeking leave to amend, principally with respect to the Lost Deals category. Compare the above reproduced explanation of Lost Deals from the POC 1868 Statement of Damages and that from Fairway's 1868 Response and the First Sheils Declaration with that from Fairway's Answering Brief and the Revised Sheils Declaration. Received on October 20, 2015, the explanations in Fairway's 1868 and the First Sheils Declaration are substantially similar:

> In or around July, 2014, White Rose terminated Fairway's forward buying rights established under the Buy and Hold Program because of liquidity constraints. At that time, White Rose requested that Fairway "re-purchase" certain of the Fairway Products (that were sold to and held by White Rose under the Buy and Hold Program) as soon as possible . . . .

(First Sheils Decl. ¶ 13(a) n.6.) In the First Sheils Declaration ("Sheils Decl."), Sheils stated

several times that White Rose cancelled the Buy and Hold Program outright: as above,

"terminated Fairway's forward buying rights" (*Id.* ¶ 13(a) n.6); "the Buy and Hold Program

terminated by the Debtors in July, 2014 (the 'Lost Deals')" (*Id.* ¶ 19); "Lost Deals due to White

Rose's termination of the Buy and Hold Program" (*Id.* ¶ 39).

On January 25, 2016, Fairway filed their answering brief and what appeared to be another

copy of the First Sheils Declaration. Fairway gave no indication of the alterations contained

within the newly filed declaration, stating only that it was "filed contemporaneously herewith."

(Fairway Answering Br. 3.) Upon closer inspection, several footnotes and arguments were

altered, most significantly those relating to the Lost Deals category:

> In or around July, 2014, White Rose terminated Fairway's forward buying rights <u>in connection with certain private label ("PL") Products</u> it purchased and warehoused for Fairway under the Buy and Hold Program because of liquidity constraints. White Rose continued to purchase and warehouse other Products on behalf of Fairway under the Buy and Hold Program. Note the underlined text herein is meant to qualify the representation made in my previous Declaration submitted in support of Fairway's response to the objection filed by the Debtors to its proof of claim [D.I. 2435], to clarify that any termination of Fairway's forward buying rights under the Buy and Hold Program was solely as to the PL Products, and not a complete termination of the Buy and Hold Program itself.

(Revised Sheils Decl. ¶ 16(a) n.6.) The purported notice is less convincing when buried in a

footnote in an accompanying document. Compare further to the main document:

> White Rose terminated Fairway's forward buying rights in connection with certain private label ("<u>PL</u>") Products it purchased and warehoused for Fairway under the Buy and Hold Program because of liquidity constraints. Notwithstanding White Rose's discontinuance of the Buy and Hold Program for the PL Products, White Rose continued to warehouse other Products on behalf of Fairway. [Altered] Sheils Declaration, ¶16(a), n.6.

(Fairway's Answering Br. 15 n.15.) The remainder of the declaration is likewise altered to

remove references to the Buy and Hold Program's cancellation, and the section on Lost Deals is

entirely recontextualized to make out a new and separate claim for a "COGS Reconciliation Payment" under section 12.2 of the Supply Agreement.

Fairway first introduced the concept of this separate claim at the December 11, 2015, hearing, attempting to tie it to the claimed Lost Deals:

> [U]pon further investigation into the categories that were in—the amounts in this category, it incorporates not only the costs incurred by Fairway due to White Rose's inability to honor Fairway's forward buying rates that are established pursuant to section 6 of the Agreement, but it also includes the difference between a maximum COGS rate that the parties bargained for and the actual COGS rate that Fairway was charged by White Rose for the purchases it actually purchased from White Rose in the post-petition period.

(12/11/15 Tr. 6:9-20.) This recharacterization was unremarked upon at the time, but then was developed further in Fairway's Answering Brief and the Revised Sheils Declaration—wherein the grounds for damages were almost entirely unmoored from the Buy and Hold Program and connected to "Vendor Funding" instead. (Revised Sheils Decl ¶ 39 & n.10; *see also* Fairway's Answering Br. 12-13, 21.) At oral argument, the decoupling of Lost Deals from "due to Termination of the Buy and Hold Program" was completed, when Fairway argued: "There is no damages under the Lost Deals category relating to the termination of the Buy and Hold. It's just with respect to the COGS rate." (6/6/2016 Tr. 29:20-22; *see generally* 6/6/2016 Tr. 26:12-28:6.) The recharacterization is not legitimized by its gradual introduction.

Finally, the amount allegedly owed under what is now the COGS Reconciliation Fee has risen to roughly $30,000 more than in the original claim for Lost Deals in POC 1868. Fairway explains that this is because it has now, a year after the General Bar Date of February 6, 2015, chosen to include amounts it wishes to claim through the November 26, 2014, rejection date. (Fairway's Answering Br. 16 n.16.) Fairway further advises that it:

> reserves the right to amend its Claim to include all amounts incurred through the Rejection Date either at such time when the parties' begin the actual reconciliation of the Claim amounts asserted to reach a resolution on the Debtor's objection to its

Claim or, in the absence of such efforts, in advance of any final evidentiary hearing
on the Claim.

(Fairway's Answering Br. 13 n.13.)

The Debtors, in their Reply, describe this as a "complete overhaul of the description of the

Lost Deals Claim," and assert that it is an entirely new claim and therefore time barred. (Debtors'

Reply 14.) The Debtors allege that Fairway is trying to "completely alter the nature of its Lost

Deals Claim now, to avoid the effects of its prior voluntary waiver of consequential damages."

(*Id.* at 15.) Most seriously, the Debtor charges that Fairway, "finding no legitimate basis to

overcome" the section 33 waiver of consequential and incidental damages, "has apparently

resigned itself to obfuscation, deception and misrepresentation." (*Id.* at 19.)

I agree with the Debtors. There was no mention whatsoever of a COGS Reconciliation

Payment in the POC 1868 Statement of Damages,[43] nor has there been a motion to amend the

proof of claim. There appears to be no good excuse for the departure Fairway has made from the

original explanations attached to their claim or for the manner in which those arguments have

been advanced.

Therefore, I hold that Fairway, absent proper amendment of its claims, is bound to its

original characterization of damages as set forth in the POC 1868 Statement of Damages.

The SJ Motion will be granted with respect to Lost Deals.

**D. <u>Additional Freight & Upcharges Stemming from Emergency Purchases</u>**

In the Statement of Damages attached to POC 1868, Freight & Upcharge damages are

described thusly:

---

[43] The Statement of Reasons only mentions section 12 of the Supply Agreement under the heading of "Increased Product Cost Stemming From Emergency Purchases," with reference only to the "Maximum COGS Rate" (that the "aggregate cost of goods would be equal or less than 86.7% of the manufacturers list prices for such products") and no further explanation. Statement of Reasons 1 n.2, 2 n.9.

-17-

> Due to the severe product shortages White Rose Inc. ("White Rose") began experiencing in July 2014, [Fairway] was forced to source and/or warehouse the products it normally purchased through White Rose, as required by the attached [Supply Agreement], from other distribut[o]rs on a short term, emergency basis. This . . . resulted in Fairway having to pay significantly higher upcharge and fuel surcharge fees than it would have if Fairway had been able to purchase these products from White Rose (see, respectively, Sections 3.1 and 11.1 of the [Supply Agreement] setting forth upcharge and fuel surcharge fees considerably below what can be obtain[ed] on [an] ad hoc basis in the open market).

(Statement of Reasons 1 n.1; *see also id.* at 2 n.8.)

Section 3.1(a) of the Supply Agreement provides that Fairway pay White Rose additional set upcharge fees "based upon the underlying Primary Product category." The four product categories with set upcharge rates were "Dairy," "Grocery," "Frozen Food," and "Ice Cream." (*Id.*) Section 3.1(a) also included a method for setting the upcharge amounts based upon percentages of the "Manufacturer's List Price"[44] or the "Manufacturer's Cost to White Rose" as defined in Schedule A to the Supply Agreement.

Section 3.1(c) of the Supply Agreement provides that, "Subject to the provisions of ¶11 [fuel and water surcharges] and ¶3.4(b) [cart surcharges], there are no separate delivery charges for standard deliveries to [Fairway]."

Section 11.1 of the Supply Agreement provides that White Rose would "add a fuel surcharge to Fairway's invoices in the event that the average monthly price of diesel per gallon exceeds certain thresholds as set forth in the Fuel Surcharge Table . . . ." Section 11.1 additionally provides a method for setting the surcharge amount based upon the government's Central Atlantic Diesel Index. (*Id.*)

**1. Incidental Damages and Cover**

The New York Uniform Commercial Code provides, in relevant part:

---

[44] "'Manufacturer's List Price' shall [mean] the published cost of an item, readily available to retail grocers without negotiation and quantity requirement, *and including the cost of freight.*" Supply Agreement Sched. A (emphasis added).

§ 2-711 Buyer's Remedies in General

(1) Where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract (Section 2-612), the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid

  (a) "cover" and have damages under the next section as to all the goods affected whether or not they have been identified to the contract; or

  (b) recover damages for non-delivery as provided in this Article (Section 2-713).[45]

§ 2-713 Buyer's Damages for Non-delivery or Repudiation

(1) Subject to the provisions of this Article with respect to proof of market price (Section 2-723), the measure of damages for non-delivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this Article (Section 2-715), but less expenses saved in consequence of the seller's breach.

(2) Market price is to be determined as of the place for tender or, in cases of rejection after arrival or revocation of acceptance, as of the place of arrival.[46]

§ 2-712 "Cover"; Buyer's Procurement of Substitute Goods

(1) After a breach within the preceding section the buyer may "cover" by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.

(2) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (Section 2-715), but less expenses saved in consequence of the seller's breach.

(3) Failure of the buyer to effect cover within this Section does not bar him from any other remedy.[47]

§ 2-715 Buyer's Incidental Damages

(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or

---

[45] N.Y. U.C.C. LAW § 2-711.
[46] U.C.C. § 2-713.
[47] U.C.C. § 2-712.

commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.[48]

## 2.  The "Contract Price"

An injured party may recover the difference between the contract price and the cost of cover plus consequential and incidental damages.[49] The Debtors concede that the separate damages under the category of "Increased Product Cost Stemming from Emergency Purchases" are direct damages under the contract, but they argue that the Freight & Upcharges are covered by the waiver of incidental damages. The different treatment follows from what is or is not considered the "contract price." The Debtors' argue that the Freight & Upcharges are "charges, expenses or commissions in connection with effecting cover" or "any other reasonable expense incident to the delay or other breach," and that, although § 2-712(2) on "cover" adds "together with any incidental or consequential damages," that does not alter the characterization of the damages as incidental or the effect of the waiver. Fairway argues that the Freight & Upcharges were specifically negotiated as part of the contract, that such Upcharge Rates and Fuel Surcharges are customary in the industry, and that the rates in the Supply Agreement are lower than they would be without having been bargained for (as well as, presumably, far below the "emergency rates" they had to pay in these instances). Due to these circumstances, none of which are disputed by the Debtors, Fairway argues that the Freight & Upcharges are included in the "contract price" and therefore the costs to cover them are direct rather than damages incidental to cover.

"Costs of cover are generally considered to be direct damages."[50] I agree with the Debtors that damages incidental to obtaining the cover are still barred, but that does not change what

---

[48] U.C.C. § 2-715.
[49] *See* U.C.C. § 2-712.
[50] *Enron Wind Energy Sys., LLC v. Marathon Elec. Mfg. Corp. (In re Enron Corp.)*, 367 B.R. 384, 408 (Bankr. S.D.N.Y. 2007).

incidental means: incidental to the central bargained for provisions of the contract. Just as parties

can waive incidental damages, parties can, as here, agree to make what would otherwise be

incidental damages into direct damages via inclusion in the contract, whether for freight, as here,

or for warehousing and commissions traditionally considered incidental.[51] If it is in the contract, it

is in the contract price, but a claim is not self-activating: the burden to "allege facts sufficient to

support the claim" is on the claimant.[52]

　　　Fairway is partially correct. I agree that, in this instance and under these facts, the

Upcharge Rates and Fuel Surcharges as defined in the POC 1868 Statement of Damages (those in

sections 3.1 and 11.1 of the Supply Agreement) were bargained for, and are included in the

contract price. Therefore, amounts spent on higher Upcharge Rates and Fuel Surcharges as a

result of the Debtors' non-delivery with respect to the same products which are also the subject of

the Increased Product Cost category would be direct damages to the extent they are proven.

　　　However, a later explanation by Fairway states that it arrived at the final number for

Freight & Upcharges by "taking the total Upcharge Fees, Freight and fuel and/or water surcharge

fees actually charged by the Emergency Vendors and then subtracting the [amounts] that would

have been charged by White Rose under the rates provided for in the Supply Agreement."

(Revised Sheils Decl. ¶ 42.) Water Surcharges (addressed at section 11.2 of the Supply

Agreement) were not specified as a source of the Freight & Upcharges in POC 1868. (Statement

of Damages 1 n.1, 2 n.8.) Any Water Surcharge amounts included in the Freight & Upcharges

will therefore be disallowed, and more information and documentation will be required from

---

[51] *See, e.g., Kashi v. Gratsos,* 790 F.2d 1050, 1056 (2d Cir. 1986) (assuming without the necessity for further discussion that the "contract price" as defined by the N.Y. U.C.C. included the cost of delivery when the cost of delivery was included in the contract).
[52] *See In re Allegheny Int'l, Inc.,* 954 F.2d 167, 173-74 (3d Cir. 1992).

Fairway to establish the damages specifically due to covering Upcharge Rates and Fuel Surcharges.[53]

Most significantly, perhaps, the Supply Agreement provides that, "Subject to the provisions of ¶11 [fuel and water surcharges] and ¶3.4(b) [cart surcharges], *there are no separate delivery charges for standard deliveries to [Fairway].*" (Supply Agreement § 3.1(c) (emphasis added).) Emergency freight fees incurred in effecting cover due to non-delivery are customarily incidental damages and would otherwise be barred by section 33 of the Supply Agreement.[54] Here, to the contrary, Freight was bargained for and included in the contract, and so is included in the contract price.[55]

The Statement of Damages alleges that Fairway was forced "to source and/or warehouse" products from other suppliers. Any costs of warehousing or costs incurred while seeking alternate sources of products are incidental damages barred by section 33 as "expenses . . . in connection with effecting cover" or "expense[s] incident to the delay or other breach." Another set of barred incidental damages in this context would be any finder's fees and travel fees Fairway incurred while negotiating replacement Upcharge Rates or Fuel Surcharges, as they would constitute "expenses or commissions in connection with effecting cover."

At present, there is not enough information or documentation provided to parse the character of the different costs Fairway included under the Freight & Upcharges category. For this reason, the SJ Motion must be denied with respect to the Freight & Upcharges category.

---

[53] Fairway's Answering Brief appears to indicate surcharges for delivery by cart under section 3.4(b) of the Supply Agreement may be included in the Freight & Upcharges as well. Fairway's Answering Br. 21. Such amounts would be similarly disallowed.
[54] *See, e.g., Jay V. Zimmerman, Co. v. General Mills, Inc.,* 327 F.Supp 1198, 1205 (E.D. Mo. 1971) (holding that premium air-freight charges incurred in replacing dune buggies were incidental damages).
[55] Although Fairway did not directly refer to subsection 3.1(c) of the Supply Agreement in the Statement of Damages, and its relationship to the claim was not detailed therein, I will consider it incorporated into the footnote references to section 3.1 in general. *See* Statement of Damages 1 n.1, 2 n.8.

## **CONCLUSION**

For the reasons set forth above, the SJ Motion is granted with respect to the "Lost Profits Due to Service Level Breach" and "Los[t] Deals Due to Termination of the Buy and Hold Programs," and denied with respect to "Additional Freight & Upcharges Stemming From Emergency Purchases."

An appropriate order will follow.

BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT

DATED:  July 26, 2016

# APPENDIX A

| United States Bankruptcy Court for the Delaware<br>ADI Liquidation, Inc. (f/k/a AWI Delaware, Inc.) Claims Processing Center<br>c/o Epiq Bankruptcy Solutions, LLC<br>FDR Station, P.O. Box 5071<br>New York, NY 10150-5071 | **PROOF OF CLAIM FORM** |
|---|---|
| **Name of Debtor Against Which Claim is Held:**<br>White Rose, Inc. | **THIS SPACE IS FOR COURT USE ONLY**<br>Filed: USBC - District of Delaware<br>AWI Delaware, Inc, Et Al.<br>14-12092 (KJC)    0000001868 |
| **Case No. of Debtor:**<br>14-12097 | |

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| **Name and address of creditor (and name and address where notices should be sent if different from creditor):**<br><br>Fairway Group Central Services LLC<br>2284 12th Avenue<br>New York, New York 10027<br>Attention: Pat Sheils<br><br>Telephone number: 646-872-0360    Email Address: pat.sheils@fairwaymarket.com | ☐ Check this box to indicate that this claim amends a previously filed claim.<br><br>Court Claim<br>Number:_____<br>*(If known)*<br>Filed on:_____<br><br>☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. | **FILED / RECEIVED**<br><br>FEB 0 6 2015<br><br>Epiq Bankruptcy Solutions, LLC |
|---|---|---|

| **Name and address where payment should be sent (if different from above):**<br><br><br>Telephone number:    Email Address: | **THIS SPACE IS FOR COURT USE ONLY** | **5.    Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**<br><br>☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). |
|---|---|---|

1. **Amount of Claim as of** Contract rejection date: $ 1,290,779.66 *[See In re Continental Airlines, Inc., 166 B.R. 520, 525 (Bankr. D. Del. 1992)]*
   If all or part of your claim is secured, complete Item 4.
   If all or part of your claim is entitled to priority, complete Item 5.
   If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.
   ☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges.

2. **Basis for Claim:** Ours Amount in re: Vendor/Customer Supply Agreement (see attached)    *(See instruction #2 on reverse side)*

3. **Last four digits of any number by which creditor identifies debtor:** 6789
   3a. Debtor may have scheduled account as: having a cure amount of $44,539.18, which is much less than what was actually *(See instruction #3a on reverse side)* incurred by Fairway as a result of White Rose's breach of the Supply Agreement.

4. **Secured Claim** *(See instruction #4 on reverse side)*
   Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
   Nature of property or right of setoff: ☐ Real Estate ☐ Motor Vehicle ☐ Other
   Describe:_____
   Value of Property: $_____    Annual Interest Rate ____% ☐ Fixed or ☐ Variable (when case is filed)
   Amount of arrearage and other charges as of time case filed included in secured claim, if any:
   $_____
   Basis for perfection:_____
   Amount of Secured Claim: $_____    Amount Unsecured: $_____

Right-column (Section 5 continued):
☐ Wages, salaries or commissions (up to $12,475), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

☐ Up to $2,775 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☒ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)( 2 ).

**Amount entitled to priority:**

$ 919,514.75

6. **Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $_____    *(See instruction #6 on reverse side)*

7. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. *(See instruction #7 on reverse side)*

8. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8 on reverse side and definition of "redacted")*
   DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
   If the documents are not available, please explain:

9. **Signature:** *(See instruction #9 on reverse side)*   Check the appropriate box.
   ☐ I am the creditor    ☐ I am the creditor's authorized agent.    ☐ I am the trustee, or the debtor, or their    ☐ I am a guarantor, surety, indorser, or other codebtor.
   (Attached a copy of power of attorney, if any)   authorized agent.    (See Bankruptcy Rule 3004.)    (See Bankruptcy Rule 3005.)

   I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.
   Print Name: Kevin McDonnell    Title: Co-President & COO    Company: Fairway Group Central Services LLC
   Address and telephone number
   (if different from notice address above):
   2284 12th Avenue
   New York, NY 1002 7    X _____ (Signature)    February 5, 2015 (Date)
   Telephone number: 646-616-8181    email: Kevin.mcdonnell@fairwaymarket.com

   *Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

## STATEMENT OF DAMAGES INCURRED BY FAIRWAY DUE TO WHITE ROSE'S BREACH OF THE PARTIES' SUPPLY AGREEMENT

| | Additional Freight & Upcharges Stemming From Emergency Purchases[1] | Increased Product Cost Stemming From Emergency Purchases[2] | DAMAGES INCURRED BY AND/OR PRIOR TO SEPTEMBER 9, 2014 Lost Profits Due to Service Level Breach[3] | Loss Deals Due to Termination of the Buy and Hold Program[4] | Reclamation Amounts Owed[5] | Volume Rebates Owed[6] |
|---|---|---|---|---|---|---|
| SuperValu | $35,876.68 | $51,191.39 | NA | NA | NA | NA |
| J&J | $2,919.23 | $3,934.49 | NA | NA | NA | NA |
| UNFI | $4,795.50 | $9,661.31 | NA | NA | NA | NA |
| KeHE | $20,250.13 | NA | NA | NA | NA | NA |
| White Rose | NA | NA | $127,993.58 | $63,022.13 | $23,483.16 | $28,137.51 |
| Total = | $63,841.34 | $64,787.19 | $127,993.58 | $63,022.13 | $23,483.16 | $28,137.51 |
| Total Amount For This Period = | | | | | | $371,264.91 |

[1] Due to the severe product shortages White Rose, Inc. ("White Rose") began experiencing in July 2014, Fairway Group Central Services LLC and its affiliates (collectively, "Fairway") was forced to source and/or warehouse the products it normally purchased through White Rose, as required by the attached Vendor Supply Agreement (hereafter, "Agreement") (see Section 1.1 of the Agreement), from other distributors on a short term, emergency basis. This breach of the Vendor Supply Agreement (see Section 9 of the Vendor Supply Agreement guaranteeing services levels of 96% or higher depending on the product category) resulted in Fairway having to pay significantly higher upcharge and fuel surcharge fees than it would have if Fairway had been able to purchase these products from White Rose (see, respectively, Sections 3.1 and 11.1 of the Vendor Supply Agreement setting forth upcharge and fuel surcharge fees considerably below what can be obtain on and boc basis in the open market).

[2] Due to White Rose's severe product shortages discussed in footnote 1 above, which was a direct breach of the service level commitment sent forth in Section 9 of the Agreement, Fairway was forced to source products it normally purchased through White Rose from other distributors on a short term, emergency basis. As a result Fairway had to pay the manufacturer list price for these products, which was significantly greater than what it would have cost to purchase the products from White Rose (see Sections 12 of the Agreement guaranteeing that Fairway's aggregate cost of goods would be equal to less than 86.7% of the manufacturer's list prices for such products).

[3] Due to White Rose's severe product shortages discussed in footnote 1, which was a direct breach of the service level commitment sent forth in Section 9 of the Agreement, Fairway lost out on customer sales of more than $383,000 resulting in lost profits of $127,993.58.

[4] As of July 24, 2014, White Rose terminated Fairway's forward buying rights established pursuant to Section 6 of the Agreement. As a result, Fairway was unable to take advantage of a number of promotional deals that it otherwise would have if the Buy and Hold program had not been eliminated by White Rose.

[5] As required by Section 10 of the Agreement, Fairway was entitled to refunds equal to refunds equal to 60% or more (depending on the product category) of the aggregate retail price for all damaged, out-of-code or otherwise unsalable products that Fairway returned (i.e. sold back) to White Rose via its Reclamation Program. White Rose failed to pay Fairway its earned reclamation refunds for the months of July and August 2014 and for the period of September 1st thru September 9th, 2014.

[6] Pursuant to Section 7.2(o) of the Agreement, White Rose was required to pay Fairway following the conclusion of each fiscal quarter, a base volume rebate equal to 0.11% of Fairway's aggregate purchase during that quarter. White Rose failed to pay to Fairway its earned volume rebates for the months of June, July and August 2014 and for the period of September 1st thru September 9th, 2014, during which time Fairway purchased a total of $25,579,535 worth of good from White Rose.

STATEMENT OF DAMAGES INCURRED BY FAIRWAY DUE TO WHITE ROSE'S BREACH OF THE PARTIES' SUPPLY AGREEMENT

| | Additional Freight & Upcharges Stemming From Emergency Purchases[8] | Increased Product Cost Stemming From Emergency Purchases[9] | Lost Profits Due to Service Level Breach[10] | Loss Deals Due to Termination of the Buy and Hold Program[11] | Reclamation Amounts Owed[12] | Volume Rebates Owed[13] |
|---|---|---|---|---|---|---|
| **DAMAGES INCURRED BETWEEN SEPTEMBER 9TH, 2014 & OCTOBER 29TH, 2014 (ENTITLED TO ADMINISTRATIVE TREATMENT PURSUANT TO 11 U.S.C. §507(A)(2))[7]** | | | | | | |
| SuperValu | $179,860.79 | $174,170.73 | NA | NA | NA | NA |
| J&J | $18,574.03 | $15,043.73 | NA | NA | NA | NA |
| UNFI | $1,730.12 | $9,162.94 | NA | NA | NA | NA |
| KeHE | $41,176.31 | NA | NA | NA | NA | NA |
| White Rose | NA | NA | $300,232.46 | $146,620.06 | $16,868.18 | $15,738.86 |
| Total* | $241,341.25 | $198,377.40 | $300,232.46 | $146,620.06 | $16,868.18 | $16,075.40 |
| *Total Amount For This Period =* | | | | | | **$919,514.75** |
| *TOTAL CLAIM AMOUNT (i.e., $371,264.91 + $919,514.75) =* | | | | | | **$1,290,779.66** |

[7] White Rose's ability to continue doing business with customers like Fairway was essential to the preservation of White Rose's estate. See 11 U.S.C. §503(b)(1)(A) incorporated by reference into 11 U.S.C. §507(a)(2). See also In re Continental Airlines, Inc. 146 B.R. 520, 525-27 (Bankr. D. Del. 1992) (affirmed by In re Continental Airlines, Inc. 148 B.R. 207 (Del. Dist. Ct. 1992)).

[8] Due to White Rose's severe product shortages (discussed in footnote 1 above), which was a direct breach of the service level commitment sent forth in Section 9 of Agreement, Fairway was forced to source and/or warehouse the products it normally purchased through White Rose, as required by the Agreement (see Section 1.1 of the Agreement), from other distributors on a short term, emergency basis. As a result of this breach, Fairway had to pay significantly higher upcharge and fuel surcharge fees than it would have if Fairway had been able to purchase these products from White Rose (see, respectively, Sections 3.1 and 11.1 of the Vendor Supply Agreement setting forth upcharge and fuel surcharge fees considerably below what can be obtain on ad hoc basis in the open market).

[9] Due to White Rose's severe product shortages discussed above, which was a direct breach of the service level commitment sent forth in Section 9 of Agreement, Fairway was forced to source products it normally purchased through White Rose from other distributors on a short term, emergency basis. As a result Fairway had to pay the manufacturer list price for these products, which was significantly greater than what it would have cost to purchase the products from White Rose (see Sections 12 of the Vendor Supply Agreement guaranteeing that Fairway's aggregate cost of goods would be equal or less than 86.7% of the manufacturer's list prices for such products).

[10] Due to White Rose's severe product shortages discussed above, which again was a direct breach of the service level commitment sent forth in Section 9 of the Agreement, Fairway lost out on almost $900,000 worth of customers sales, resulting in lost profits of $300,232.46.

[11] As a result of White Rose terminating Fairway's forward buying rights established pursuant to Section 6 of the Agreement, Fairway was unable to take advantage of a number of promotional deals that it otherwise would have if the Buy and Hold program had not been eliminated by White Rose.

[12] As required by Section 10 of the Agreement, Fairway was entitled to refunds equal to 60% or more (depending on the product category) of the aggregate retail price for all damaged, out-of-code or otherwise unsalable products that Fairway returned (i.e., sold back) to White Rose via its Reclamation Program. White Rose failed to pay Fairway its earned reclamation refunds for the periods of September 10th thru 31st, 2014 and October 1st thru October 29th, 2014.

[13] Pursuant to Section 7.2(a) of the Agreement, White Rose was required to pay Fairway following the conclusion of each fiscal quarter, a base volume rebate equal to 0.11% of Fairway's aggregate purchases during that quarter. White Rose failed to pay Fairway its earned volume rebate for the periods of September 10th thru 31st, 2014 and October 1st thru October 29th, 2014, during which time Fairway purchased a total of $14,308,055 worth of good from White Rose.

2