UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ADI Liquidation, Inc., *et al.*,[1]<br><br>Debtors. | CHAPTER 11<br><br>Case No. 14-12092 (KJC)<br>(D.I. 1554, 2326)<br><br>(Jointly Administered) |

## OPINION[2]

BY: KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

### BACKGROUND

The following matters are presented for decision: McKesson Corporation's Application for Allowance of Administrative Claim and Proof of Setoff Right (D.I. 1554) (the "Application,"), to which the Debtors have filed the Debtors' Preliminary Objection to McKesson Corporation's Application for Allowance of Administrative Claim and Proof of Setoff Right (D.I. 2326) (the "Objection"). A hearing was held on September 17, 2015, prior to which the parties agreed that the arguments presented would address only the threshold issue of liability.[3] For the reasons stated

---

[1] By order dated September 10, 2014, this Court authorized joint administration of the following debtors in these chapter 11 cases: ADI Liquidation, Inc. (f/k/a AWI Delaware, Inc.); AW Liquidation, Inc. (f/k/a Associated Wholesalers, Inc.); NK Liquidation, Inc. (f/k/a Nell's Inc.); Co-Op Agency Inc.; AL Liquidation, Inc. (f/k/a Associated Logistics, Inc.); WR Liquidation, Inc. (f/k/a White Rose, Inc.); RT Liquidation Corp. (f/k/a Rose Trucking Corp.); WRSC Liquidation Corp. (f/k/a WR Service Corp.); WRSC II Liquidation Corp. (f/k/a WR Service II Corp.); WRSC V Liquidation Corp. (f/k/a WR Service V Corp.); and White Rose Puerto Rico, LLC (collectively, the "Debtors"). D.I. 45. Items on the docket for Case No. 14-12092 are referred to as "D.I. ___."

[2] This Opinion constitutes the findings of fact and conclusions of law, as required by Fed. R. Bankr. P. 7052. This Court has jurisdiction to decide this claim objection pursuant to 28 U.S.C. § 157 and § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), and (O).

[3] Debtors' Letter to Judge Carey, dated Sept. 10, 2015 (D.I. 2355) ("The Debtors, therefore, suggest to the Court that the Debtors Objection go forward on the September 17th omnibus hearing solely for legal argument upon the issue of whether McKesson can hold any administrative claim against any of the Debtors' estates under the terms and conditions of the applicable agreements…"); McKesson's Letter to Judge Carey,

herein, I find that the Customers (defined *infra*) are liable to McKesson for the payment that the Debtors failed to remit to McKesson.

**Procedural Background**

On September 9, 2014 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. On February 6, 2015, McKesson Corporation ("McKesson") filed identical Proofs of Claim (collectively the "McKesson Proofs of Claim") against AL Liquidation, Inc., NK Liquidation, Inc., AW Liquidation, Inc., ADI Liquidation, Inc., and WR Liquidation, Inc. (D.I. 2668 Ex. B-F). On the same day, McKesson also filed the Application, which describes McKesson's reasoning for the allowance of its alleged administrative claims and setoff rights. The Debtors objected to the Application by filing its Objection.[4] Thereafter, the parties submitted numerous briefs, attaching supplemental documents and declarations. An oral argument on the threshold issue of liability regarding the Objection was held, and I took this matter under advisement.[5]

---

dated Sept. 11, 2015 (D.I. 2363) ("McKesson agrees with the Debtors that the legal issue of the liability of the [Customers] raised by the Debtors' Objection will be a subject of the September 17 hearing.").

[4] D.I. 2326 (filed under seal) & D.I. 2327 (redacted version).

[5] A second hearing took place on April 26, 2016 at which the parties addressed issues concerning the remainder of McKesson's Proofs of Claim. A separate opinion will be filed which addresses those claim objections.

## FACTS

On March 14, 2014, McKesson and the Debtors entered into the Amended and Restated Supply Agreement (the "Supply Agreement").[6] Under the Supply Agreement, McKesson delivered goods to certain third-party entities, six of which are involved here (the "Customer(s)").[7] The Customers each entered into an agreement with McKesson (the "Participation Agreement(s)") whereby each Customer became a party to, and was bound by, the terms of the Supply Agreement. Pursuant to the Supply Agreement, McKesson delivered goods to the Customers.[8] Amounts due to McKesson in connection with the delivered goods were billed centrally through AWI. As such, AWI billed and received payment from the Customers. Payment to McKesson by AWI was remitted after deducting administrative fees.

McKesson and the Debtors (and by virtue of the Participation Agreements, the Customers) were parties to the Supply Agreement for the purposes of "(1) establishing a multi-year program for the supply of prescription drugs and other health and beauty care products by McKesson to Participating Pharmacies; and (2) having the billing associated with such program centrally billed through [the Debtors] for Equity Pharmacies."[9] Under the terms of the Supply Agreement, each contract year, the Customers were expected to purchase a total of $20,000,000 of goods from McKesson in exchange for certain benefits including discounts and rebates.[10]

---

[6] In the Application, McKesson maintains that the Supply Agreement continued a relationship that began in 2009. D.I. 1554 at 4.

[7] The Supply Agreement defines these third parties as "Participating Pharmacies." The term "Participating Pharmac(ies)" is further broken down into "Equity Pharmacies" and "Non-equity Pharmacies." The Supply Agreement defines "Equity Pharmacies" as "Participating Pharmacies which are equity members of AWI and for which billing is centralized through AWI." Each of the Customers referred to in this Opinion were Equity Pharmacies. The Supply Agreement defines "Non-equity Pharmacies" as "Participating Pharmacies which are not equity members of AWI and for which billing is not centralized through AWI."

[8] The Participation Agreements recite that they are an exhibit to the Supply Agreement.

[9] See Supply Agreement, at Intro.

[10] Section 5.A of the Supply Agreement specifically states, "[i]n consideration for the cost of goods specified herein, AWI, on behalf of the Customers, and Customers expressly commit to purchase a total of

3

During the days before and after the Petition Date, McKesson delivered goods to the Customers consistent with the orders they placed. The Customers then forwarded payment to AWI for the goods. However, AWI failed to remit those payments to McKesson.

McKesson contends that the Customers are jointly and severally liable to McKesson for payment under the Supply Agreement. If the Customers are jointly and severally liable, McKesson argues that it may seek payment from the Customers, even though the Customers already paid AWI.[11] McKesson further contends that the Customers would then have to pay for the goods twice, and would therefore have post-petition breach of contract claims against AWI based on AWI's failure to remit payment to McKesson.

McKesson ultimately entered into an Assignment Agreement Regarding Transfer of Claim (the "Assignment Agreement(s)") with each Customer, whereby each Customer transferred to McKesson any claim it possessed against AWI (the "Assigned Claims") in exchange for McKesson releasing each Customer of its obligations under the Supply Agreement (the "Release"). The Supply Agreement was rejected by the Debtors by Order dated December 16, 2014.[12]

---

$20,000,000 in New Direct Store Pharmacy Delivery Volume of Merchandise from McKesson each contract year." Supply Agreement at §5.A.

[11] The amount of these payments and withholdings, as well as the timing of the payments made, are disputed by the parties.

[12] D.I. 1198.

## STANDARD

Objection to a Proof of Claim

A claim that is properly filed under Rule 3001 and Bankruptcy Code § 501 is deemed allowed unless a party in interest objects.[13] When a claim objection is filed in a bankruptcy case, the burden of proof as to the validity of the claim "rests on different parties at different times."[14] The Court of Appeals for the Third Circuit described the burden shifting as follows:

> Initially, the claimant must allege facts sufficient to support the claim. If the averments in his filed claim meet this standard of sufficiency, it is *"prima facie"* valid. In other words, a claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward. The burden of going forward then shifts to the objector to produce evidence sufficient to negate the *prima facie* validity of the filed claim. It is often said that the objector must produce evidence equal in force to the *prima facie* case. In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence . . . . The burden of persuasion is always on the claimant.[15]

## DISCUSSION

On February 6, 2015, McKesson filed its Application seeking, *inter alia*, allowance and payment of the Assigned Claims totaling $748,076.18 as administrative claims under Bankruptcy Code section 503(b)(1)(A). McKesson's main argument rests on the theory that the Debtors' post-petition failure to remit payment to McKesson gives rise to an administrative expense claim for the Customers under the terms of the Supply Agreement. This argument can be parsed into three separate inquiries: (1) are the Customers liable to McKesson for the payment of the delivered goods,

---

[13] 11 U.S.C. §§ 501, 502(a); Fed. R. Bankr. P. 3001.
[14] *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992).
[15] *Id.* (citations omitted).

5

despite having already paid AWI for the goods; (2) if so, did the Customers have a cognizable breach of contract claim against AWI; and (3) if both inquiries are answered in the affirmative, is the resulting claim a post-petition priority administrative claim?

McKesson suggests that holding an evidentiary hearing is necessary before the Court can answer these questions. The first threshold issue of whether the Customers are liable to McKesson for the goods they received can be resolved as a matter of law. The two remaining issues, however, necessitate an evidentiary hearing. Specifically, the record is underdeveloped regarding (i) the timing of delivery of the goods giving rise to McKesson's asserted Administrative Claim; (ii) the timing of the Customers' payments to AWI in connection with the goods;[16] and (iii) the amount each Customer paid to, and withheld from, AWI. As such, an evidentiary hearing will be scheduled to determine the remaining issues surrounding the allowance of the claims asserted in the Application filed by McKesson.

### A. The Customers are Liable to McKesson for Payment under the Supply Agreement.

McKesson contends that the terms of the Supply Agreement and the Participation Agreement (collectively, the "Agreements") impose joint and several liability on the Customers for AWI's failure to remit its payments to McKesson. I must interpret the language of the Agreements in accordance with California law.[17] A decision from the Court of Appeals of California described the rules governing contract interpretation as follows:

---

[16] McKesson asserts that the goods were delivered on dates "straddling" the Petition Date. The lack of detail regarding timing and other facts is simply inadequate to determine the amount of any valid post-petition claim.

[17] Both the Supply Agreement and the Participation Agreement are governed by California law. See Supply Agreement, at ¶ 17(E).

6

The rules governing the role of the court in interpreting a written instrument are well established. The interpretation of a contract is a judicial function.[18] In engaging in this function, the trial court "give[s] effect to the mutual intention of the parties as it existed" at the time the contract was executed.[19] Ordinarily, the objective intent of the contracting parties is a legal question determined solely by reference to the contract's terms.[20] The court generally may not consider extrinsic evidence of any prior agreement or contemporaneous oral agreement to vary or contradict the clear and unambiguous terms of a written, integrated contract.[21] Extrinsic evidence is admissible, however, to interpret an agreement when a material term is ambiguous.[22]

Therefore, I must determine the objective intention of the parties at the time that the contracts were executed based on the terms of the Agreements, and can do so without the aid of extrinsic evidence.[23] As a preliminary matter, during the hearing held on September 17, 2015, the Debtors expressed the importance of distinguishing the manner in which Equity Pharmacies versus Non-equity Pharmacies are required to pay for goods pursuant to the terms of the Supply Agreement.[24] Equity Pharmacies have a centrally billed system through AWI (discussed *supra*).[25] However, Non-equity Pharmacies pay McKesson directly.[26] Taken together, the Supply Agreement

---

[18] *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1125–26, 76 Cal. Rptr. 3d 585, 601–602 (2008), as modified on denial of reh'g (June 4, 2008) citing *Pacific Gas & Electric Co. v. G.W. Thomas Drayage & Rigging* (1968) 69 Cal.2d 33, 39–40, 69 Cal. Rptr. 561, 442 P.2d 641 (*Pacific Gas & Electric*).
[19] Civ. Code, § 1636.
[20] Civ. Code, § 1639 ("[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible ..."); Civ. Code, § 1638 (the "language of a contract is to govern its interpretation ...").
[21] Code Civ. Proc., § 1856, subd. (a); *Cerritos Valley Bank v. Stirling* (2000) 81 Cal. App. 4th 1108, 1115–1116, 97 Cal.Rptr.2d 432; *Principal Mutual Life Ins. Co. v. Vars, Pave, McCord & Freedman* (1998) 65 Cal. App. 4th 1469, 1478, 77 Cal. Rptr. 2d 479 (parol evidence may not be used to create a contract the parties did not intend to make or to insert language one or both parties now wish had been included).
[22] *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1125–26, 76 Cal. Rptr. 3d 585, 601–602 (2008), as modified on denial of reh'g (June 4, 2008).
[23] There is nothing in the Participation Agreement to suggest that liability to McKesson is imposed on the Customers, so I turn to the language of the Supply Agreement, made part of the Participation Agreement, for guidance.
[24] D.I. 2915.
[25] Supply Agreement at p. 1.
[26] *Id.*

7

refers to both Equity Pharmacies and Non-equity Pharmacies as "Participating Pharmacies." In addition, each Customer referred to herein is an Equity Pharmacy.

In assessing the issue of the Customers' liability to McKesson, the following provision of the Supply Agreement provides some guidance:

> AWI agrees to be fully responsible for the payment of all charges incurred by any and all Equity Pharmacies under the Agreement . . . AWI will bill and receive payment directly from such Equity Pharmacies for their purchases and related charges hereunder, and any failure by any such Equity Pharmacy to pay such amounts due and owing to AWI shall not affect AWI's obligation to timely pay McKesson for them. *Nothing shall limit McKesson's rights and remedies to seek payment from Equity Pharmacies for amounts not paid when due by AWI.*[27]

This language is clear and unambiguous. Based upon the terms of the Supply Agreement, as well as its purpose (defined *supra*), it is evident that the mutual intention of the parties as it existed at the time the contract was executed, was to provide for the following arrangement: (i) McKesson was to deliver goods to the Customers; (ii) AWI was to bill and receive payment from the Customers; and (iii) AWI was to remit payment to McKesson. In addition, the terms of the Supply Agreement indicate that McKesson could seek payment from the Customers if AWI failed to make payments to McKesson.[28] Accordingly, I find that the Agreements impose liability on the

---

[27] Supply Agreement at 4.K (emphasis added). Of note, the Court also carefully considered the following provisions of the Supply Agreement:
    "For the purposes of this Agreement, 'due and payable' means that AWI or such Participating Pharmac(ies) shall make any payments due hereunder…" Supply Agreement at 4.C.
    "AWI, each Equity Pharmacy and each Non-equity Pharmacy, as applicable, agrees to render payment in full to McKesson on the applicable due date as specified in this Agreement …" Supply Agreement at 4.G.
    "Failure by AWI or any Participating Pharmacy to make any payment when due in accordance with the terms of this Agreement shall constitute a default." Supply Agreement at 11.A.

[28] Clearly, first and foremost, the Supply Agreement requires that AWI remit payment to McKesson for the goods. Counsel for AWI made this abundantly evident during oral argument. However, this situation requires the Court to look to the parties' intention, based on the language in the Agreements, in case of a situation when AWI does not remit payment. If presented with that situation, Section 4.K of the Supply Agreement simply could not make the parties' intentions more clear— "[n]othing shall limit McKesson's rights and remedies to seek payment from Equity Pharmacies for amounts not paid when due by AWI." This provision,

8

Customers to pay McKesson for the price of the goods ordered, notwithstanding the fact that they may have already paid AWI for such goods.

### **CONCLUSION**

For the reasons set forth herein, I conclude that the Customers were liable to McKesson. A status hearing will be held on July 10, 2017 at 11:00 a.m. to consider the remaining pre-trial needs of the parties; however, the parties should be prepared to engage in mediation before the Court fixes any evidentiary hearing. An appropriate order will follow.

BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT

DATED: June 28, 2017

---

taken together with the other relevant provisions of the Agreements, imposes liability on the Customers for the payment of the goods they received.

9