## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| ADI Liquidation, Inc. (f/k/a AWI | : | |
| Delaware, Inc.) *et al.*,[1] | : | |
| | : | |
| | : | Case No. 14-12092 (KJC) |
| Debtors. | : | (Jointly Administered) |
| | : | (Re: D.I. 4439, 4444) |

## MEMORANDUM SUSTAINING OBJECTION TO NO LIABILITY CUSTODIAL ACCOUNT CLAIMS[2]

### BY:   KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

Before the Court is the Objection to No Liability Custodial Account Claims (the "Objection")[3] filed by the post-confirmation debtors (the "Debtors") and the response filed by Richard B. Neff, Stephen R. Bokser and Rose-WR Partners, LP (the "Response").[4] A hearing was held on October 23, 2018.[5] Given that any right to payment of reversionary claims depends on the

---

[1] Pursuant to the Plan, each of the Debtors in these cases were substantively consolidated into one of the following entities, along with the last four digits of their federal tax identification number, AW Liquidation, Inc. (f/k/a Associated Wholesalers, Inc.) (7857) and WR Liquidation, Inc. (f/k/a White Rose Inc.) (1833). On July 11, 2017, the Bankruptcy Court entered an order closing the bankruptcy cases of AW Liquidation, Inc., (f/k/a Associated Wholesalers, Inc.) (7857); NK Liquidation, Inc. (f/k/a Nell's, Inc.) (1195); Co-Op Agency Inc. (4081); AL Liquidation, Inc. (f/k/a Associated Logistics, Inc.) (1506); RT Liquidation Corp. (f/k/a Rose Trucking Corp.) (2630); WRSC Liquidation Corp. (f/k/a WR Service Corp.) (5698); WRSC II Liquidation Corp. (f/k/a WR Service II Corp.) (9444); WRSC V Liquidation Corp. (f/k/a WR Service V Corp.) (4224); and White Rose Puerto Rico, LLC (4914). D.I. 4233. The Court ordered that the lead Debtor case, ADI Liquidation, Inc. (f/k/a AWI Delaware, Inc.) (3683) remain open and all docket entries be made in that case, notwithstanding the fact that ADI Liquidation, Inc. is now part of AW Liquidation, Inc.

[2] This Memorandum constitutes the findings of fact and conclusions of law required by Fed. R. Bankr. P. 7052. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(1), (b)(2)(A) and (b)(2)(B).

[3] D.I. 4439. The Debtors' Original Objection contained objections to (I) No liability custodial account claims, (II) No liability claims, and (III) Overstated Claims. On October 23, 2018, the Court entered an Order sustaining the objection to (II) No liability claims and (III) Overstated Claims. *See* D.I. 4463. Therefore, this Memorandum and Order address only the no liability custodial account claims. These claims are numbered 2114, 2111, 2113, 2110, 2115, 2112 and 1517.

[4] D.I. 4444.

[5] D.I. 4491.

existence of available funds, when those funds are exhausted, so are the reversionary rights to those funds. For the reasons set forth below, I will sustain the Objection and disallow the claims.

## FACTS[6]

On September 9, 2014, each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Prior to the petition date, AW Liquidation, Inc. (f/k/a Associated Wholesalers, Inc.) ("AWI") purchased the stock of Di Giorgio Corporation ("DGC"), pursuant to a Stock Purchase Agreement dated June 15, 2006 (the "SPA"). DGC previously adopted, and as of the petition date, maintained, the Third Restated Di Giorgio Retirement Plan (the "Pension Plan"). The Pension Plan was for non-union employees whose benefit accrual and participation were frozen in April 2005. As of the petition date, DGC and AWI were parties to certain agreements relating to the Pension Plan, including an agreement dated December 7, 2011 with Rose-WR Partners, LP, a Delaware limited partnership, Richard B. Neff and Stephen R. Bokser entitled the "Frozen DGC Retirement Plan Agreement" (the "Frozen Plan Agreement").

The Frozen Plan Agreement referenced the SPA Escrow, which was established by the SPA for the resolution of the Post-Closing Purchase Price Adjustments (as defined in the SPA) and indemnification claims under the SPA. The Frozen Plan Agreement provided, among other things, that the funds in the SPA Escrow would be held in a custodial account (the "Custodial Account") and that funds would be disbursed as contributions to the Pension Plan or to reimburse AWI and/or DHC for their contributions to the Pension Plan (a) in advance of the termination of the Pension Plan, or (b) in connection with the termination of the Pension Plan. The Frozen Plan Agreement also provided that if excess funds remained in the SPA Escrow after termination of the

---

[6] The parties do not dispute the following facts, many relating to the origin of the custodial account.

Frozen Plan Agreement, such funds were to be paid to the outstanding DGC stockholders, subject only to certain deductions for excise taxes and costs of termination advanced by the Debtors.

On August 11, 2016, the Debtors filed their Modified Second Amended Chapter 11 Plan of Liquidation (as confirmed, the "Plan") and related disclosure statement.[7] On September 30, 2016, the court confirmed the Plan.[8] On November 21, 2016, the Plan became effective in accordance with its terms (the "Effective Date").[9] On November 8, 2016, the Debtors filed their *Motion to Approve Compromise under Rule 9019 for Entry of an Order Approving Stipulation between and among Debtors, Creditors Committee and the Pension Benefit Guaranty Corporation Resolving Claims and Authorizing Use of Funds in the Custodial Account.*[10] On December 29, 2016, the Court entered an Order *Approving Stipulation between and among Debtors, Creditors Committee and the Pension Benefit Guaranty Corporation Resolving Claims and Authorizing Use of Funds in Custodial Account* (the "Custodial Account Order"),[11] which authorized the Debtors to use funds in the Custodial Account to reimburse themselves for certain pension related expenses and to satisfy, in part, the allowed claims of the Pension Benefit Guaranty Corporation ("PBGC").[12] In December 2017, the Debtors made an interim distribution to general unsecured creditors, including a distribution to the PBGC on account of its allowed general unsecured claims.

---

[7] D.I. 3155.
[8] D.I. 3679.
[9] D.I. 3918.
[10] D.I. 3834. The Claimants initially objected to the Motion, but later withdrew their objection. *See* D.I. 3920.
[11] D.I. 4022.
[12] PBGC timely filed three proofs of claim in connection with the Pension Plan, each of which was asserted against all of the Debtors. Proof of Claim no. 1600 totals approximately $5,257. Proof of Claim no. 1601 totals approximately $30,332,982, with portions of which to be administered as administrative expense claims. Proof of Claim no. 1602 totals approximately $3,170,388, with $73,360 of which was asserted as an administrative expense claim.

The claimants, Richard Neff, Stephen Bokser and Rose-WR Partners, LP (the "Claimants") do not dispute that the PBGC was entitled to a distribution, but dispute that the distribution caused the Custodial Account to become exhausted. Specifically, the Claimants argue that the Debtors have not presented sufficient evidence to overcome the prima facie validity of the claims. Further, the Claimants allege a breach of contract based on the Debtors' violation of the Frozen Plan Agreement. The Debtors rebut these arguments by presenting evidence of the Custodial Account's depletion and asserting that the Claimants failed to state a valid claim for breach of the Frozen Plan Agreement.

## DISCUSSION

I.  The Custodial Account Funds Have Been Exhausted Pursuant to the Custodial Account Order

The Claimants are responsible for alleging facts specific to support a legal basis for a claim. If the assertions meet this standard, then the claims are prima facie valid pursuant to Bankruptcy Rule 3001(f).[13] When an objection is filed, the objecting party bears the burden of presenting sufficient evidence to overcome the presumed validity and amount of the claim.[14] If the objecting party overcomes the prima facie validity of the claim, then the burden shifts back to the claimant to prove the validity of the claim by a preponderance of the evidence.[15]

The Claimants have demonstrated the prima facie validity of their claim under Bankruptcy Rule 3001. But the Debtors have overcome the presumption of prima facie validity by presenting evidence, supported by the declaration of Valerie E. DePiro (the "DePiro Declaration"), which states that the funds in the Custodial Account were exhausted pursuant to the Custodial Account

---

[13] *In re United Companies Financial Corp.*, 2001 WL 1819941 (Bankr. D. Del. Feb. 1, 2001) (citing *In re Allegheny International, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992)).
[14] *Id.*
[15] *Id.*

Order, and any reversionary interests were valued at $0.[16] The Debtors further supported their Objection by providing the second declaration of Ms. DePiro, (the "Supplemental DePiro Declaration"), which describes in detail how the Custodial Account funds were exhausted in accordance with the terms of the Custodial Account Order.[17] Specifically, on the Effective Date, the balance of the Custodial Account was approximately $7,909,153.21.[18] In February 2017, the Debtors directed the disbursement of $4 million from the Custodial Account to the PBGC, and the Debtors reimbursed themselves $1 million on account of fees and expenses, as specified in the Custodial Account Order.[19] Following these disbursements, at the end of February 2017, the balance of the Custodial Account was $2,913,390.79.[20]

In December 2017, the Debtors made interim distributions to general unsecured creditors holding allowed claims, including the PBGC.[21] According to the Plan, creditors holding allowed general unsecured claims against AWI were to receive 11% distributions, and creditors holding allowed general unsecured claims against WR debtors were to receive 8%.[22] The PBGC held a general unsecured claim in the amount of $25 million against both AWI and WR Debtors.[23] Therefore, the PBGC received an interim distribution of $2.75 million on account of its claim against AWI Debtors and $2 million on account of its claim against WR Debtors.[24] Thus, the $4.75

---

[16] *See* D.I. 4439. "As the funds from the Custodial Account have been exhausted pursuant the Custodial Account Order, any reversionary interest must be valued at $0. As a result, such claims do not evidence actual, valid liabilities of the Debtors' estates." ¶ 5.

[17] *See* D.I. 4455. "As the Custodial Account balance was less than the $4.75 million distributed to the PBGC on account of its allowed claims consistent with the Custodial Account Order the Debtors reimbursed themselves with all of the funds contained in the Custodial Account and closed the Custodial Account on or about January 8, 2018." ¶ 13. Both the DePiro Declaration and the Supplemental DePiro Declaration were admitted into evidence without objection.

[18] *See* D.I. 4455 at ¶ 4.

[19] *Id.* ¶ 5.

[20] *Id.* ¶ 6.

[21] *Id.* ¶ 7.

[22] *See* D.I. 4455, ¶¶ 8-9.

[23] *Id.* ¶ 10.

[24] *Id.* ¶ 11.

million distributed to the PBGC exceeded the $2,921,564.77 balance of the Custodial Account at the time of the transfers.[25] Accordingly, the balance of the Custodial Account was zero, and the account was closed on or about January 8, 2018.[26] The Claimants offered no credible evidence whatsoever and no reason to doubt the accuracy or credibility of the DePiro declarations. Ms. DePiro was present in the courtroom at the October 23, 2018 hearing, and was cross-examined by the Claimants' counsel.[27]

II.    The No Liability Custodial Account Claims Did Not Assert a Claim for Breach

The No Liability Custodial Account Claims do not assert claims for alleged breach of the Frozen Plan Agreement; each provide that the sole basis of their claims is for a reversionary interest.[28] The Claimants neither allege specific facts nor present evidence showing a breach in the Frozen Plan Agreement. Aside from the bald assertion in Claimants' response that there was a breach,[29] evidence of a breach was not provided, neither in the Claimants' response nor in the claims themselves.

---

[25] *Id.* ¶ 13.
[26] *Id.* ¶ 14. The Supplemental DePiro Declaration attaches a copy of a bank report for the Custodial Account's balance. The report indicates a beginning market value of $7,905,287,48 and ending market value of $2,913,390.79. As the Custodial Account was an investment account at Bank of America, the balance fluctuated daily depending on the value of investments held in the account. At the hearing, Ms. DePiro stated that the account was closed on or about January 8, 2018. Hearing Tr. 10/23/2018, p. 13:7-10.
[27] Hearing Tr. 10/23/2018, p. 13:7-25, 14:1-18.
[28] *See* D.I. 4439.
[29] D.I. 4444.

## **CONCLUSION**

For the reasons set forth above, I conclude that the Debtors have presented ample evidence demonstrating the duly authorized exhaustion of the Custodial Account. The Claimants have not reciprocated with any evidence to the contrary. The Debtors' Objection will be sustained. An appropriate Order follows.

BY THE COURT:

DATED:  February 22, 2019

KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT